Thomas M. Monson, SBN 071993
Susan L. Horner, SBN 144806
**MILLER, MONSON, PESHEL, POLACEK & HOSHAW**
A Partnership of Professional Law Corporations
501 West Broadway, Suite 700
San Diego, CA  92101
(619)239-7777
FAX: (619) 238-8808
e-mail: tommonson@erisa-law.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENT E. KIMBERLY, M.D., an individual,<br><br>                            Plaintiff,<br><br>v.<br><br>SHARP REES-STEALY MEDICAL GROUP INC. GROUP LONG TERM DISABILITY INSURANCE PLAN<br><br>                            Defendants. | CASE NO.:   **08 cv 0157 JLS (POR)**<br><br>FIRST AMENDED COMPLAINT TO DETERMINE AND ENFORCE RIGHTS FOR LONG TERM DISABILITY BENEFITS UNDER THE PLAN, CLARIFY FUTURE RIGHTS TO BENEFITS UNDER THE TERMS OF THE PLAN, AND FOR OTHER APPROPRIATE EQUITABLE RELIEF<br><br>ERISA § 502 (a)(1)(B) and (a)(3)<br>29 U.S.C. § 1132(a)(1)(B) and (a)(3) |

Plaintiff **KENT KIMBERLY, M.D.,**  ("Dr. Kimberly") complains and alleges as follows:

### *JURISDICTION  AND  VENUE*

**1.**     This Court's jurisdiction is invoked under the federal question jurisdiction of 28 U.S.C. §§ 1331 and 1337, and the Employee Retirement lncome Security Act of 1974, 29 U.S.C. § 1101, *et seq.* ("**ERISA**"),  29 U.S.C.§ 1132(a), (e), (f) and (g), as it involves a claim by Plaintiff for Long Term Disability ("LTD") benefits under an employee group welfare benefit plan governed by ERISA.

First Amended Complaint

2.    Venue is proper within the Southern District of California pursuant to 29 U.S.C. § 1132(e)(2), ERISA § 502(e)(2): this is the District where the ERISA Plan is established, maintained and administered, Defendants conduct business and may be found in this District and the ends of justice so require.

3.    The ERISA statute and the Secretary's Regulations provide, at 29 U.S.C. §1133, 29 C.F.R. § 2560.503-1(h)-(j) procedures for internal appeal and review of benefit denials.   After Dr. Kimberly appealed, Hartford commissioned new evidence and reports and immediately thereafter issued its "final" denial of further benefits communicating that Plaintiff's "administrative remedies" were exhausted.

### NATURE OF ACTION

4.    Dr. Kimberly's action under ERISA § 502(a)(1)(B) seeks recovery of his continued own-occupation disability benefits under the group LTD policy issued to Sharp Rees-Stealy Medical Group which employed him, seeks clarification of the terms of the Plan and of his rights under ERISA, including regarding a review of his appeal that was intentionally neither full nor fair, this court's nature of and scope of review pursuant to Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. Cal. 2006) *en banc* and Saffon v. Wells Fargo & Co., LTD Plan (re MetLife), 2008 U.S. App. LEXIS 8136 (9th Cir. Apr. 16, 2008), and regarding his future rights to benefits.

### PARTIES

5.    Plaintiff KENT E. KIMBERLY, M.D.  ("**Plaintiff**" or "**Dr. Kimberly**") is and at all times relevant herein has been a resident and citizen of the County of San Diego, State of California.

6.    Sharp Rees-Stealy Medical Group, Inc.'s (hereinafter "SRSMG") group disability plan ("The Plan") is an employee welfare benefit plan established and maintained for the benefit SRSMG's employees and is insured through an insurance policy issued by HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY.

7.    Plaintiff is informed and believes and thereon alleges that HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY d.b.a. ITT HARTFORD, INC. (hereafter, "**HARTFORD**"), real party in interest, is a corporation, duly licensed, organized and existing under the laws of the State of Connecticut with its principal home office located in Hartford, Connecticut, and is and at all times

relevant herein, has been licensed to do business as a foreign corporation in the State of California.

**8.**    Upon information and belief, HARTFORD is and at all times referenced herein was licensed to issue insurance policies in the State of California and is subject to the insurance laws of the State of California that regulate the insurance industry in this State.

### GENERAL ALLEGATIONS

**Insurance Coverage:**

9.    Upon information and belief, HARTFORD issued a group disability insurance policy number GLT 036915 and GLT 36000 to Policy Holder "United Services Employers Trust" and issued to SRSMG for its disability plan thereunder a benefit "Booklet Certificate" called Group Benefit Plan. This is the disability insurance that covers SRSMG physicians and SRSMG employees.

10.    Disability benefits under the Plan are subject to a 90-day "elimination period" before benefits begin and benefits are paid at 60% of the employee's predisability average monthly pay to a maximum monthly benefits cap of $10,000.

11.    The Plan defines Total Disability under the applicable "Option I" as:

"Disabled or Disability means Total Disability or Residual Disability or Totally Disabled or Residually Disabled.

Total Disability or Totally Disabled means that throughout the Elimination Period and until you reach the end of the Maximum Duration of Benefits for the option shown on your Certificate Validation Form, **you are unable to perform the Material and Substantial Duties of your Own Occupation due to an Injury or Sickness,** and are not earning more than 20% of your Average Monthly Pay.

You will not be considered Totally Disabled solely because of the loss or restriction of your license to engage in your Own Occupation.

**Residual Disability** or **Residually Disabled** means as a result of Injury or Sickness, you are unable to perform the Material and Substantial Duties of your Own Occupation on a full-time basis, but you are:
1.    performing at least one of the Material Duties of your Own Occupation or another occupation on a full-time basis; or
2.    performing each of the Material Duties of your Own Occupation or another occupation on a part-time basis; and
3.    you are earning more than 20% of your Average Monthly Pay, but less than 80% of your Indexed Average Monthly Pay.

> You will not be considered Residually Disabled solely because of the loss or restriction of your license to engage in your Own Occupation as defined under the terms of this plan.. .

12.    HARTFORD is the entity which must establish the reserves necessary for payment of the claim for its expected life.

13.    HARTFORD is the entity that either through itself or its agents, administers the claims and decides whether to pay the claims.

14.    HARTFORD is the entity which pays the claim from its assets.

**Occupation**

15.    Dr. Kimberly was a board certified full time Ophthalmologist (eye surgeon), employed beginning August 1992 with Sharp Rees-Stealy Medical Group Inc. (SRSMG).

16.    From a cognitive aspect, the occupation of an Ophthalmologist involves and/or requires, among other, sustained focused high-level mentation; critical and analytical medical thinking and decision making in patient work up, follow up and surgery; complex information processing and problem solving; initiative, dependability, vigilance, and attention to detail; rapid judgment and actions; multitasking; a high degree of accuracy and in which error can produce devastating results; unimpaired short and long term memory, unimpaired recall and attention for the providing of safe medical and surgical care throughout each day including while 'on call' and during emergency or trauma care as needed, during pre-and post surgical physical status and risk evaluation; the safe administration of any pharmaceutical agent needed during surgery, and the immediate recall of all the risks and interaction of each drug with other drugs the patient is taking; the ability to deal calmly and effectively with high-stress situations.

17.    With respect to physical requirements, the occupational specialty of eye surgeons require full range of body motion, prolonged fine manual and finger dexterity and eye-hand coordination, maneuvering of a range of applicable medical tools and equipment to the specialty and the ability to cope with stressful situations that may be random and unpredictable during surgery, including surgical complications, rush situations, potential life and death situations, dealing with complex medical and surgical issues and situations, complicated further by time constraints

/ / /

**Medical and Claim history**:

18.    Dr. Kimberly, born May 21, 1955, became disabled at age 46 on **May 31, 2001.**  He is currently 52 years old.

19.    Beginning in or about July 1998 and forward, Dr. Kimberly began suffering a constellation of symptoms including loss of energy, feeling increasingly fatigued, "pooped out", unable to concentrate, feeling "overwhelmed," increasingly irritable and had an increasingly depressed mood.

20.    Dr. Kimberly's physicians believe these symptoms to be representative of depression, and diagnosed him with Major Depressive Disorder ("MDD").  His psychiatrist  prescribed a series of anti-depressants, one after the other, including Zoloft, then Wellbutrin, then Effexor, then Remeron, then Celexa, then Zyprexa, then Lithium Carbonate, then Serzone, then Prozac, then Pamelor, then Nardill, then back to Zoloft.  Many of these antidepressant medications were at times given concurrently in apparently random fashion.  While many of them made his symptoms increasingly worse, the remainder produced no appreciable lasting beneficial effect.

21.    Dr. Kimberly's physician placed him on disability from November 2, 2000 to November 27, 2000 to rest and recover.

22.    When he returned to work in or about end-November 2000, and after, he continued to struggle with fatigue, insomnia, sense of work "overload", had continued anxiety attacks, had to expend twice the effort to accomplish routine results, and continued to suffer depression.

23.    In early 2001, Dr. Kimberly was complaining of sleep-cycle disturbance, indecisiveness, decreased concentration, anxiety, free-floating panic, feeling unmotivated, unproductive, able to work only "with great effort", suffered constant "dull and spacey" feelings, developed mild tremors, and reported being "ok if active, otherwise falling asleep."

24.    He was again placed on disability **May 31, 2001**, carrying the diagnosis of MDD, hypertension and hypercholesterolemia.  He began Ativan for anxiety, which also did not resolve his symptoms, but which he took until October, 2002.

25.    After starting Ativan, his lethargy, fatigue, anxiety and depression continued.  He returned to work for approximately one week in late June and on July 6, 2001, fell asleep at the wheel while driving and crashed into the median, and was immediately returned to disability by his physicians and

medically disallowed to return to work as an Ophthalmologist.  He was referred to a neurologist and a pulmonologist for a "sleep study" due to his blacking-out and excessive daytime sleepiness and possible correlation with the rest of his resulting symptoms.

26.    Dr. Kimberly's specialists noted a thick neck, his hypertension and hypercholesterolemia, a large weight gain of 44 pounds in 18 months, and when questioning his wife, received reports that she had noticed snoring, periods of apnea (cessation of breathing) during sleep, choking and gasping.  The one sleep study revealed the culprit:  he was "suffocating at night."  That night, he had 344 episodes of desaturations, oxygen saturation down to the 60 percent range and a respiratory disturbance index consistent with *severe Obstructive Sleep Apnea Syndrome* ("**OSAS**").  This diagnosis was made on **August 31, 2001.**

27.    The 90-day "elimination period" before which disabled participants cannot receive benefits, ran from May 31, 2001 to September 7, 2001, the benefits start date.

28.    Upon information and belief, a *"Syndrome"* is a set of symptoms or conditions that coexist or occur together and suggest the presence of a certain disease / a group of signs and symptoms that collectively define or characterize a disease or disorder.

29.    Upon information and belief, symptoms of sleep apnea may include restless sleep, loud, heavy snoring often interrupted by silence and then gasps,  excessive daytime sleepiness, falling asleep while driving and/or during the day, morning headaches, feeling mentally dull, groggy, confused, or disoriented particularly on awakening, loss of energy, lack of concentration and limited attention, uncharacteristically irritable, forgetfulness, memory loss, poor judgment, significant deterioration in functions requiring concentration or dexterity,  personality changes, mood or behavior changes, anxiety attacks, depression, obesity.

30.    OSAS, a physical condition or disease associated with a syndrome of clinical signs and symptoms, often goes undiagnosed and untreated for years because its symptoms may be confused as arising from some other disorder.

31.    Upon information and belief, untreated OSAS is associated with the development of hypertension, coronary artery disease, impotence, cognitive dysfunction, <u>memory loss</u>, psychiatric problems, stroke and death.

32.    "Successful" treatment of OSAS is dependent not only upon the level of reduction of respiratory disturbance on periodic sleep studies to "normal" levels, but by the elimination of symptoms produced by OSAS like fatigue and depression and the patient's personal sense of well-being.

33.    Hartford began paying Dr. Kimberly monthly benefits as of approximately September 8, 2001 under a Mental Illness provision in the policy, which would limit benefits payments for 24 months instead of to age 65.  The provision states:

> MENTAL ILLNESS AND SUBSTANCE ABUSE BENEFIT
>
> A Monthly Benefit for a Disability due to Mental Illness or Substance Abuse will be payable up to a total of 24 months during your lifetime for all Disabilities due to Mental Illness or Substance Abuse, providing you satisfy the Elimination Period under this plan. A Monthly Benefit will continue to be paid for a Disability due to Mental Illness or Substance Abuse beyond 24 months of benefits only if you are confined to a Hospital or Medical Facility licensed to provide care and treatment for the condition causing the Disability. If you are reconfined under the Recurrent Periods of Disability provision of this plan, a Monthly Benefit will be paid only during the period of your reconfinement.

34.    In or about September 2001, Dr. Kimberly was prescribed a basic "CPAP" (Continuous Positive Airway Pressure) nasal mask, as opposed to the more-advantageous "autotitrating CPAP", to wear during sleep in the attempt to treat the OSAS nonsurgically.  The CPAP nasal mask often becomes displaced or produces other side effects.

35.    Dr. Kimberly underwent a second self-administered sleep study at home while on the CPAP nasal mask, on one night.  While it showed some improvement, continued periods of desaturation, apneas, hypopneas occurred, and he continued to demonstrate OSAS-related symptoms of anxiety and depression, especially in the morning, nervousness, and some complaints of memory problems.

36.    Then-unknown to Dr. Kimberly as being contraindicated in OSAS patients, Dr. Kimberly remained on Ativan.

37.    Multiple night *in-patient* sleep studies to determine night-to-night variability in the severity of the continuing apnea, hypopneas, desaturation, both levels and duration were never performed.

38.    Upon information and belief, problems with CPAP include dry mouth, air leaks and pressure sores at the mask interface, impacting the ability to consistently use the treatment, barotrauma, pneumothoraces, aerophagia  — and all of the problems impacting comfortable uninterrupted sleep.

39.     Dr. Kimberly's records reflect poor tolerance of the CPAP mask due to one or more of the above problems.

40.     Because his symptoms remained multiple and continued to significantly interfere with his function, Dr. Kimberly was losing hope that no treatment would work, so his psychiatrist, focusing on the anxiety and depression, suggested trying bilateral Electroconvulsive Therapy ("ECT").

41.     The signed ECT consent form of 11/8/2001 lists various known side effects and risks of ECT generally including "memory loss lasting from an hour or so after each treatment to spotty losses lasting for several months or years after a series of treatments," and "there may be serious complications of . . . brain functioning as a result of the treatments or procedures used with the treatment."

42.     No separate list of risks were identified for patients undergoing bilateral versus unilateral ECT.

43.     Dr. Kimberly was never advised before or during the bilateral ECT procedures of any particular risks or problems experienced by patients who undergo ECT *and who have concurrent severe OSAS.*

44.     Dr. Kimberly underwent 16 *bilateral* ECT procedures under anesthesia during the five weeks between November 9, 2001 (the first) and December 14, 2001 (the 16th). Unfortunately, minimal post-procedure monitoring during the anesthesia recovery period was provided either during the first procedure, and or the remaining 15 procedures when he was simply sent home to go to sleep and recover on his own.

45.     Throughout the five-week 16-bilateral ECT treatment period, Dr. Kimberly was kept on Ativan. He was also administered additional intravenous or, worse, intramuscular Ativan when he became agitated and combatant immediately after completion of the ECT procedure. He was also given intramuscular Versed, another central nervous system (CNS) depressant.

46.     Starting with the second ECT, and progressively worsening thereafter, Dr. Kimberly began reporting significant (and significantly increasing) memory problems, agitation, and finally, after the 16th procedure, inability to remember anything. He became incapable of decision making and, after the final treatment, did not know his name, or who his wife was. He was initially unable to drive, no longer able to remember how to get to the store, lost his way en route, could not remember where he was going.

47.    Dr. Kimberly's memory loss continued, particularly when confronted with multiple demands.  He was unable to listen and write at the same time.  He remained forgetful, frequently misplacing things, continued to complain of trouble sleeping, excessive daytime sleepiness, lack of energy, tiredness, depression, suffered morning headaches, continued to feel mentally dull, groggy, confused, or disoriented particularly on awakening, still suffered loss of energy, suffered short term memory loss, loss of ability to sustain focus and concentration, had limited attention, had major problems with comprehension, suffered decreased dexterity, was uncharacteristically irritable with personality changes, mood and behavior changes and anxiety attacks.

48.    On <u>January 14, 2002</u>, Dr. Kimberly's was diagnosed with low Testosterone levels (also called Low T or hypogonadism) which required monthly intramuscular serum Testosterone Injection of Depotestosterone to produce a *short-lived* normal level (in September 2002) with continuing injections through 2003, 2004, wherein levels fluctuated and while usually remained low, would intermittently return to normal for short periods.

49.    Low testosterone levels may trigger clinical depression and/or irritability, fatigue, inability to concentrate, insomnia, decreased sex drive,  reduced muscle mass and strength/weakness, increased body fat, decreased bone density and osteoporosis, in men.

50.    In <u>June 2002</u>, Dr. Kimberly's physicians scheduled him for major surgery for his OSAS through a four-stage operation (Uvulopalatopharyngoplasty (UPPP) for disease of the pharynx, tonsillectomy for hypertrophied tonsils (reactive lymphoid hyperplasia), base of tongue (BOT) reduction to tongue disorder)  —the first of which surgeries was performed on June 28, 2002.

51.    Dr. Kimberly discontinued Ativan in October 2002.

52.    The results of Dr. Kimberly's second self-administered, at home sleep study on one night at end-August 2002, while improved, still showed mild desaturations.  There was no formal laboratory sleep study performed.

53.    In August 2002, Dr. Kimberly underwent psychologic testing at the request of the Social Security Administration.  The testing psychologist noted that Dr. Kimberly's impaired "ability to abstract verbally . . . suggests possible <u>brain organicity on his dominant side</u>"; he demonstrated "low verbal subscore" on a test that "is very sensitive to brain damage"; and the test findings suggested "failing

First Amended Complaint

competency" in his immediate memory function.  The conclusion was that Dr. Kimberly was unable to return to work due to a <u>problem in the frontal lobe of his brain</u>.

54.     All of Dr. Kimberly's physicians and his family noted his significant memory problems, forgetfulness, lack of concentration, substantial short-term memory loss and loss of the ability to sustain attention.  His memory had become completely compromised after the ECT treatments.

55.     Dr. Kimberly's diagnoses based on his testing and clinical presentation were Amnestic Disorder and Cognitive Disorder, unable to sustain attention for any length of time, memory problems, inability to carry out and remember instructions, unable to do complex intellectual tasks.

56.     Dr. Kimberly learned much later that **Ativan**, which was not discontinued until October 2002 (10 months after the last of the 16 bilateral ECT treatments), is a central nervous system (CNS) depressant *which produces a tranquilizing action on the central nervous system*, and that it is therefore *contraindicated in patients whose oxygen saturation is already depressed* — such as Dr. Kimberly's was throughout that time.

57.     The Kimberly's attempted on numerous occasions to discuss with Hartford personnel the origin of Dr. Kimberly's problem as being that produced by chronic sleep apnea and significant sleep apnea at the same time he underwent the 16 bilateral ECT treatments under anesthesia without monitoring during the post-anesthesia recovery period.

58.     On October 9, 2002, Dr. Kimberly underwent another OSAS surgery on the Tongue Base "Somnus."

59.     While Dr. Kimberly's depression markedly improved after OSAS surgery, he continued to experience ongoing significant short term memory deficiencies, forgetfulness, unable to remember things on a daily basis, inability to complete tasks, could not multi-task, and continued to have major problems with comprehension.

60.     In January 2003, his pulmonologist diagnosed that Dr Kimberly still had "OSA despite S/P UPPP and TONGUE SURGERY x2";  in February 2003 he began using a BiPAP machine;  and subsequent sleep testing in mid-March 2003 showed continued **mild desaturations**.

61.     In April 2003, Dr. Kimberly purchased, outside his medical plan, an "auto-titrating sleep machine.

62.    Testosterone levels also continued to measure intermittently low even though injections continued, periodically returning to within the normal range such as August and September 2003.

63.    In or about May 2003, while Dr. Kimberly noticed improvement in his "mood" (had less depression and anxiety),   his memory impairments and frontal-lobe complaints remained unchanged, with complaints such as: "Can't do multiple tasks," lost 'memory', "I can't organize," "I lose things"; he continued to be distracted by small things when talking, continued to have difficulty with complicated calculations; cannot remember things he reads; had trouble with complex instructions and directions; forgets something that has occurred in last day or two before;  fails to complete tasks he starts because he has forgotten he was doing it;  almost always forgets things that he has agreed to do;  needs supervision in paying the bills, needs help keeping himself on task.

64.    In May 2003, Dr. Kimberly underwent additional neuropsychological testing with Barbara Schrock, Ph.D., which demonstrated improvement over the significantly more limited testing conducted by Dr. Vincent for the SSA before Dr. Kimberly's second OSA surgery, testosterone treatment, and discontinuation of Ativan, but nevertheless demonstrated deficits of verbal fluency, visual attention, verbal memory, and perseverative tendencies, and states her belief that his test scores (scored from an earlier GDF scoring system which was replaced a year later), "may represent a mild underestimate of the patient's current neuropsychological status" reflect her perception that the patient had a greater degree of neuropsychological impairment than  demonstrated at test performance.

65.    Dr. Kimberly was advised at end-August 2003 about his cognitive impairments as relevant to his occupation as an eye surgeon by his now long-treating psychologist: :

"Performance subtests you obtained scaled scores of  9 on the Picture Completion and Digit Symbol Coding Subtests, which places you at the 37th percentile. The Picture Completion subtest measures visual concentration  and the discovery of inconsistencies. In this test, you must concentrate on internalized and externalized patterns and identify how an external pattern differs from an internalized  pattern. The Digit Symbol subtest measures speed and visual motor coordination. Your Index scares were also reviewed. The Index scores reflect processes  underlying the IQ scores. The Verbal Comprehension Score was at the 68th percentile, the Perceptual Organization score was at the 77th percentile, and the Working Memory score was at the 84th percentile. However, the processing speed was at the 47th percentile. Your performance on the Wisconsin Card

First Amended Complaint

Sorting test was impaired because of a high number of perseverations. In terms of the Digit Vigilance Test, your score fell within the mildly impaired range in terms of accuracy. Your Verbal memory was mildly impaired at immediate recall. On the Buschke Verbal Selective Reminding test, your ability to learn an unorganized list of words was mildly to moderately impaired in terms of long-term storage of information and retrieval of information.

As I noted to you, there are many positive aspects in your functioning. However, I wanted to examine issues with you and to provide you with feedback on factors that may influence your providing direct patient care. **Based on the above information, I strongly believe your ability to provide direct patient care as an ophthalmologist would be significantly compromised**.

66.    Dr. Kimberly's long-treating psychiatrist is of the professional opinion that despite Dr. Kimberly's recovery from depression, he continues to demonstrate evidence of brain damage, most likely as a result of chronic hypoxemia, which causes him to be unable to work as an ophthalmologist.  He stated in January 2004, "Dr. Kent Kimberly has a cognitive brain disorder. He is unable to practice medicine at this time and it appears that this is a permanent disability."

67.    Dr. Kimberly's physicians at no time released him to return to work in his occupation and opined that based on a number of tested items that they specifically discussed, advised Dr. Kimberly that his "ability to provide direct patient care as an ophthalmologist would be significantly compromised" indicating his continued disability.

68.    Hartford continued to pay Dr. Kimberly throughout this time under the "mental illness" provision, disregarding his severe OSAS problems.

69.    The 24-month "mental illness" benefits limitation ended September 7, 2003.  Hartford continued paying the claim without admission of any continuing liability while it conducted its 'review' of the claim.

70.    Throughout the period May 31, 2001 to September 7, 2003, Hartford steadfastly refused to reclassify the cause of Dr. Kimberly's disability to one other than "mental illness" for which there is a 24-month benefits limitations.

/ / /

71.    Hartford admitted to Dr. Kimberly, however, that mental illness does not include dementia, organic brain syndromes, and other syndromes described in the policy.

72.    On **April 29, 2004**, effective April 1, 2004, without prior notice to Dr. Kimberly or further clarification, investigation, examination, face-to-face interview or field visit, or input from Dr. Kimberly's long treating specialists, Hartford issued a 5-page letter terminating Dr. Kimberly's own-occupation disability claim and ceased payment of monthly LTD benefits of $4,331.00.

73.    The first two pages of the April 29, 2004 adverse decision quoted the disability definitions from the policy and listed various selected documents that had been reviewed. Under the 24-month "mental illness" limitation Hartford had steadfastly applied , Hartford found Dr. Kimberly was no longer depressed. Hartford parroted the position of its psychologist reviewer, Milton Jay, Ed.D., through University Disability Consortium (UDC), whose March 2004 review report focused on "depressive symptoms," which Dr. Jay asserted were currently  "mild"  —also commenting that Dr. Kimberly's current "sleep apnea appears to be under reasonable control." Dr. Jay focused on Dr. Schrock's July 2003 report of her May 2003 limited neuropsychological testing which, Dr. Jay asserted, "showed many normal findings," ignoring the test scores that showed that Dr. Kimberly's "ability to provide direct patient care as an ophthalmologist would be significantly compromised."

74.    Dr. Jay also ignored Dr. Eaton's opinion that Dr. Kimberly continued to be disabled by a "cognitive brain disorder" — except to characterize this as "selected cognitive performance weaknesses with uncertain validity" — also ignoring all of the Claimant's statements and witness descriptions of his major problems exhibited at home.

75.    Milton Jay did not state a conclusion that Dr. Kimberly had no brain damage but advised Hartford that "only rigorous neuropsychological re-evaluation showing the same weaknesses, in the context of definitive cognitive symptom validity testing showing normal findings, would validate the cognitive difficulties, in my opinion."

76.    Hartford failed to order "rigorous neuropsychological testing, despite its reserved right to do so in the policy and the above statement by Milton Jay.

77.     Hartford failed to conduct a comprehensive face-to-face history and physical examination to assess, first hand, Dr. Kimberly's consistently-reported and third-party confirmed memory problems,

despite the fact the right to do so was specifically reserved in the Plan.

78.    Therefore, based upon said selective "paper review" by Milton Jay, EdD, that Plaintiff's "depression and sleep apnea conditions are under good control" and assertion that "only mild residual symptoms" remained and that "these conditions did not appear to be significantly impairing," Hartford's overall April 29, 2004 conclusion to avoid further benefits liability was: there is "no clear valid basis for restrictions and limitations which would preclude you from working as an ophthalmologist."

79.    Prior to its termination of the claim and benefits, Hartford did not send Dr. Kimberly or his physician specialists a copy of  Milton Jay, EdD's, report for comment or input.

80.    Hartford's "review" did not investigate or consider the combination effects of the brutal 16 bilateral electroconvulsive shock treatments under anesthesia and while on CNS-depressant Ativan in the presence of severe OSAS and minimal post-anesthesia monitoring through November/December 2001, which produced thereafter Plaintiff's cognitive problems as alleged herein..

81.    While Hartford's conclusion was that nothing would preclude Dr. Kimberly "from working as an Ophthalmologist," Hartford did not apply the policy definition or state that Hartford had made the assessment that Dr. Kimberly was actually **"able to perform the Material and Substantial Duties of your Own Occupation [eye surgeon] due to an Injury or Sickness**, and are not earning more than 20% of your Average Monthly Pay" as set forth in the Plan.

82.    Hartford claimed that its decision to terminate the claim was based on "all the documents contained in your claim file viewed as a whole."

83.    Hartford told Dr. Kimberly he could "appeal" the decision within 180 days, and that he would then "receive a full and fair review."

84.    Hartford did not explain what it would consider to be a "clear" or "valid" basis for "restrictions and limitations which would preclude you from working as an Ophthalmologist."

85.    Hartford did not indicate what additional clarification, testing, or analysis it would need to understand the relationship between Dr. Kimberly's impairments in relation to performing each of the material and substantial duties of he own occupation.

86.    Hartford did not inform Dr. Kimberly that he should obtain an updated comprehensive neuropsychological evaluation.

87.    Hartford asked Dr. Kimberly for nothing specific.

88.    In the meantime, the insurance company for Dr. Kimberly's individual insurance policy, UNUM Provident, had accepted and paid and were continuing to pay Dr. Kimberly's own-occupation disability claim.

89.    In addition, the Social Security Administration granted disability benefits for what it determined to be Dr. Kimberly's inability to perform any gainful occupation as a result of his memory and cognitive problems.

90.    Unaware of what he should submit because Hartford provided him no direction, Dr. Kimberly underwent current rigorous and comprehensive neuropsychological testing, face-to-face personal and family interviews with the testing board certified clinical and forensic neuropsychologist, Dr. Clark Clipson, Ph.D., who also conducted research of pertinent medical literature regarding memory disturbances connected with OSAS and repeat bilateral ECT procedures.

91.    Dr. Clipson discussed the prior test results against the corrected norms noting Dr. Kimberly's findings were "indicative of significant loss of intellectual ability," and discussed results of current testing of Dr. Kimberly, who demonstrated, among other, a "Global Deficit Scale (GDS) T-score of 39 (14th percentile), indicating mild overall cognitive impairment," and "Significant discrepancies between his actual and predicted performance on measures of Verbal Comprehension and Processing Speed . . . , based on his performance on a measure of pre-morbid intellectual functioning . . .."

92.    Dr. Clipson found evidence demonstrating "impaired performance on measures of sensory-perceptual functioning, auditory comprehension, short-term memory, long-term memory, and motor functioning" which he stated "is consistent with the kinds of deficits one would expect from chronic hypoxemia." He concluded there was "significant and substantial" evidence that Dr. Kimberly had indeed suffered some degree of brain damage and "currently demonstrates mild cerebral dysfunction."

93.    The clinical and forensic examiner, Dr. Clipson, stated ECT is known to cause memory problems more so with bilateral ECT, that OSAS is associated with a variety of neuropsychological deficits, that the areas of the brain that are particularly affected include the left frontal cortex and cerebellum, and that Dr. Kimberly's deficits appeared in a pattern associated with brain damage from

chronic hypoxemia.

94.    Dr. Clipson's professional opinion was that Dr. Kimberly is precluded from returning to his previous employment as an Ophthalmologist because of his tendency to forget important information, reduced cognitive efficiency and planning abilities, deficits in cognitive flexibility and problem solving, inability to make rapid diagnoses and treatment decisions, and  his problems with manual dexterity and fine motor speed which are all crucial to the performance of the material duties of an eye surgeon.

95.    Dr. Kimberly's long-treating psychiatrist concurred, noting that the neuropsychological testing shows cognitive impairments;  concludes that Dr. Kimberly "will be unable to function as a physician as defects and certain forms of memory and sensory perceptual functioning would make it impossible to function reasonably or adequately as an ophthalmologist."

96.    Dr. Kimberly's psychiatrist also noted Dr. Kimberly's difficulties with motor coordination and clumsiness which he stated would be intolerable in an ophthalmalic surgeon.

97.    Dr. Kimberly's psychiatrist declared that Dr. Kimberly was impaired on a permanent basis from the practice of eye surgery — ophthalmology.

98.    Dr. Clipson interviewed Dr. Eaton and reported that Dr. Eaton expressed the following opinion to Dr. Clipson:

> "despite Dr. Kimberly's recovery from depression that he continues to demonstrate evidence of brain damage, most likely as a result of chronic hypoxemia which causes him to be unable to work as an ophthalmologist".

99.    Dr. Clipson explained that Dr. Kimberly suffers from "dementia secondary to chronic oxygen deprivation as a result of OSA," and noted that this was not only his opinion, but the concurring opinions of psychiatrist Dr. Eaton, psychologist Dr. Koumaris, and neurologist Dr. Grisolia.

100.    On **October 26, 2004**, Dr. Kimberly, through the assistance of Miller, Monson, Peshel Polacek and Hoshaw (MMPPH), submitted his **comprehensive letter of appeal** (67 pages), a copy of which is attached hereto as **Exhibit "B",** explaining Dr. Kimberly's history, testing, discussed basic information about OSAS and its constellation of symptoms, which were each entirely consistent with those suffered by Dr. Kimberly, and submitted two reports by Dr. Clipson which included the neuropsychological test results and letter from Dr. Clipson with medical journal articles, the opinions of

Dr. Grisolia, an all-inclusive 121-page detailed medical chronology so that the appeal reviewer at Hartford would not be encumbered by difficult-to-read physician handwriting.

101.    Dr. Clipson attached "The Neuropsychological Correlates of Acute and Chronic Hypoxemia" from "Neuropsychological Assessment of Neuropsychiatric Disorders" (1996) (Grant & Adams, ) which Plaintiff quoted in his appeal referencing the appeal file page number, that explains, among other,

> ""even subtle deviations in the oxygen supply to the brain can result in significant and enduring neurobehavioral sequelae" (9..1253). "If the anoxia continues for more than a few minutes, an anoxic/ischemic encephalopathy will likely ensue, frequently involving both neuropsychological impairments and neuroradiological abnormalities. Equally salient neurobehavioral effects ay also occur however when the brain is supplied with a *physiologically inadequate amount of oxygen (i..e, hypoxemia*) over an extended period of time .
>
> When middle-aged patients with SAS show deficits on formal neuropsychological tests, these tend to occur in the areas of intellectual efficiency..., attention and concentration...; memory..., perceptual-motor organization and efficiency..., executive functioning..., and on tests of simple motor skills...
>
> "...that deficits in attention and memory were more related to sleep disruption, whereas declines in general intellectual measures, executive-type
>
> 9..1268: "when neuropsychological deficits persist following CPAP, they tend to occur on tasks requiring planning and manual dexterity. . . . Finally, it is important to note that the discontinuation of CPAP for one night can result in the reversal of treatment gains....
>
> The accumulation of evidence from studies of individuals . . . with sleep disordered breathing, sleep apnea syndrome . . . suggests that both acute and chronic exposures to hypoxemia can significantly impair neurobehavioral functioning. Although some neuropsychological deficits improve with supplemental oxygen therapy in persons with cardiopulmonary disorders or with nasal [CPAP] in persons with sleep disorders, other deficits persist. These residual neuropsychological deficits that remain after treatment may indicate that permanent cerebral damage has been sustained, and in deed there is some postmortem evidence that suggests this is the case.  (9..1268)

First Amended Complaint

102.    Dr. Kimberly returned a copy of Hartford's just-over 1400 pages of claim file documents, but page numbered 000001-000733 and 9990001-9990701 for easy cross reference of the medical history to specific page numbers in the file.

103.    Page 46-47 of his appeal included medical studies documenting the significant increased risk of anesthesia in producing significant suppressant of airway muscles, increased number of and duration of apneic episodes and decreased arterial oxygen saturation in patients with OSAS, particularly during successive unmonitored anesthesia recovery periods, *to which Dr. Kimberly was exposed*. This information included the following:

> "General anesthesia suppresses upper airway muscle activity, and it may impair breathing by allowing the airway to close. Anesthesia thus may increase the number of and duration of sleep apnea episodes and may decrease arterial oxygen saturation. Further, anesthesia inhibits arousals which would occur during sleep. Attention to sleep apnea should continue into the post-operative period because the lingering sedative and respiratory depressant effects of the anesthetic can pose difficulty, as can some analgesics.   Given the nature of the disorder, it may be fitting to monitor sleep apnea patients for several hours after the last dose of anesthesia and opioids or other sedatives, longer than non-sleep apnea patients require and possibly through one full natural sleep period. Hence there is concern that same-day surgery (also known as out-patient or ambulatory surgery) may not be appropriate for some sleep apnea surgery patients. . . . The use of preoperative sedatives must be considered carefully as sedative medication, like anesthesia, suppresses upper airway muscle activity. . . .For certain patients, it may be judicious to admit them to an intermediate care or intensive care area postoperatively to facilitate close monitoring and airway support measures. . . .
>
> - - - - -
>
> Licteig and Grigg, in "Risks of OSA and Anesthesia" state, "It is well known that anesthetic, opiate, and sedative agents are central nervous system (CNS) depressants that increase the tendency for upper airway collapse (Figure 1). Additionally, CNS depressants alter the normal ventilatory response to hypercapnia and hypoxemia." citing Cullen DJ. Obstructive sleep apnea and postoperative analgesia—a potentially dangerous combination. J Clin Anesth. 2001;13:83-85.
>
> - - - -

We note that on <u>November 21, 2001</u> (ECT #6) due to excessive "agitation" after the procedure, Dr. Kimberly was given extra Ativan, and after the procedure on <u>November 9</u>, was given Vicodin . . .for "agitation." He received IV sedation [sometimes including IV Ativan], which would inhibit breathing, as well as [chronic] Ativan by mouth, which also [cumulatively] suppresses breathing. He also received supplemental IV sedation in the recovery room because of agitation, and was sent home sometimes still groggy from the sedation, where I took an unmonitored nap for 3-4 hours without the CPAP machine which was not adequately treating his OSA. All shock treatments, except the first, were done on an outpatient basis after which he was sent home. This raises the possibility that Dr. Kimberly suffered some increases in his already moderate OSA due to anesthesia and/or CNS depressant medications. What is certain, is that his profound cognitive problems became noticeably apparent toward the end of the ECT treatments.

104.   By letter dated November 1, 2004, Hartford confirmed receipt of the appeal and indicated its intent to review the claim file and all documents relevant to it.

105.   MMPPH requested that if Hartford was going to first add to the record any "new post-appeal information or opinions requested or generated by Hartford or its employees or agents, *after* Dr. Kimberly's appeal and *before its review of the appeal,* that MMPPH be provided with a copy of all such documents or information first, so that Dr. Kimberly "has an adequate opportunity to comment on all information which you will review for your final decision."

106.   On December 10, 2004, Hartford notified MMPPH that it was unable to make a decision on the appeal during the required initial 45-day period because "we have requested an independent record review of the medical evidence contained in his LTD claim file."

107.   By a letter of the same day, December 10, 2004, MMPPH asked Hartford whether its medical reviewer would be provided with a copy of the appeal cover letter and the rest of the information submitted with it, <u>specifically asked that</u> Hartford provide its reviewer with the appeal letter and the detailed medical chronology, specifically asked for a copy of the communications between Hartford and its "reviewer" in case it included something that Hartford had failed to specify to Dr. Kimberly before his appeal.

/ / /

108.    MMPPH's December 10, 2004 letter <u>specifically requested that Hartford send a copy of any report it received regarding Dr. Kimberly to MMPPH and provide an opportunity for comment by Dr. Kimberly *before* Hartford conducted it's final "review</u>."

109.    Hartford wrote to Dr. Clipson indicating it had questions for Dr. Clipson.

110.    Dr. Clipson responded on December 28, 2004 asking Hartford to please submit their questions in written format to insure accuracy of communication on both sides, and that Dr. Clipson would thereafter respond within a reasonable period of time as well.

111.    On January 4, 2005, Hartford wrote to MMPPH stating only that a "Dr. Jacquelyn Olander" wanted a "complete copy of the raw data" from Dr. Clipson's neuropsychological testing.

112.    By letter of January 5, 2005, Dr. Clipson asked Hartford why the physician no longer wanted to ask him any questions but only wanted a copy of his raw test data.

113.    Dr. Clipson also asked in his January 5, 2005 letter to receive a copy of any written statement prepared by Dr. Olander based on a review of his (Dr. Clipson's) raw data  so that he has the opportunity to comment on her statements or opinions.

114.    On January 6, 2005, MMPPH faxed a letter to Hartford reiterating MMPPH's request to be provided with a copy of any new materials Hartford or its agents have generated or received related to the Kimberly claim so that Dr. Kimberly has a fair opportunity to submit any comments or information prior to Hartford conducting its final review.

115.    Via faxed letter of January 12, 2005,  4:21 PM, Hartford informed Dr. Clipson that he must overnight his raw data to Dr. Olander's office for her review Friday, January 14, 2005, and that if she did not receive it, she would proceed with her review  "noting the absence of the raw data." Hartford avoided commitment to Dr. Clipson's stated condition for the release of his raw data, that he be provided with Dr. Olander's report before Hartford conducted its final review.

116.    By letter dated January 13, 2005 MMPPH "overnighted" to Dr. Olander a copy of Dr. Kimberly's appeal cover letter and advised her that she needed to send Dr. Clipson a copy of her comments and report in exchange for his raw data, so that he can make his comments prior to any Hartford final review.

/ / /

117.    Dr. Olander's report ignores all of the first-hand reports of Dr. Kimberly's cognitive problems at home by his wife, family, psychologist, psychiatrist, neurologist, Dr. Clipson during his patient interview, and of Dr. Kimberly himself of the many witnessed examples of his memory loss and problems.

118.    At 1:21 pm, January 14, 2005, Hartford wrote to MMPPH regarding the "independent" paper reviews Hartford had arranged through "University Disability Consortium," but again did not commit to forwarding a copy of any resulting reports to Plaintiff or his specialists before Hartford conducted its final review.

119.    On Wednesday **January 26, 2005**, Hartford transmitted a 5-page "final" denial letter, a copy of which is attached hereto as **Exhibit "C"**, relying primarily on a new review of "Dr. V.Leyenson," and a lengthy opinion letter of "Dr. Olander," neuropsychologist and told Plaintiff that Hartford's "determination as described in the above analysis represents our final decision on this claim"; ". . . we are closing Dr. Kimberly's claim file at this time, and no further action will be taken with respect to this claim."

120.    Hartford purposefully disregarded Plaintiff's reservation to submit additional proofs related to Hartford's new reviewers comments prior to the final denial.  Hartford purposefully cut off that right, holding the record open for itself and in its own self-interest, closing it to Plaintiff.

121.    Prior to issuing the January 26, 2005 final denial, Hartford, UDC, Dr. Olander, and/or Dr. Leyenson, failed and refused to forward to Plaintiff, his counsel or his physicians a draft or final copy of ANY comments, observations or reports from the new physicians on which Hartford relied to uphold its "final" benefits termination.

122.    While Hartford contended that Dr. Olander had concluded that  "insufficient data was found to support Dr. Clipson's diagnoses," Hartford never advised Dr. Kimberly or his physicians or Dr. Clipson that Dr. Olander believed there was "insufficient data" submitted, nor did they indicate what might be "sufficient."

123.    Hartford never described to Dr. Kimberly or his counsel what specific type of test or data would be "sufficient", what was lacking, and did not order its own neuropsychologic battery of testing to repeat the tests conducted by Dr. Clipson to answer any legitimate and non-pretextual questions

regarding Dr. Kimberly's "current" cognitive function as needed to safely and fully perform each of the material duties as an eye surgeon.

124.    Despite the alleged "insufficiency" of data, Hartford never requested an Independent Medical Examination or any additional tests, to make their information complete.

125.    While Hartford's denial letter stated there were "questions" regarding Dr. Clipson's diagnoses, and Hartford had stated its reviewing physician was going to ask questions, no questions were posed to Dr. Clipson during Hartford's review process; no additional testing was ordered.

126.    Hartford failed to address findings of Dr. Kimberly's fine motor/manual dexterity problems that would also interfere with or preclude performing surgery on eyes.

127.    Nowhere in Hartford's January 26, 2005 final decision letter was there any analysis of the effect of the 16 bilateral ECT treatments which, in conjunction with Dr. Kimberly's OSA, had resulted in consistent and well-documented significant memory difficulties that began during those treatments and have remained permanent since.

128.    On February 11, 2005, MMPPH received from the Hartford, for the first time,

1) a new post-appeal 6-page letter dated Friday, January 21, 2005, from V. Leyenson and

2) a new post-appeal 25-page report dated January 21, 2005 from Jacquelyn Olander PhD., through University Disability Consortium (UDC), who has never seen, interviewed, examined or tested Dr. Kimberly, which concluded on page 25, that "from a neuropsychological perspective, there is insufficient data to suggest that Dr. Kimberly is not able to function at an employment level similar to his previous occupation."

129.    Upon information and belief, Hartford regularly utilized and continues to regularly utilize UDC to arrange, direct, orchestrate or conduct paper reviews on claimants' claims under Hartford Policies.

130.    Plaintiff is informed and believe and based thereon alleges that as a result of UDC's frequent orchestrating and handling of reviews for Hartford, as its agent in the investigation and administration of Plaintiff's claim, renders UDC's file materials (whether hard copy or electronically generated or stored) part of the "administrative record" — whether or not Hartford has gathered them to retain in its claims file.

131.    Hartford failed to obtain from UDC a copy of its file materials and all other UDC-related documents, notes, writings, including electronic information related to the investigation of Dr. Kimberly's Claim on behalf of Hartford to include in the "Administrative" Record and ensure it is complete.

132.    Hartford similarly failed and refused to obtain all other related documents, notes, writings, including electronic information from Drs. Leyenson and Dr. Olander related to their communications with both Hartford and UDC or any other entity or person related to the claim of Dr. Kimberly so that it could be included with the rest of the claim-related information (the "Administrative Record").

133.    The regulations of the Secretary of Labor define at 29 C.F.R. § 2560.503-1 (m)(8) what are the "relevant" documents and information which must be provided to plan participants upon request, including those at (I) that were actually "relied on" by the decision maker in making the benefit determination, and (ii) those that were "submitted, considered, *or generated* in the course of making the benefit determination, *without regard to whether such document, record, or other information was relied upon* in making the benefit determination".

134.    Upon information and belief, Hartford's failure to properly gather and maintain in all its related to the claim an actual copy of all *"documents, records, and other information relevant to the claimant's claim for benefits"* described under the regulations at 29 C.F.R. § 2560.503-1 at (j)(3) and expressly defined under subsection (m)(8), is a violation of its fiduciary duties to maintain an accurate copy of the "Administrative Record."

135.    Upon information and belief, Hartford's failure to obtain information related to the claim generated by or on its behalf during the claim investigation and administration improperly truncated the "Administrative Record," and failed to provide Plaintiff with "reasonable access to" copies of said documents records and information, and risked — if not effectuated — a spoilation of evidence.

136.    Plaintiff is informed and believes and based thereon alleges that Hartford thus intentionally truncated the "administrative record" by not including documents within the possession and control of agents employed by Hartford to assist with investigating the claim for and on behalf of Hartford, and are thus documents within Hartford's constructive control and possession.

/ / /

137.    Upon information and belief, Hartford's failures and breaches of the ERISA regulations which form the minimum requirements and responsibilities of the claims administrator, and refusal to comply with the requirements of the regulations and information required by Title I of ERISA, justify appropriate relief by this court in its discretion, including but not limited to:

137-(1)    *injunctive relief* under 502(a)(3) compelling the claims administrator to immediately obtain and provide Plaintiff with any and all documents, records, information, writings, including electronically stored, by UDC and by Drs. Leyenson and Olander that are "relevant to" Plaintiff's claim as defined under subsection (m) of the regulations.

137-(2)    *adverse inference* against Hartford regarding all information generated by UDC or its hired reviewers for Hartford that Hartford and its agents continue to conceal and/or spoil;

137-(3)    *permanent injunction* against further such failure and refusal to gather and maintain all relevant information pertaining to Plaintiff's claim, into the future, by Hartford and any of its agents or employees engaged to perform work related to Plaintiff's claim.

138.    Upon information and belief, Hartford targeted Dr. Kimberly's claim for termination because his total disability from his occupation was permanent, he was 48 at termination with benefits owed to age 65 (16 years: 2020) and his monthly benefits were $4,331 at termination and would have increased to $5,185 as of July 1, 2006 due to a decrease in Social Security Disability income as a result of his children reaching the age of majority.

139.    Upon information and belief, Hartford's expected monthly benefits liability under the policy, exclusive of interest thereon, for Dr. Kimberly's permanent disability from benefits termination 4/1/2004 to 5/21/2020 is **$986,461.50, consisting of the following breakdown:**

139-a.    $4,331.00 for the first 27 months between 4/1/2004 to 6/31/2006, or **$116,937.00**.

139-b.    $5185.00 for the next 19 months between 7/1/2006 to 2/29/2008, when the complaint was filed **($98,515.00)**.

139-c.    Continuing at $5,185.00 for each of the future 147.7 months (12.3 years) from 3/1/08 to age 65 on 5/21/2020: **$771,009.50.**

/ / /

140.    Upon information and belief, by terminating Dr. Kimberly's claim, Hartford was able to release in April 2004 all of the reserves it had held necessary to pay the life of the claim, which should be the present value of $986,461.50 depending on the discount rate Hartford uses in establishing reserves.

141.    Plaintiff has remained unable to perform the material duties of his own occupation as an ophthalmologist and due to his ongoing and apparently permanent memory problems and inability to practice medicine safely, will not only never be able to return to the practice of performing eye surgery, but will never be unable to return to the practice of medicine.

142.    Plaintiff also seeks declaratory relief as to his continued entitlement to future monthly benefits to age 65 under the terms of the policy since his condition and impairments are permanent and he will never be able to perform the occupation of an eye surgeon.

143.    Plaintiff seeks to enjoin Hartford from violation of the notice and disclosure requirements mandated by the Secretary's Regulations and of the "meaningful dialogue" mandated by this Circuit for over a decade pursuant to Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463-64 (9th Cir. 1997), Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. Cal. 2006) *en banc*, Saffon v. Wells Fargo & Co., LTD Plan (re MetLife), 2008 U.S. App. LEXIS 8136 (9th Cir. Apr. 16, 2008).

144.    Plaintiff seeks an award of pre-judgment interest on all delayed benefits from the date such benefits payments were due, in an amount and at the rate lying within the Court's discretion, including disgorgement of profits earned by Hartford at the rate of increase Hartford has earned on its assets to the extent that rate of increase exceeds the 10% interest provided under the California Insurance Code, or the rate Plaintiff has had to pay on loans or credit as a result of not having the $4331 in monthly disability benefits promised under his group disability contract when he became disabled from performing his own occupation.

145.    Plaintiff also seeks *post*-judgment interest on the benefits from the date of judgment until the date they are paid at the Order of the court pursuant to 28 U.S.C. §1961.

146.    29 U.S.C. §1132(g)(1), ERISA § 503(g), entitles a Plaintiff who prevails in obtaining any of the benefit for which the Plaintiff brought suit to an award of a reasonable attorney's fee and costs of action under the remedial purposes and policies of ERISA.

/ / /

147.    Plaintiff has retained the services of legal counsel and has necessarily incurred and will continue to *incur attorney's fees and costs* in preparation for and in the prosecution of this action, all in a final amount which is currently unknown.

**WHEREFORE, Plaintiff prays for judgment against Defendant as follows:**

1.    For payment of Plaintiff's own-occupation disability benefits from date of denial on April 1, 2004 forward at the rate of $4331 to July 1, 2007, and thereafter from August 1, 2007 forward to date of judgment at the monthly rate of $5,185;

2.    *Pre*-judgment interest at a rate within the Court's discretion;

3.    *Post*-judgment interest at the appropriate rate under 28 U.S.C. § 1961, from the date of judgment to the date the Court establishes for payment of the judgment amount;

4.    For a finding that Plaintiff remains totally disabled under the terms of the Plan and is permanently disabled and entitled continue receiving monthly disability benefits pursuant to the terms of the policy to age 65;

5.    Such other appropriate equitable relief as the Court deems proper including but not limited to (a) *injunctive relief* under 502(a)(3) compelling Hartford to immediately obtain and provide Plaintiff with any and all notes, documents, records, information, writings, including electronically stored, to, from or generated by University Disability Consortium and Drs. Leyenson Olander for Hartford after Plaintiff's appeal; (b) *permanent injunction* against further such failure and refusal to gather and maintain all relevant information pertaining to any record reviews or other new-evidence gathering activities after an appeal of a denied claim is received.

6.    For any appropriate equitable relief under ERISA § 502(a)(3) as the court deems proper to remedy improper claims handling or breaches of fiduciary duty and/or acts or practices which violate ERISA and/or the terms of the PLAN;

7.    For reasonable attorneys' fees and costs of suit under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1);

/ / /

First Amended Complaint

1

2

3      **MILLER, MONSON, PESHEL, POLACEK & HOSHAW**

Dated:__**May 19, 2008**____    By:

/s Susan L. Horner

Susan L. Horner
Attorneys for Plaintiff,
Kent E. Kimberly, M.D.