# EXHIBIT B

# EXHIBIT B

THOMAS M. MONSON*
MARY J. PESHEL*
TIMOTHY C. POLACEK*
WILLIAM D. HOSHAW*
ROBERTA D. REPASY*
PHILIP R. FREDRICKSEN†
SUSAN L. HORNER˜
STEVEN E. COWEN
RAY W. RIDLON
DANIELLE C. HUMPHRIES¨
MATTHEW M. McCORMICK
GREGORY J. MATUS
KATHRYN J. BESCH

*A PROFESSIONAL LAW CORPORATION
†OF COUNSEL
¨ALSO LICENSED IN OREGON
˜ALSO LICENSED IN TEXAS

LAW OFFICES

**Miller, Monson, Peshel, Polacek & Hoshaw**

A PARTNERSHIP OF PROFESSIONAL LAW CORPORATIONS

THE KOLL CENTER

501 WEST BROADWAY, SUITE 700

SAN DIEGO, CALIFORNIA 92101-3563

TELEPHONE: (619) 239-7777

October 26, 2004

RALPH GANO MILLER
Retired

HOME PAGE
http://www.mmpph.com

WRITER'S DIRECT E-MAIL
susanhorner@erisa-law.com

FAX NUMBER
(619) 696-6163

REPLY TO FILE:

49311-01-14

Disability Claim Appeal Unit
Hartford Life & Accid. Ins. Co.
Benefit Management Services - Floor B2-E
P.O. Box 2999
Hartford, CT  06104-2999

Also via fax 860-843-7272

|  | | |
|---|---|---|
| Re: | Insured claimant: | Kent E. Kimberly, M.D. |
| | Occupation: | Opthalmologist (eye surgeon) |
| | DOB / SSN: | 5/21/1955 / 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 |
| | Employer: | Sharp Rees-Stealy Medical Group, Inc. |
| | Policy & Claim Nos: | GLT  036915 / 01-02533523-001 |

Disability Dx:     Clipson/Grisolia: Axis I: Dementia due to hypoxemia (294.1) Major Depressive Disorder, recurrent, in partial remission (296.35);     Axis III: Chronic hypoxemia secondary to obstructive sleep apnea, Hypertension, Hypogonadism, Elevated triglycerides; Axis IV:  Unemployment; Axis V: Current GAF - 65 (Symptoms of mild severity that interfere with social and adaptive functioning); and Cognitive Brain Disorder NOS 294.9, MDD.D 296.3 (Eaton).

Social Security Disab:     Granted effective July 14, 2002; —continuing
Hartford **LTD Termination:** **Letter dated 4/29/04** (Jeanne Kohler)
Req. all info. re claim:     May 27, 2004;  follow up request July 14, 2004

<u>Dr. Kimberly submits this appeal of Hartford's reasons for terminating his LTD benefits by</u> **letter dated April 29, 2004.**   (We were not given appeal representative(s) names as the appeal fiduciaries, but simply instructed to send this to the Disability Claim Appeal Unit.)

The contents of Dr. Kimberly's appeal consist of this letter and three binders of existing or new medical and claim information.

**page 1 of 67**

Dr. Kimberly was an **ophthalmologist (eye surgeon)** with the Sharp Rees Stealy Medical Group (**SRS**) until he became disabled in 2001. He submitted a claim for total disability benefits in mid 2001 because he was unable to continue to provide medical surgical care for his surgery patients arising from a certain constellation of symptoms. Due to a positive family history and prior diagnosis and treatment for depression in or about 1993-1994, his psychiatrist during the period 1993-1994, and again in 1998-1999, Dr. Albala reinstated the diagnosis of depression and treated Dr. Kimberly for depression and anxiety. *However, he also suffered from sleep apnea —specifically, Obstructive Sleep Apnea (OSA), which was initially overlooked because of the assumption his symptoms must be arising from a major depressive disorder (MDD).* However, the symptoms which he suffered , as will be discussed in this appeal, are those seen with severe sleep apnea patients and thus complicated an early-on accurate diagnosis.

Attached to this cover letter is a detailed chronology of medical, clinical and objective information. What has become very clear from the testing he has undergone and his medical records, is that he suffered from severe obstructive sleep apnea, which the medical literature reports indicates can be associated with serious cognitive deficits from brain damage thought to be caused by chronic episodes of significant oxygen deprivation and oxygen desaturation. The records reflect the unmistakable consistent and continued reports of ongoing cognitive deficit, and document brain damage. He is not disabled because of mental illness, but from brain damage produced from his prior severe OSA, markedly worsened following conclusion of the numerous (16 total) bilateral ECT treatments that he underwent between November 9, 2001 and December 20, 2001.

He is left with permanent significant cognitive dysfunction from the brain damage that totally disables him from his prior occupation as an eye surgeon, that continues to be improperly categorized as a "mental illness." He is not limited to the 24-month 'mental illness' disability coverage under the policy.

We have provided numerous medical articles related to OSA to assist your understanding in this medical illness and its symptoms and signs. We will quote several and provide you with a review of several of these in this letter. This should give Hartford some basic understanding about this medical problem against which to understand Dr. Kimberly's presenting symptoms and difficulties. The we will discuss the medical and clinical information available. The picture that emerges after careful consideration of all of the information as a whole is that this gentleman has been unable since 2001 to, continues to be unable to, and will never be able to, return to his occupation as an eye surgeon as a result of brain damage.

While Hartford initially paid Dr. Kimberly disability benefits for a "mental illness"-caused disability, this should have been corrected in late-August 2001 when he was diagnosed with significant OSA, during the elimination period, or by August or September, 2002 after the cognitive deficits that Dr. Vincent's testing found and shortly thereafter with Dr. Kimberly's post-UVPP improvement in mood, otherwise treatment resistant when treating simply for 'depression.' Alternatively, the correction certainly could have been made in early 2002, shortly after completion

Hartford Disability Claim Appeal Unit
October 28, 2004                                                              Page 3 of 67

of the ECT treatments when it had become apparent that something happened during the course of that treatment that resulted in cognitive deficits not present as such before the 16 bilateral ECT treatments. The fact the claim was initially paid under a "mental illness" provision does not mean that errors and corrections in the cause of disability as new medical information became available cannot be made. Whether Dr. Kimberly's ongoing memory deficits associated with his documented brain damage resulted from the 16 bilateral electroconvulsive treatments and/or the chronic and prolong anoxic or hypoxemic/hypopneic effects from OSA which went undiagnosed and untreated for about three years, or resulted from the depressant effects of anesthesia and CNS depressant Ativan together with his existing OSA, were the cause of his brain damage is as yet uncertain, but what is documented both clinically and objectively is evidence of organic damage.

**OBSTRUCTIVE SLEEP APNEA**:

1.      Types of Sleep Apnea / Features of Obstructive Sleep Apnea (OSA):

There are, in essence, two distinct types of sleep apnea. The first, *"central sleep apnea"* is a <u>neurological condition</u> causing cessation of all respiratory effort during sleep, usually with decreases in blood oxygen saturation. The individual is aroused from sleep by an automatic breathing reflex, so he may end up getting little sleep at all. The second, which is called *Obstructive Sleep Apnea* or **OSA**, is caused by the collapse or obstruction of the airway with the inhibition of muscle tone that occurs during REM (rapid eye movement) sleep. As discussed by Cataletto and Hertz in "Breathing-Related sleep[ Disorder, 2004, OSA[1] results from airflow obstruction secondary to upper airway collapse or anatomic airway obstruction. In adults, the obstruction typically occurs at the level of the uvula/soft palate or tongue, although they note that the interrelationship of age, sex, obesity, and craniofacial size and dynamics is still poorly understood. <u>Daytime sequelae of sleep deprivation, includes depression, irritability, poor concentration and memory, and daytime sleepiness</u>.

The National Institute of Neurological Disorders and Stroke provide some basic information about OSA:

> Sleep apnea is a disorder of interrupted breathing during sleep. It <u>usually occurs in association with fat buildup or loss of muscle tone with aging</u>. These changes allow the windpipe to collapse during breathing when muscles relax during sleep (see figure 3). This problem, called obstructive sleep apnea, is usually associated with loud snoring (though not everyone who snores has this disorder). Sleep apnea also can occur if the neurons that control breathing malfunction during sleep.

---

[1] Available at http://www.emedicine.com/med/topic3130.htm

During an episode of obstructive apnea, the person's effort to inhale air creates suction that collapses the windpipe. This blocks the air flow for 10 seconds to a minute while the sleeping person struggles to breathe. When the person's blood oxygen level falls, the brain responds by awakening the person enough to tighten the upper airway muscles and open the windpipe. The person may snort or gasp, then resume snoring. This cycle may be repeated hundreds of times a night. The frequent awakenings that sleep apnea patients experience leave them continually sleepy and may lead to personality changes such as irritability or depression. Sleep apnea also deprives the person of oxygen, which can lead to morning headaches, a loss of interest in sex, or a decline in mental functioning. It also is linked to high blood pressure, irregular heartbeats, and an increased risk of heart attacks and stroke. Patients with severe, untreated sleep apnea are two to three times more likely to have automobile accidents than the general population. In some high-risk individuals, sleep apnea may even lead to sudden death from respiratory arrest during sleep.

An estimated 18 million Americans have sleep apnea. However, few of them have had the problem diagnosed. Patients with the typical features of sleep apnea, such as loud snoring, obesity, and excessive daytime sleepiness, should be referred to a specialized sleep center that can perform a test called polysomnography. This test records the patient's brain waves, heartbeat, and breathing during an entire night. If sleep apnea is diagnosed, several treatments are available. Mild sleep apnea frequently can be overcome through weight loss or by preventing the person from sleeping on his or her back. Other people may need special devices or surgery to correct the obstruction. People with sleep apnea should never take sedatives or sleeping pills, which can prevent them from awakening enough to breathe.

On their Sleep Apnea Information Page, NINDS explains:

There are two main types of sleep apnea. "*Obstructive sleep apnea*" may represent cessation of breathing due to mechanical blockage of the airway; "*central sleep apnea*" appears to be related to a malfunction of the brain's normal signal to breathe. Symptoms of sleep apnea may include restless sleep, loud, heavy snoring (often interrupted by silence and then gasps), falling asleep while driving and/or during the day (at work, watching TV, etc.), morning headaches, loss of energy, trouble concentrating, irritability,

forgetfulness, mood or behavior changes, anxiety or depression, obesity, and decreased interest in sex. Not all people with sleep apnea experience all of these symptoms and not everyone who has these symptoms has sleep apnea. However, it is recommended that people who are experiencing even a few of these symptoms visit their physician for evaluation. Prompt and proper diagnosis of sleep apnea is an important first step to treating the disorder. Problems associated with untreated sleep apnea include hypertension, coronary artery disease, myocardial infarction, stroke, psychiatric problems, impotence, cognitive dysfunction, memory loss, and death.

Although we have provided you with a copy of their Information page and article, they are at: http://www.ninds.nih.gov/health_and_medical/disorders/sleep_apnea.htm.

Another source, CPAPMAN (http://www.cpapman.com/disorder.htm) also provides basic information: "Most prominent symptoms are snoring, not breathing while asleep, excessive daytime sleepiness and obesity. Other symptoms include lack of concentration, forgetfulness, uncharacteristically irritable, anxiety, depression, mood and/or behavioral changes, morning headaches, disorientation at awakening and loss of sexual interest."

"People most likely to have or develop sleep apnea include those who snore loudly and also are overweight, or have high blood pressure, or have some physical abnormality in the nose, throat, or other parts of the upper airway"; and Often, the person who has obstructive sleep apnea does not remember the episodes of apnea during the night[2]. The predominant symptoms are usually associated with excessive daytime sleepiness due to poor sleep during the night. Other symptoms include: • Loud snoring, • Periods of not breathing (apnea), • Awakening not rested in the morning, • Abnormal daytime sleepiness, including falling asleep at inappropriate times, • Morning headaches, • Weight gain, • Limited attention, • Memory loss, • Poor judgment, • Personality changes, • Lethargy. Additional symptoms that are associated with this disease: • Swelling overall (edema), • Confusion • High blood pressure. . . . Because of the serious disturbances in their normal sleep patterns, people with sleep apnea often feel very sleepy during the day and their concentration and daytime performance suffer. The consequences of sleep apnea range from annoying to life threatening. They include depression, irritability, sexual dysfunction, learning and memory difficulties, and falling asleep while at work, on the phone, or driving. It has been estimated that up to 50 percent of sleep apnea patients have high blood pressure." http://cms.psychologytoday.com/conditions/sleepapnea.html

Lipton, and Gozal, Obstructive Sleep Apnea Syndrome, note:

---

[2] see also http://www.sleepdisorderchannel.net/osa/symptoms.shtml: "Patients rarely complain about frequent awakenings due to obstruction, but awakenings do occur."

The physiological and behavioral effects of partial and total sleep loss because of OSA in adults have been investigated extensively. Daytime tiredness or fatigue is a common symptom, although sleepiness, being a subjective notion, may not be reported directly. Significant deterioration in functions requiring concentration or dexterity, as well as automatic behavior with retrograde amnesia, disorientation, and morning confusion, all were reported in patients with sleep fragmentation and led to the term sleep drunkenness. In addition, personality changes and abnormal behavioral outbursts follow sleep fragmentation. Aggressiveness, irritability, anxiety attacks, and depression may occur.

http://www.emedicine.com/ped/topic1630.htm.

In The Practical Peer Review ed Journal for Primary Care Physicians, Postgraduate Medicine online, Attarian HP, 2002; 3:70-6, "When to suspect Sleep Apnea Syndrome", the authors explain:

The most common symptoms of OSAS are snoring, excessive daytime sleepiness, nocturnal snorting and gasping, and witnessed apneic episodes. The snoring may be extremely loud, disturbing the bed partner, the entire household, and even neighbors; however, the snoring may be so quiet that it may not be reported even by the bed partner. Snoring usually precedes the complaint of excessive daytime sleepiness. Cessation of breathing reported by the bed partner is usually a source of great anxiety because of fear that breathing may not resume.

Other nocturnal symptoms include restlessness, diaphoresis, awakenings with a sensation of choking or dyspnea, esophageal reflux with subsequent heartburn and laryngospasm, frequent nocturia, dry mouth, drooling and, rarely, enuresis. Tiredness and sleepiness are the most common complaints; upon awakening, patients do not feel refreshed and often find it difficult to get out of bed. Some feel mentally dull, groggy, confused, or disoriented. Daytime sleepiness is initially manifest during boring, sedentary situations in the afternoon or evening. Patients may describe difficulty remaining awake during meetings after lunch or while driving or reading. As sleepiness becomes more severe, patients may fall asleep during conversation, while on the telephone, or during sexual intercourse. The most catastrophic result of excessive daytime sleepiness is falling asleep behind the wheel and causing injury or

death. It is essential that physicians ask patients specifically about sleepiness behind the wheel, because symptoms may be too subtle to be spontaneously reported by patients. Irritability, depression, impotence or reduced libido, and morning headaches are other typical daytime clinical manifestations; however, morning headaches are overrated as a marker of OSAS.

. . .

patients with OSAS have more cognitive impairment (8)[3] and a poorer overall quality of life than people without OSAS (9)[4].

Again, we have provided a copy of this article, but it is also available at: http://www.postgradmed.com/issues/2002/03_02/attarian.htm.

See also "Obstructive sleep apnea/hypopnea syndrome page available through the manufacturers of Provigil at http://www.provigil.com/patient/disorders/apnea.aspx

Piccirillo, Duntley and Schotland in "Obstructive Sleep Apnea," JAMA 2000; 284: 1492-1494 explain that the most popular method of treatment for diagnosed OSA, since its introduction in 1981, is nasal continuous positive airway pressure, or "CPAP. They explain that CPAP equipments acts as a pneumatic splint, creating positive pressure inside the airway through the respiratory cycle. The caution that, "However, the 'successful treatment' of sleep apnea is dependent upon the level of reduction of respiratory disturbance to normal levels, as well as by the elimination of symptoms like fatigue and depression, and the patient's personal sense of well-being. The patient with sleep apnea faces incredible physical, social and emotional challenges. Family, friends and business associates often do not understand the disorder and are not properly equipped to deal with the effects." Similarly, Cataletto and Hertz above, similarly discuss treatment through CPAP:

n-CPAP is the most frequently used medical modality for the treatment of OSA. This technique involves the application of positive pressure to the upper airway via a nasal mask. In this way, n-CPAP is used to stent open the collapsed pharyngeal tissue and to improve airflow. Studies suggest that n-CPAP improves airway dimensions by approximately 20%, more so in the lateral than the anteroposterior dimension. Effective delivery pressures are titrated in the sleep

---

[3]Engleman HM, Kingshott RN, Martin SE, et al. Cognitive function in the sleep apnea/ hypopnea syndrome (SAHS). Sleep 2000;23(Suppl 4):S102-8

[4]Flemons WW. Measuring health related quality of life in sleep apnea. Sleep 2000;23(Suppl 4):S109-14

laboratory. It is noninvasive and highly effective in <u>reducing</u> apnea and <u>improving</u> sleep architecture. However, it is often limited by poor patient compliance. Compliance studies have shown that 46% of patients used n-CPAP for at least 4 h/d for 5-7 days. Seventy-six percent of patients overestimated their compliance.

They explain that there are three variations of positive pressure support via nasal masks that can be used at home for OSA: 1) n-CPAP, which delivers a constant pressure throughout inspiration and expiration; 2) bilevel positive airway pressure (BiPAP), which allows independent adjustment of inspiratory and expiratory pressures. This technique provides a lower mean airway pressure, and risk of barotrauma reportedly is decreased. (Although no improvement in compliance has been observed with BIPAP as compared to n-CPAP; 3) autotitrating CPAP, has also been used in the home setting and has the advantage of adjusting to the individual patient's airflow patterns.  Unfortunately, possible adverse effects related to this type of nocturnal ventilatory support include those related to pressure, airflow, and the mask-face interface. It produces dry mouth, barotrauma, pneumothoraces, and aerophagia, as well as air leaks and pressure sores at the mask interface, impacting the ability to consistently use the treatment.

As explained by Piccirillo JF, Duntley S, Schotland H in "Obstructive Sleep Apnea," JAMA 2000;  284:1492-1494 (mentioned above),

> "the clinical sequelae of untreated OSA syndrome are often severe and include daytime hypersomnolence, cognitive impairment, systemic hypertension, . . .and increased risk of motor vehicle crashes. Unfortunately, the majority of patients with OSA syndrome remain undiagnosed and untreated."

Among the "general treatment measures" is the "avoidance of central nervous system depressants." (As you may know, Ativan (Lorazepam), which Dr. Kimberly was taking from June 2001 to August 2002, is a central nervous system depressant.)   In a study of normal subjects, Lorazepam has a tranquilizing action on the central nervous system.     The contraindication of a CNS tranquilizer/depressant in someone whose oxygen saturation is already depressed as a result of obstructive airways disease would seem obvious.

Drs. Cataletto and Hertz in a review of "Breathing-related Sleep Disorder" discussed the resulting morbidity.  They explain:

> Morbidity with OSA falls into 2 major categories, as follows:
>
> •     Neuropsychiatric or psychosocial: This includes excessive daytime sleepiness, poor concentration and memory, decreased performance, irritability, depression,  and  disturbed  social

Hartford Disability Claim Appeal Unit
October 26, 2004

relationships. This population has a significantly increased risk of motor vehicle accidents, with reports of a 7-fold increased risk in patients with an AHI [apnea-plus-hypopnea index] greater than 5.

- Cardiovascular: Systemic hypertension occurs in 45-90% of patients with OSA. Pulmonary hypertension has been reported in 15-20%.

Drs. Piccirillo, Duntley and Schotland at p. 1492 explain that inadequate or difficulty in use of, or inability to use CPAP can result in inadequate treatment, reduced compliance, and even potentially life threatening consequences such as sustained hypoventilation (and its consequences such as permanent brain damage).

Cataletto and Hertz review various pertinent attributes presented in the "**History**" portion of the history and physical examination that OSA patients related that should trigger suspicion of OSA. explaining that "Features of both a patient's history and the physical examination can direct attention to the possibility of a diagnosis of breathing-related sleep disorder. . . .A genetic marker has not been identified, and this finding probably relates to a combination of factors, including craniofacial morphology, level of obesity, sex, age, and environment.. . .

- **Habitual snoring**: This may be the presenting symptom and often is more distressing to the bed partner than to the patient. Along with a history of nasal obstruction or chronic mouth breathing, this symptom should direct the physician to consider evaluation for sleep-disordered breathing.

- **Excessive daytime sleepiness**: Daytime sleepiness is the most commonly reported symptom in patients with OSA.[5]

- **Psychosocial dysfunction**:   Symptoms include irritability, depression, decreased sex drive, and cognitive dysfunction, including poor concentration and impaired memory. These signs are consistent

---

[5]They refer to the Epworth sleepiness scale (ESS) has been used to subjectively quantify the degree of sleepiness by having patients rate their likeliness to doze off in various sleep-conducive situations. This scale has been evaluated in patients with sleep apnea and has been correlated with AHI. Scores range from 0-24. Studies in various populations experiencing excessive daytime sleepiness have established mean ESS scores for sleep apnea at 11.7 as compared to 17.5 in people with narcolepsy and 5.9 in people without sleep disorders.  When Dr. Kimberly reported his difficulty getting up in the morning, with improvement in his symptoms during the day, Dr. Kimberly was not given this scale to fill out.

with chronic sleep deprivation. Morning headaches may also be reported.

**Witnessed apnea**:   Reported by bed partners, these are more predictive than a history of waking up gasping for air, which can be observed with a number of other disorders. See Differentials.

**Cardiovascular disease**: Symptoms in this category often reflect the sequelae of chronic hypoventilation and include <u>hypertension</u>, coronary artery disease, and stroke. Bradycardic-tachycardic dysrhythmias have also been associated with apneas.

Enuresis/nocturia and impotence

**Obesity**: Defined as a body mass index (BMI) greater than 28 kg/m2, obesity is reported in 60-90% of patients with OSA. Both central and truncal obesity correlate with the severity of OSA.

Cataletto and Hertz also discuss pertinent findings on the "Physical" part of the History and Physical. Among other general characteristics is "<u>Obesity</u>."

**Mental status**: The Mental Status Examination should be tailored to the individual patient, <u>with particular attention to affect because depression is not an uncommon comorbidity in people with sleep deprivation.</u> In patients with neuropsychiatric disease, this evaluation is more extensive.

**Blood pressure**:  <u>Systemic hypertension occurs in approximately 50% of patients with OSA.</u> While diagnostic upper limits may vary somewhat by study site, <u>most agree that hypertension exists when systolic blood pressure is documented repeatedly (ie, on 2 or more visits) as greater than 140 mm Hg or when the diastolic value equals or exceeds 90 mm Hg on 2 or more visits. Patients with hypertension have an increased incidence of OSA (ie, up to 30%), and questions about sleep should be included in the workup of patients with hypertension.</u>

**Height and weight** (BMI): BMI greater than 28 is frequently associated with OSA.

**Collar size**: Collar size is measured at the level of the cricothyroid membrane and is another parameter associated with predicting risk

Hartford Disability Claim Appeal Unit
October 26, 2004

for OSA. In snoring male patients with collar sizes greater than 17 inches, the prevalence of OSA is 30%. ...

. . .

**Oropharynx**: A variety of anatomic feature can have an impact on airflow limitation at this level, including large tonsils, long soft palate, large uvula, pharyngeal flap, posterior pharyngeal stenosis and scarring, redundant fold, and tumors. The relationship of the tongue, palate, and posterior pharyngeal wall can cause posterior pharyngeal crowding and predisposition to OSA.

**Neck**: Fat distribution in this area can compromise airflow during sleep when muscle tone is reduced, especially during REM sleep. ...

From mid-1998 forward to mid 2001, Dr. Kimberly began demonstrating increasing symptomatology fully consistent with his development of OSA with increasing age, but obscured by his prior experience with depression which had readily and successfully been treated with Zoloft. He has hyperlipidemia, particularly hypertriglyceridemia, and has hypertension, both systolic and diastolic, for which he takes blood pressure medications.

In July 1998, he reported the reappearance of and increasing level of depression than that which he experienced approximately four-to-five years earlier. He presented in July 1998 with **depressed mood, less energy, increase irritability**, complaining he was having to push himself at work. At that time, he did not consciously note any problems with sleeping, but not surprising, since individuals with OSA often do not know they have apneic events. He took Zoloft and Tranxene. He had difficulty getting out of bed in the morning, reporting more depression in the morning, but feeling better in the evening. (p. 9..580-581, reference to 9.579). Increasing the dose of Zoloft had the opposite effect on him, if his symptoms of fatigue and loss of energy were caused by a simple diagnosis of Depression: ie. He felt even more tired and had less energy with increased Zoloft. For that reason, his psychiatrist (instead of looking into other causes), placed him on Wellbutrin (9.580). While some improvement became apparent. He was "still tired and with low energy" (9..579). The focus on only a psychiatric cause of the symptoms continued to divert attention from ascertaining another condition responsible for the symptoms. While an unfortunate occurrence, he is not the only patient who has experienced the failure to identify OSA. In late 1998, he continued to report feeling depressed, "pooped-out", low interest level and energy, "unmotivated, burdened with low concentration" and still having "to push" himself. (9..577). The unsuccessful Zoloft and Wellbutrin were discontinued and Effexor was started, with tranxene (9..577), but several weeks later, in January 1999, he continued to report lack of energy, having to push himself to function, lack of interest, negative thoughts and feeling of depression continued, although he reported feeling better on weekends when he faced fewer demands. He also reported psychomotor retardation and "feeling overwhelmed". (9.576, 575). There still were no referrals by the psychiatrist to evaluate the presence of another causative condition. Without much improvement by end January 1999, Dr. Kimberly became tearful, about his low energy, loss of interest, sense of being overwhelmed and symptoms

Hartford Disability Claim Appeal Unit
October 26, 2004

of depression. (9..574). The only treatment offered, however, was "support" by a prescription for some psychotherapy (beginning with **Robert Aguilar, Marriage Family counselor**) and increased dose of Effexor. Mr. Aguilar specifically noted at his first visit in <u>February 1999</u> Dr. Kimberly's continued irritability, loss of energy and feeling of being overwhelmed. (9..621). While the Axis I [Clinical Syndromes] diagnosis was MDD, he "deferred" Axis II [Developmental Disorders and Personality Disorders] and left Axis III blank [Physical Conditions which play a role in the development, continuance, or exacerbation of Axis I and II Disorders].

Whatever was happening with his probable developing OSA would remain unaddressed for some time, as he began showing improvement for a time on the increased dose of Effexor, Wellbutrin and psychotherapy through the Counselor. However, in <u>early 2000</u>, his irritability and depression increased (9..564). Effexor was discontinued. He noted difficulty concentrating and reporting a "feeling like 'short-circuit' in my head" (9..561), although it appears that the only considered explanation for this might have been simply side effects to discontinuing Effexor. Other medications were tried (Remeron, Zoloft again, Tranxene" but they were "not..helpful" (9..559). After facing approximately two years with this frustrating circumstances, he was "depressed, tearful frustrated" complained of "decreased concentration...overwhelmed..." and "somnolence, tiredness, tingling feelings, and as if 'in a fog'", which the psychiatrist noted only as "side effects." (9..559). Unfortunately, inquiry into another possible contributing cause still was not done. On <u>November 2, 2000</u>, he was placed on disability by **Dr. Alabala**. His Family practitioner, **Dr. Sacks** simply recorded he had been seeing a psychiatrist and had been on "multiple psychiatric medications" and suffered what apparently were assumed to be "multiple 'side effects.'" (9..515). He continued to report to **Dr. Sacks** that he "feels overwhelmed at work; has problems with interaction with his family, yelling at wife and kids; and sleeps a lot." These are also symptoms reported with OSA, yet the family practitioner's only "Assessment" was "adjustment reaction, hypertension, hyperlipidemia". (9...808). In <u>November 2000</u>, he even "appears fatigued" (9..609, 9..602). Yet he returned to work <u>November 27, 2000.</u> He continued to report intermittent mood swings and fatigue (9..605) and depression (0..604), and continued to physically look fatigued (9..606) and was "'oversensitive' to noise at home" (9..603).

On <u>January 25, 2001</u>, he reported to **Dr. Albala** that while he thought his sleep was good, nevertheless reported symptoms consistent with OSA: anxiety, "fully unmotivates" "Less productive", that he "doesn't care", has to "push himself" —"I have to struggle to get things done" and that it took him twice the effort to get routine results, but still "continues to work, at great effort." (9..556). By the next moth, anxiety ad "stressing" were increasing (9..594) and that he was noticing insomnia, —waking up at 3:00 AM (9..512, 9..516). Zyprexa produced some short term improvement , although in <u>April 2001</u>, he complained of his frustration in always being "overwhelmed" at work and also complained of "...cycle sleep disturbance" and decreased effectiveness of the medications in treating his symptoms. (9..700). In <u>mid-May 2001</u>, Dr. Kimberly continued to report anxiety, depression, "indecisiveness", "decreased concentration at times or has to make active efforts to successfully concentrate" (9..540-550). **Dr. Albala** was retiring from active clinical practice, so he was, in the meantime, making arrangements to refer Dr. Kimberly to another

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 13 of 67

psychiatrist with his group —**Dr. Eaton** (9..551), with no referral to a neurologist or other professional to investigate the possibility of a different cause or contributing organic cause for his recalcitrant symptoms. Lithium was added, with an early slightly positive response, although Dr. Kimberly still rated himself as an "8" level of severity out of "10" (worst). (9..696). On May 31, counsel **Aguilar** met with Mrs. Kimberley, who reported her observation that the medication was not helping; that the patient was still anxious and overwhelmed. (9..694) Even Dr. Kimberly himself reported increasing anxiety —at times intolerably so (9..547), with continued concentration difficulties, feeling "dull and spacey" and having to "push himself" to get anything done, also reporting "mild tremors." (9.547). **Dr. Albala** precluded him from further work (9..547). It is at this time (June 1, 2001) the CNS depressant Ativan was started by **Dr. Eaton** (9..547), although Dr. Kimberly only took a dose in the morning, not in the evening (9..546). Although he was also off work, his slight improvement in the level of significant anxiety was attributed to the medication. (9..693). **Dr. Eaton's** initial History however specifically notes that Dr. Kimberly reported being "okay if active, otherwise falling asleep"; that he suffered from depression progressing to "now pathetic" with a lot of self-doubt, anxiety, free floating panic. (9..388-393). He diagnosed as Axis I MDD, D, Rec; left Axis II blank; and Axis III as "Hypertension" as well as hypercholesterolemia. Axis IV was "mild" psychosocial stressors and Axis V current GAF was 65. The following week, Dr. Eaton recorded reports of "trouble getting out of bed especially without working" (9..1187). Dr. Kimberly was still taking Ativan, to which **Dr. Eaton** attributed his reports of feeling "spacey", and free floating anxiety, almost panic, and questioning of his decision making ability. (9..1187). Counselor **Aguilar** opined on June 14 that Dr. Kimberly appeared depressed (9..691), reporting anxiety; **Dr. Eaton** clarified in his records the next week that his "anxiety is more focused  i.e., in the AM." (Dr. Kimberly continued to use Ativan 1 1 ½ mg per dose < 10 times per week). (9..1186). He tried returning to work for two weeks causing acute anxiety, tearfulness and distraught, and complaining of noticeable "loss in quality and quantity of sleep" and that he is "more insecure about making [medical] decisions at work [as an eye surgeon].  (9..689).  He appeared lethargic with complaints of anxiety and fatigue and was overwhelmed with trying to work given his condition. (9..688).  Within the next two or three days, he fell asleep at the wheel while driving and hit the median, and was thereafter precluded from further work. He told **Dr. Eaton** he has to "double and trip check himself" and suffers a "total lack of confidence" as a result of his circumstances. (9..1185). Counselor **Aguilar** also noted his hypersomnia and falling asleep at the wheel (9..687).  He was awakening at night crying (0..686), probably caused instead by inability to breathe or get air at night. The next week, July 13, 2001, Dr. Kimberly on his own, saw his family practitioner Dr. Sacks, who apparently referred him to a neurologist, **Dr. Bena fisher, M.D.** for a neurological consult related to his blacking out and "excessive daytime sleepiness". On the same day as his visit with **Dr. Sacks**, Dr. Eaton noted that he "continues with problems with sleep" —"he can be "sitting there" and just go off to sleep,"  "still [has] a lot of anxiety",   "Need[s] to write things down to remember", producing "a lot of doubt and worry." Instead of querying another problem might be the source of all of this, including possible sleep apnea, **Dr. Eaton** simply queried, "does this relate to increased Ativan?" (9..1184).

**page 13 of 67**

On <u>July 20, 2001</u>, **Dr. Fisher** noted pertinent history that Dr. Kimberly's

> "...<u>wife noted over the years that when he is reading the newspaper,
> she may call him several time before he answers</u>. Over the [past] few
> months he has <u>episodes where he appears to be in a daydream, and
> she will call him many times before he answers</u>. (paraphrased)
> ...problem became significant when it occurred while driving and he
> hit a median... <u>he has been observed during the episode and just
> appears to be staring.</u>
>
> ... "some <u>intercurrent problems with depression</u>...is currently on a
> number of medications which can cause drowsiness. ... Wife notes
> that <u>he snores and has periods of apnea during sleep</u>. ... Has had
> <u>instances where he could no(t) remember a word. Occasionally he
> will substitute a word that sounds like the word he wants to say</u>...has
> had some **mild** problems with memory and concentration.

(P. 9..799-801, Underline added). Apparently trying to rule out central sleep apnea, **Dr. Fisher**
ordered an EEG during wakefulness (9..505), which **Dr. Fisher** interpreted a showing "no *neurologic*
abnormalities." **Dr. Fisher** therefore referred Dr. Kimberly to **Pulmonologist, Steven D. Kavy,
M.D.** to perform a "sleep study." (9..798). In the meantime, Dr. Kimberly continued to report that
he has to "force himself not to stay in bed all day." (and that Provigil doesn't help that) (9..1183); that
his mood was "worse" (continuing to appear somewhat lethargic (9..684)), that it is **"harder to get
out of bed** (<u>8/2/01</u>, **Dr. Eaton**, 9..382), that he "spends hours trying to fill out [insurance] forms
(9..382), that he continues to get no relief from his medications and still feels overwhelmed, tearful,
dysphoric and is depressed about his lack of progress with his mood (9..683).

     **Dr. Eaton** filled out the first Attending Physician Statement (APS) on <u>August 2, 2001</u>
indicating that the disabling symptoms are "depressed, unable to concentrate; Hypersomnia (can't
sleep) and has a "major impairment in several areas —work, family relations. Avoidant behavior,
neglects family, unable to work." (9..1182). The psychiatrist's diagnoses were, not surprising, given
the above explanation, "MDD, Depr, Rec. 296.3 (9..1182). Shortly thereafter **Dr. Eaton** again
documents Dr. Kimberly was taking increased Ativan and complained, "I'm just getting worse. Not
out of bed till 9:00 am. ..."only relief is when asleep" (9..1181). Two days later the therapist also
opined he appeared lethargic and low energy level (9..682). A week later (<u>8/23/01</u>) **Mr. Aguilar**
opined Dr. Kimberly appeared mildly anxious complaining of anxiety and hypersomnia and lethargy,
struggling with his poor motivation (9..681), and on the same day, reported to **Dr. Eaton** that he
"continues to 'nod off' in the car" and so is not driving. (9..1180).

     The following day, <u>8/24/01</u>, Dr. Kimberly saw pulmonologist **Dr. Kavy**. (9..797). Dr. Kavy
noted in the relevant history that Dr. Kimberly's "Wife noticed <u>apneas, chocking & gasping</u>"; that
Dr. Kimberly had **gained 44 lb in 18 months**; that he had +<u>daytime fatigue. -naps</u>. -cataplex, -

Hartford Disability Claim Appeal Unit
October 26, 2004                                                Page 15 of 67

hypnograph hallucination, -sleep paralysis. <u>Difficulty concentration</u>." Dr. Kavy measured Dr. Kimberly's **collar size as 17.5** and noted his "**thick neck**." His impression was that of a "46 y/o M physician <u>with snoring, fatigue, apneic:    r/o OSA</u>." He queried, "It would be interesting if he does have OSA —how much his HTN and depression is related to this." (9..797).

Cataletto and Hertz in "Breathing-Related Sleep Disorder" discuss relevant data related to how many people with OSA —moderate to severe OSA— go undiagnosed for years or at all:

> "Studies have shown that significant numbers of patients (93% of women and 83% of men) with moderate-to-severe OSA are undiagnosed."

They point out that most of the procedures involved in diagnosis, evaluation, and treatment involve subspecialty consultations. One of those specialists is a psychiatrist, since "patients with OSA may have difficulties with the sequelae of chronic sleep deprivation, the need for n-CPAP or surgery, and the prospect of often-significant weight loss. Depression may coexist with chronic sleep deprivation and may require ongoing psychiatric intervention until both are under control." Cataletto and Hertz. They also list treatment by a Pulmonologist because the "underlying pulmonary parenchymal or airway disease can influence the severity of the response to OSA. Treatment of such disorders can complement the treatment of OSA." They also list "oral surgeons" and "Sleep medicine physicians, [who] are generally affiliated with a sleep disorder center. Their specialty training may come from a variety of sources, most commonly from pulmonology, neurology, or psychiatry. Additional training in the area of sleep disorders may lead to board certification from the American Board of Sleep Medicine. Once patients have been identified with OSA, titration of positive pressure ventilation can be achieved under supervision in the sleep laboratory."

**Dr. Kavy** ordered a 9-hour sleep study to test for apneas, hypopneas, desaturation. "Apnea" is defined as a chest or air flow pause for at least 10 seconds; "Hypopnea" is a drop in air flow of 50% below the average amplitude for at least 10 sec with a 4% drop in $O_2$ saturation; "Desaturation" is a drop in $\%O_2$ of 5% below baseline saturation for at least 10 sec. Treatment is necessary with an RDI higher than 20 regardless of associated symptoms or conditions. Man CG. Obstructive sleep apnea: diagnosis and treatment. Med clin North Am. 1996; 80:8C.

Dr. Kimberly's sleep study demonstrate multiple desaturations: <u>344</u> **14% of night, 02 sat 60's, with an RDI (respiratory disturbance index)**[6] **of 20.9 consistent with sleep apnea.** (9..854-871). There appear to have been 34 obstructive apneas > 10 sec; 12 obstructive apneas > 15 sec. 7.9 apneas > 10 sec/hr, or 3.6% of the study. There were 13.1 hypopneas > 10 sec/hr or total of 33 min; 6.9 hypopneas > 15 sec, or total duration of 22 ½ min. The study included an Oxygen desaturation bar graph. (at p. 9..530). Dr. Eaton and counselor Aguilar also made specific note of

---

[6]RDI is defined as the total number of apneas and hypopneas per hour.

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 16 of 67

the reported 02 saturation in the 60% level.   According to Dr. Eaton on <u>August 31, 2001</u>, Dr. Kimberly had been "suffocating at night." (9.1179).   Thus, Dr. Kavy diagnosed Dr. Kimberly with obstructive sleep apnea.[7]

Psychiatrist Eaton's letter to UnumProvident repeats the Axis I clinical syndrome of MDD, Depressed, recurrent, against leaves Axis II blank, repeats Axis III as HTN and hypertriglyceridemia, that the Axis IV stressors are being unable to work and that the Axis V current GAF is 42.   Whether Dr. Eaton referred to his <u>6/7/01</u> initial evaluation for the mechanical recitation of this letter, what is clear is that he failed to mention under Axis III what had become a definitive and unquestionable Axis III diagnosis as of <u>8/28/01</u>:   OSA   (it is more likely that he dictated his letter before his visit with Dr. Kimberly on August 31, —i.e., before he learned of the diagnosis only receiving the letter from transcription for signature about 10 days later, as he also states later in the letter, "He has not been able to come out of his present depression. <u>Interestingly, he has been seen by a neurologist, Dr. Bena Fisher, and in the process is being worked up for possible sleep apnea. He told me on his last visit that he had a sleep test and is now in the process of getting a CPAP machine. He had numerous problems during the evening, and it will be interesting to see what impact this has on him and his mood</u>.   Since Dr. Kimberly informed Dr. Eaton on <u>August 31</u> about the "341 events" of 01 desaturation and that he was getting a CPAP (9..1179), it would appear Dr. Eaton did know about the diagnosis of OSA, but simply forgot to update his <u>September 10</u> letter.   What becomes clear from that letter is that Dr. Kimberly's symptoms had begun to escalate and he had an "increasingly difficult time since November of 2000" (9..538) and that "he is troubled by hypersomnia" and because of his inability to work and handle things, also from "excessive guilt," has "free-floating anxiety, panic attacks, insecurity, and loss of self-esteem." (9..538).   Dr. Eaton notes that his wife "is afraid of letting him drive, as he frequently falls asleep because of the hypersomnia."   At that time in the course of Dr. Kimberly's OSA, Dr. Eaton assessed "his concentration is fair, memory is also fair, but he needs to rely on notes."   Thus, it is not surprising that as to this eye surgeon who is unable to remember things but responsible for the health of patients, Dr. Eaton affirmed his disability, explaining "He has <u>difficulty with decision-making, is constantly second-guessing himself, and when returning to work for the short time that he did, he was obsessing over minor details</u> [undoubtedly trying to ensure he was not mis-remembering something or could end of making an irreparable mistake that would result in damage to the patient.]   Noting that he sees Dr. Kimberly once every 7 to 10 days for 15 to 30 minutes, Dr. Eaton's goal was to ultimately stabilize his depression and to have him feel more comfortable and confident about himself and his work and hope fully to return to work."   Dr. Eaton makes it clear that Dr. Kimberly's response to all of the treatment with various psychotropic medications, and psychogherapy <u>"has been one of a progressive deterioration</u>."

Dr. Kimberly was limited in the type of CPAP machine he could get by his HMO, which approved only a basic model, Respironics brand called "Remstar Plus".   While he reported doing

---

[7](Note, this was not Dr. Fisher who diagnosed OSA)

somewhat "better" with it since starting approximately September 7, 2001 (9..678), that he was "not snoring," was "sleeping more" —although it remained "harder to get up"; that his depression had improved in the morning, but that he continued to experience "anxiety" "especially in the morning" and "nervousness" (9..1178, 9..796). He indicated to Dr. Eaton that the pulmonologist told him the CPAP "needs a higher setting" (9..1178).

On September 17, 2001, he underwent another 8 ½-hour sleep study which, compared to the prior results, was "improved on CPAP 8." (9..477). (0..141; 9..846-53), there were 23 periods of desaturation, compared to the prior 344, and the low was 65% compared to 61% on August 28, 2001. There were 17 apneas (compared to the prior 70) and 14 hypopneas (compared to the prior 116, with a total desaturation time of 7 minutes (compared to the prior 51 minutes). Of course it must be remembered these were tests on only one night of sleep, and do not necessarily mean every night's sleep is the same, inasmuch as the time spent in the supine vs. recumbent position may vary each night, among other sleep variables. "Improvement" obviously does not mean 'normal,' or absence of apnea). Whether it means fewer hypopneic episodes, or apneic episodes, or less lengthy episodes, or *what,* it is unclear. The true effectiveness, however, as noted by the authorities, lies in the clinical information (such as continued day time sleepiness, difficulty getting up in the morning, anxiety, or other OSA-related symptoms which he demonstrated). On September 27, 2001, Dr. Eaton as much confirmed this, noting the worst thing Dr. Kimberly noted was "anxiety" and that while he was "doing better with CPAP" it was "still hard to get going in the AM." (9..1177). Dr. Kimberly was tearful recounting this and his "chronicity of symptoms" to Dr. Eaton which, not surprisingly, left him feeling distraught. (9..1177, 9..677).

After using the CPAP machine about a month, Dr. Kimberly reported on October 11, 2001 his discouragement that it had not been more helpful, —still reporting to Dr. Eaton and Dr. Sacks that "mornings remain the worst" (9..1176, 9..795) and that he was having the "same difficulty with memory" (9..795)(having to make lists, difficulty prioritizing, difficulty concentrating, has to make lists); interestingly, Dr. Kimberly had been left on Ativan throughout this time.

The 'most trouble in the mornings' reports continued (11/2/01 to Eaton: 9..1174, 11/7/01 to Eaton 9..963). Interestingly, instead of further workup for ECT, further testing to delineate the effectiveness of the CPAP at different levels, or UPPP surgery with tonsilectomy, or even discontinuance of the CNS depressant he was on, Dr. Eaton recommended bilateral ECT, "to give him hope" (9.1024); or per Dr. Kimberly, "because they can't find anything that works for my depression, I am here for ECT." (9..986-988). Dr. Eaton went into a little more detail about Dr. Kimberly's reports of "inability to function, for example, describing trying to change the oil in his car and ending up with it all over the floor." (9..1022-1023). Somewhat incredibly, Dr. Eaton still fails to document OSA under his Axis III. (9..1022-1023). Apparently it was assumed by the ECT physicians that CPAP took care of his sleep apnea. (9..1030; repeated by Dr. Tecca, internist at mesa Vista 9..1027-1029). Mesa Vista psychiatrist, Dr. McManus noted on November 8, 2001, just before the first bilateral ECT, "demonstration; short term memory deficit." (0..997), and the internist who was supposed to perform an internal medicine consultation, apparently had no set of medical records

to review, and makes no note of contacting Dr. Kimberly's neurologist, but states "most of the history comes from Dr. Kimberly"—who had been reporting concentration and memory difficulties. He mentioned nothing about the sleep study results, appeared not to go into any detailed history about the use of the CPAP or how Dr. Kimberly felt with it, did not measure his collar girth or discuss other classic symptoms and signs often reported by OSA patients, but simply concluded"sleep apnea, on a CPAP, Obesity mild, HTN controlled, clear for ECT. (9..1027-1029). This despite the Progress notes on 11/8/01 that reiterate about the complaints of depression that it is "deepest in AM and eases during the day." The psychiatrist, McManus, also goes into the depressive symptoms, but, copying the Eaton report, lists only HTN and hypercholesterolemia as Axis III, failing to mention OSA.

After the first bilateral ECT procedure which was performed by Johnathan Koelle, M.D. on 11/9/01, Dr. Kimberly "exhibited post-ECT agitation" post-ECT headache (9..959) and nausea. His discharge after care included Ativan bid. (9..922). It appears there was no careful correlation of Dr. Kimberly's presenting symptoms with those that are well known to present in patients with OSA. He was placed under anesthesia again for ECT#2 on an outpatient basis, following which he was "agitated, restless, tearful" and was to "return home with wife" (9..1039-1040). On November 13, 2001, he reported to Dr. Eaton he "feel[s] worse since I had it." (9..1173) and continued taking Ativan.  The physicians continued the bilateral ECT treatment on 11/12/01 (#2: 9..1034), 11/14/01 (#3: 9..1034), 11/16/01 (#4: 9..1034), 11/19/01 (#5: 9..1034).   Half way through the course of treatments, Dr. Kimberly reported how "brutal" it is to go through, and that he "does not see any improvement" and in fact "feels worse now. Can't drive. Memory is 'not good', 'brain feels thick'." (9..1172).   Despite this, ECT was continued pm 11/21/01 (#6), 11/23/01 (#7); 11/26/01 (#8); 11/28/01 (#9); (9..1035); 11/30/01 (#10); 12/3/01 (#11); 12/5/01 (#12); 12/7/01 (#13)  (9..1036); 12/10/01 (#14); 12/12/01 (#15); 12/14/01 (#16)  (9..1038).

After ECT #14, he reported confusion, in that he can't remember office, trips, is not able to drive (9..1170), and is "more bothered by not being able to remember" (9..1169). Dr. Eaton noted on January 2, 2002 that although he remains on CPAP, there was "no major difference." While Dr. Eaton recorded in the medical note that appointment that "memory seems to be improving," Dr. Kimberly completed a "Claimants Statement" for Unum Provident (0.1378) the same day, stating

> "Still with poor memory & decision making ability. Unable to see patients in time generally allowed without extreme stress and second guessing myself. Panic when confronted with excessive demands. Still questioning patient safety due to memory difficulties. ..."Trying to remember necessary medical information for work"... "Since 16 ECT treatments, having great difficulty w/memory. Still unable to safely drive car. Cannot remember where I am going or how to get home." ... "My wife must provide assistance w/written information... she also must drive me to & from all activities & appts."

(It is possible Dr. Eaton subconsciously wanted Dr. Kimberly to have improved after going through the difficult series of treatments when he didn't.)

When the treatments were begun, there was no mention that there would be a total of 16 treatments. While the original consent form which is their standard states "probably" 3 times per week for 30 days, but not to exceed 15 treatments," Dr. Eaton told the Kimberlys that only a few treatments would be necessary, and he and Mrs. Kimberly assumed it might be three to four at the most. He even tried to skip the one around Thanksgiving, but the male nurse in charge of the ECT area and the doctor told them that in that case, trying to pass any potential 'blame', that Dr. Kimberly 'would be responsible for the treatment not working.' In that context, the Kimberlys drove down from the L.A. area at 5:00AM Friday 11/23/2001 because they did not want to be 'blamed' for the treatment being ineffective, if it turned out to be so. While he has seen his signature on the same standard form on 12/10/2001, he has absolutely no recollection of doing so and does not believe, after being shocked, he could 'refuse' such treatment at that time anyway. After being shocked 16 times, Dr. Kimberly did not know his own name or even who his wife was, to the significant alarm of Dr. Koelle, who then stated to the Kimberlys that *there would be NO further treatments*.

The next week, on January 11, 2002, family practitioner Dr. Sacks noted "still very depressed" "problems with memory"; that Dr. Kimberly stated, "I don't like doing anything" and "I'm worse than I was in July 2001" —very concerned about memory being poor —he forgets things (9..794). This was reiterated to Dr. Koumaras at end January 2002 [16 treatments, bilateral ECT - no response] (9..454-457), a psychologist with whom Dr. Kimberly had begun consulting at the recommendation of Dr. Eaton. Dr. Koumaras noted Axis I: MDD recurrent; Axis II defer; Axis III Sleep apnea see record; Axis IV psychosocial stressors moderate; Axis V current GAF 55 (9..457). Dr. Kimberly continued to report that his symptoms of depression/discouragement were worse in the mornings; that all of the psych treatment was doing nothing; that nothing was changing, and now, after the ECT he had such memory difficulties —"I lost so much memory." (9..452).

On January 14, 2002, Dr. Fisher again saw Dr. Kimberly, noting the prior sleep study and that he woke up 380 x per night with a P02 in the low 60s; that he got a CPAP machine, had one test with it in 9/01 where the 02 was "ok; went up to 10; but that he "started to have memory problems about 3 months [ago –in about mid/end November 2001]; "goes to store and can't remember" (although Dr. Fisher does not expound, Dr. Kimberly would get lost on the way to the store). Dr. Fisher ordered an EEG (which was done on January 21, 2002 which was normal), obtain an MRI (with

Hartford Disability Claim Appeal Unit
October 26, 2004                                                    Page 20 of 67

gadolinium enhancement —showed partially empty sella[8]: 9..831)and check testosterone level. (9..793) (which was found to be low (9..889)).

On his February 5, 2002 Claimant's Statement, Dr. Kimberly confirmed no improvement since a month prior; that he had "Poor short term memory & difficulty making decisions still exist. Very anxious & panic when confronted with multiple demands. "I am unable to listen & write at the same time. Driving only on a limited basis and day time only. Must know where I am going & have detailed directions." (9..1377). Dr. Eaton's 2/19/02 APS noted complaints of inability to do any parallel process such as listening and writing (like in lecture) and continues to misplace things (9..1165) and he reported Axis III to be Sleep apnea, hypertension and hypertriglyceridemia. (9..1165).

Due to the empty sella syndrome and finding of low testosterone, Dr. Kimberly was referred to endocrinologist Joyce Chung MD on March 6, 2002 to rule out a pituitary problem cause. Dr. Chung began treatments of multiple intramuscular Depotestosterone injections, and reported the pertinent history in her initial visit, "Complains of excessive daytime sleepiness and memory loss in the past year. Has seen Neurologist Dr. Bena Fisher. Work up showed no neurological abnormalities. **Later sleep study found sleep apnea.** He was placed on CPAP since Sept. last year (01) symptoms did not improved" (9..789-792).

In the meantime, he continued to consistently report "no energy" "tired" "memory problem" "continues to be depressed" "cried all day last week (implicating his frustration) when he couldn't fix computer (9..450). On March 13, 2002, Dr. Eaton continued to note that Dr. Kimberly was "not doing well with sleep apnea, was "more depressed," "can't retain anything" —and finally queried "does he need tonsil's out?" (9..1164). He saw Dr. Fisher again on March 13, 2002 who noted "decreased short term memory . . . has sleep apnea." Dr. Kimberly gave examples of this on his "Claimant's Statement" submitted to Unum Provident: ""Again no improvement since last statement. Still continue to have poor short term memory & difficulty making decisions. Very anxious & panic when confronted w/multiple demands." "My wife continues to assist me w/necessary paperwork. I am still unable to listen & take notes at the same time. I am still continuing to drive on a limited basis w/directions provided." (9..1375), reporting the same at the end of that month (9..1374). Dr. Koumaras also noted consistent complaints about his 'memory' —so much so

---

[8]Empty sella syndrome is the absence of the pituitary gland on radiological imaging of the sella turcica, a bony structure that normally partly surrounds the gland. The pituitary gland is a small gland located at the base of the brain. It makes several hormones that control the function of other glands in the body, including the thyroid, the adrenal glands, and the ovaries or testes. When the sella is empty because the pituitary gland has regressed following an injury such as head trauma or an event such as surgery or radiation therapy, the condition is called secondary empty sella syndrome. Therapy is directed at replacing hormones that are deficient as a result of abnormal pituitary gland function.

Dr. Kimberly became 'teary' 'discouraged' 'really despondent' in describing it, also noting a very high blood pressure. (9..449). His reports continued in April 2002: "Still no improvement ... Continues to have poor short term memory & difficulty making decisions. Very anxious & panic when confronted w/multiple demands. Sleep apnea still not resolved." Wife continues to help with paperwork. Listening & taking notes is difficult and driving is still on a limited basis with directions provided. (9..1372).

Dr. Kavy referred Dr. Kimberly for a Head and Neck Surgery consultation with Dr. Charles Tesar of SRS on April 12, 2002. Dr. Tesar noted his weight of 230#, "overweight with rather thick neck," thin nose, snoring with apnea, 8 months CPAP use since 9/01, although "difficult to use", multiple antidepressants, fatigue-associated MVA, and then discussed his plan for surgical procedures. (9..283, 9..784). In the meantime, Dr. Kimberly continued to lament the lack of any benefit from ECT (9..447).

In April 2002, Dr. Kimberly also applied for Social Security Disability Benefits, indicating his "impairments were Sleep Apnea, depression, impaired short term memory, Hypertension and endocrine dysfunction. (9..973-974). He and his wife tried to describe some of the memory problems on the Social Security Questionnaire (9.1364-1370), such as follows:

> 1 Typical Day: ...He tries hard to do activities & things around the house but following through & completing those tasks are difficult for him.

> 2. Normal Sleeping Hours? Sleeps 8-10 hrs per night "However I don't believe he sleep soundly all during the night." He has a severe case of sleep apnea which causes him to stop breathing many many times during the night and his oxygen level dips very low. He has a mask/machine that helps some, but it is very difficult to use on a nightly basis and still get enough sleep to feel rested.

> 5. What shopping? He will sometimes go to the grocery store for me with a very short detailed list. He may do this once every other week or so. He must have the list written out in detail or he will forget things. He also only drives to the closest w/directions.

> • Pay Bills Jointly? "I must check to be sure he has done things correctly."

> • Household Chores? ...I usually give him simple chores but completing these tasks can be difficult. He forgets how to complete the whole process of a task."

> • Need Any Help on Chores? "Yes, I have to oversee him & help him to keep on task & remind him of the steps involved."

Hartford Disability Claim Appeal Unit
October 26, 2004

7. Assistance in going out? "He will drive himself a few places if he is sure where he is going. We review directions frequently. He never drives at night or long distances."

•Recreational Activities/Hobbies? "...spends a lot of time sitting in front of our children's computers ...he spends a lot of time with very little productivity. The same applies for gardening & car repair...now he does what is necessary at a very slow pace. He also second guesses his skills, constantly."

9. Radio/TV? "He watches some TV as family time. However when we discuss these programs at a later date, he usually does not remember seeing that particular episode."

10. Reading? "He reads the paper...however I don't think he comprehends much of it. The same as the case w/books....he must reread it several times in order to comprehend it."

• Getting Along With Family/Friends/Coworkers/Others?   "Before Kent left work, he was having difficulty falling asleep - his relationships with coworkers was without depth. At home he is emotional & moody. We are careful not to upset him as he can get angry at times. Most of his anger stems from frustration about himself. His emotions also range to pathetic when he will express to me 'why am I still alive'. Most of the time he remains aloof in order not to cause a confrontation. ... Most of our activities are limited to just our immediate family.

• Community, Church, Sports, Social Groups? "He has dropped out of the Men's Bible study he was attending. These group activities are just too difficult for him to attend alone.

• Attend Movies/Concerts/Entertainment? "Goes w/family, not alone."
• Activities Changed Since Condition Began? "He will not instigate [initiate] an activity. He will attend things with us at our urging. He used to find things for the family to do together."

1. Problems Concentrating or Remembering? "Kent has a very difficult time both concentrating and remembering.","The sleep apnea, which causes him to not get the rested sleep everyone needs, he is just not functioning at the same level. His attempts to do small tasks are hindered by his inability to remember the steps involved. He will go outside to do a couple of chores and not remember why he went out. He leaves things places & can't find them & forgets how to get places when he drives around town."

2. Any Trouble Following Instructions/Finishing the Job? He has trouble w/directions "He will read directions on a sheet of paper or how to

Hartford Disability Claim Appeal Unit
October 26, 2004

assemble something and he is puzzled about how to begin. He must read &
study them over several time. Completing chores are difficult for him
sometimes. Handling more then one task at a time is impossible. He has
taking to making lists for everything. Even the smallest of tasks."

3. Any Unusual Behavior or Fears?   ..."Forced to quit work because he fell
asleep driving home & had an accident. He finally had to admit he could no
longer continue the way he was." ...Very fearful about his future... grim
pessimism about life. He worries that he will never be able to work again
or do anything of any value for any one. He is very fearful about treating
patients properly in his medical practice if he can't function the was he
used to.

4. Additional Factors/Observations: "This bout of depression has been much
more severe then the past episodes. He has struggled with this problem
before but always managed to come out the other side. I am sure the sleep
apnea contributes. The sleep apnea causes him to never have a full restful
night's sleep. Therefore he faces each day with anxiety and hopelessness.
... Whether his depression or the sleep apnea or as a result of 16 ECT
treatments, he just is not at the same level he was.

On May 1, 2002, Dr. Koumaras noted problems with "awake[ning] every hour - sleep, x-ray
for sleep apnea (9..1217); and similarly, on May 8, 2002: "Not sleeping well - wakes up 3 or 4 times,
can't go back to sleep. —discouraged, depressed, hopeless, "nothing seems to be happening", lacks
motivation. Continues depressed (9..443); Consistently, Dr. Sacks reported on May 14, 2002, "still
having problems sleeping, discussed weight and sleep apnea. (9..783). This continued, with Dr.
Koumaras reporting at the same time, May 15, 2002 (and similarly 5/29/02), "sleep bad . . . I'm
always fatigued. . . anxiety. . . I feel so lousy. . . he will see surgeon re sleep apnea (9..442; 9..441).
Dr. Tesar noted on May 22, 2002 that Dr. Kimberly was "significantly bothered with CPAP; Dr.
Tesar's Assessment: OSA history, poor tolerance CPAP, overweight, and recommended Base of
Tongue (BOT ) reduction with somnus technique and UPPP to enlarge the area (9..781; see also
9.779, 9..1110).  On June 10, Dr. Kimberly reported on his Claimant's Statement to UnumProvident
that he, "Continues to still have poor short term memory, difficulty with decision making & anxious
panic attacks still occur. Sleep apnea continues to be a problem - surgery scheduled for 6/28." "My
wife still assists me with forms such as this, taking notes and listening is still difficult & I am still
driving on a limited basis.".  Two days later, Dr. Koumaras noted "feels tired in the morning"
("lousy"), better at night. "Couldn't think"; had lost 5 pounds; and had "no memory" regarding the
past ECT treatments. (9..1214).

On June 23, 2002, **HENT Surgeon, Dr. Tesar**, addressed the "Chief complaint" of
"obstructive sleep apnea" with a history of "labile hypertension, hypertriglyceridemia and
documented OSA, also significant depression." Dr. Tesar wrote (9..1077 -1079),

Hartford Disability Claim Appeal Unit
October 26, 2004                                              Page 24 of 67

> Currently attempting to use CPAP but has very poor difficulty
> tolerating the machine. Patient has noted no improvements w/ the
> machine. A sleep study 8/20/01 showed multiple desaturations, 344,
> with 14% of the night's 02 sats in the 80s. His respiratory distress
> index is 20.9.    The patient was tried on a CPAP machine with a
> setting of 8 on [9/17/02] and it showed at that time a respiratory
> distress index of 3.5.  With the patient's inability to tolerate CPAP,
> it was felt that additional intervention measures would be indicated."
>
> Has attempted weight reduction; --currently 235# (5'10").
> . . . EXAM:  *Neck: slightly short bull neck.  has a round chubby
> face. ... Base of tongue has decreased posterior airway space.*
>
> ASSESS:   46 y.o. Hispanic male MD with **OSA history with
> multiple desaturations**. (abbreviations added).    Reviewed
> uvulopalatopharyngoplasty w/ tonsillectomy & Somnus base of
> tongue reduction. Will be observed post surgery to assure no postop
> difficulties.    He will probably require additional tongue base
> debulking procedures."

(Dr. Tesar's pre-operative History and Physical of June 28 reiterated this: 9..1077-1079).

The plain CPAP machine which he was given was used for perhaps 9 months until surgery in late June 2002, at which time Dr. Tesar told him he could stop.

On June 25, 2002, Dr. Eaton confirmed knowledge that Dr. Kimberly was scheduled to have major surgery for sleep apnea—"big time"—4-stage operation (9..1160), and Dr. Kimberly reported in his June 26 "Claimant's Statement", " Poor short term memory, difficulty w/decision making & anxious, panic attacks still ongoing. Problems continue w/sleep apnea - surgery scheduled for 6/28." ..."My driving is still limited & doing tasks such as this form remain difficult & seem complicated for me. My wife still assists me with things like this." (9..1362).  On June 27, 2002, Mrs. Kimberly advised Jeanne Kohler of Hartford, that her husband was still seeing psychiatrist Dr. Eaton, about once a month, sees a psychotherapist Dr. Koumaras, that uses a new CPAP machine, —different from the initial one because of how difficult a time he had using the first one, explaining the new one is easier to use and that while it has helped, it has not cured his problem, explaining to her that the pressure is still about 10. She advised Ms. Kohler that Dr. Kavy had explained the recommended surgery was "pretty last ditch type of surgery" and that Dr. Kimberly's primary disabling condition "came from sleep apnea" producing total exhaustion from not sleeping, in turn causing depression. She also explained that all of the symptoms improved as soon as the sleep apnea was treated, except his "short term memory loss" and his "attention" problems from "his lack of oxygen and everything else that was done to him" including "the medications that they have had him on." (9..52-59). Advises Kohler that testing for sleep apnea showed O2 level down in the 50-60 percentile. "This

<u>went on for a couple of years...easily</u>". They tried all different medications, and he was "heavily...medicated like a zombie".

Dr. Kimberly underwent his first part of the operation, a Uvulopalatopharyngoplasty with tonsillectomy and somnus base of tongue reduction in 4 places. According to what he found at surgery, Dr. Tesar felt "the primary mode of obstruction is in the oropharynx with tonsillar tissue and soft palate tissue as well as the base of the tongue in a recumbent sleeping position" (9..774-776) and sent the tissue for analysis. Pathologist Dr. Schlack found "reactive lymphoid hyperplasia in both the right and left tonsils. (9..1006-1007).

With respect to ongoing psychological counseling, he saw Dr. Koumaras on <u>July 10, 2002</u> noting he was "really nervous" and still had "memory problem - feels loss of memory" and has one more surgery in 4 to 6 weeks, on the tongue. He states he is "better than I was 6 months ago" but "I can't get stuff done". (9..1219). A week later he reported to family practitioner Dr. Sacks that he was still taking some Ativan, that his "sleeping [was] not great" but was "scheduled to have a new UVPP". With respect to "the severe short term memory problems", he will be having some neuropsychological testing.(9..769). On <u>July 24, 2002</u> and <u>July 30, 2002</u>, he reported to Dr. Koumaras and Eaton, respectively "I lose stuff all over the house" and "can't do multiple tasks" (9..1213), "still with memory problems - I forget stuff all the time" (9..1159). In <u>mid August 2002</u>, he told Dr. Koumaras that the ENT surgery helped and his sleep had improved and his "anxiety diminishing" although "free floating" is worse in the morning. But he continued to complain of memory problems. (9..1212).

As you know, he underwent a battery of four tests on <u>August 22, 2002</u>, with Dr. Kenneth Vincent, a psychologist testing on behalf of the Social Security Administration. Dr. Vincent noted in the history that "[d]uring 1999 he began to feel seriously tired. He felt a loss of motor control at times and his memory began failing. He was exhausted and tired easily often getting lost while driving in familiar areas. In July of last year he was granted disability. After Electro-Convulsive Therapy in November last year, his memory was completely compromised and has only partially recovered. In June of this year he underwent the first of several operations to remove air obstructions in his throat which were related to his sleep apnea." (9..1229). Among other things, Dr. Vincent stated,

> "The claimant's thought content and processing generally were both organized and productive. <u>His scaled score on the Similarities subtest, which measures the ability to abstract verbally, was 7. This suggests possible brain organicity</u> on his dominant side when compared to a Comprehension scaled score of 14."

Dr. Vincent also discussed the Wechsler Adult Intelligence Scale -111 verbal subsets, stating, "**Of particular note is his low verbal subscore on Similarities (7). This subtest is very sensitive to brain damage**." (9..1231). He also stated, "<u>Of particular note are the very low subscores on</u>

Hartford Disability Claim Appeal Unit
October 26, 2004

<u>Picture Completion (5) and 4 on Coding. This suggests a failure of visual recognition and of visual-motor control.</u>" and opined that "it <u>is important to note that his Immediate Memory Index Score was 76, suggesting a failing competency in this area</u>.. (9..1232). Dr. Vincent summarized and concluded as follows:  Dr. Kimberly

1. .. has the ability to relate and interact with others such as supervisors and co-workers in a working placement.  However, <u>his failing level of immediate memory functioning might well interfere with his relating effectively to others in the competitive job market.</u>

2. <u>previously had the ability to understand, remember and carry out an extensive variety of technical and/or complex job instructions. However, I doubt that at this time he could do so.</u>

3. <u>may not have the ability to understand, remember, and carry out one-or-two step instructions even in a setting that has routine and untimed performance requirements.</u> **Most likely he would not be able to function in the competitive job market as depression and most likely organic complications slow his response rate and limit his activity.**

4. has <u>marginal ability to deal with the public.</u> He appears to have social skills but <u>his level of irritability is high and he probably would offend relationships or avoid them.</u>

5. has the <u>ability to maintain only moderate concentration and attention for two-hour increments based on his current test performance.</u>

6.. . . **does not have the ability to withstand the stress and pressures associated with an eight-hour workday in the competitive job market. Even during the current testing, his stamina appeared to fail. Most likely Sleep Apnea interferes with his rest**.   He is recovering from a recent throat surgery, one of a series of operations aimed at reducing apnea symptoms.  His high level of depression also causes a reduction of stamina and an increased need for sleep. <u>The stress of his **failing memory, aggravated by the ECT**, is also energy consuming.</u>

7. ... has the ability to handle funds.
8.  The expected duration of the claimant's restrictions are uncertain.

Hartford Disability Claim Appeal Unit
October 26, 2004

> <u>Certainly severe depression **and sleep apnea are related to a failure**
> **of memory and energy capacity,** but I am unable to determine what
> underlying process, **probably organic,** may be impairing his visual
> motor skills as evidenced in the testing.</u>

Dr. Vincent's diagnostic impression at the time was, MDD (296.23), Amnestic Disorder Not
Otherwise specified (294.8), and he believed that "the most likely cause of these symptoms is related
to depression, <u>exacerbated by Electric Convulsive Therapy and Sleep Apnea.</u>

Dr. Vincent's third diagnosis was <u>Cognitive Disorder</u> Not Otherwise Specified (294.9),
opining that

> "<u>There are some underlying organic processes, as yet undiscovered</u>
> <u>that are affecting the claimant's visual-motor ability and his ability to</u>
> <u>discriminate important visual cues.</u> Both of these impairments were
> evident in the testing.

and Axis III was "Sleep apnea" (9..331).   <u>Dr. Vincent explained to Dr. Kimberly that he would be</u>
**<u>unable to return to work due to a "frontal lobe" problem</u>.**  (See reference at p. 9..756).   Dr.
Kimberly found the testing "exhausting" (9..433).

He was to undergo a repeat sleep test, and complained to Dr. Eaton he has a hard time with
multiple tasks, giving the example that he can't pay the bills.  He had a follow up sleep apnea study
with pulmonologist Dr. Kavy on <u>August 29, 2002</u> which demonstrated much improvement following
ENT surgery, showing "mild desaturation" (an RDI of 4.6) (9..476).  In fact, the 8/29/02 sleep test
demonstrated 7 desaturation episodes, with a low of 77%, improved over the prior low of 65%.
However, the number of hypopneas at all length levels (> 10, 15, 20 and 30 seconds) increased over
the prior test (although they were still better than the first test), and he had 7 apneas with and RDI
of 4.6.

He reported to Dr. Koumaras shortly thereafter (<u>9/13/02</u>) that he was less depressed, but still
frustrated with some continuing sleep difficulties, but that most problematic was "difficulties with
recent memory; memory deficits, difficulty with recall.  Dr. Koumaras noted, "definitely not
malingering". (9..1211).  Dr. Kimberly discontinued the use of Ativan at <u>end August, 2002.</u>  At his
visit with Dr. Sacks on <u>September 17, 2002</u>, he reported improvement in sleep apnea since UVPP;
and SS testing showed problems with memory.  He had discontinued Ativan, but still has problems
with memory and difficulty completing tasks. (9..767).  The Claimant's Statement he and his wife
completed on <u>September 20, 2002</u> stated, "Memory problems continue to cause difficulties & much
stress. Decision making & panic attacks are still a problem.  Sleep apnea surgery was performed
6/28/02."  "Since sleep apnea, he has been recovering and additional studies are pending as to the
results of the surgery.", "His driving is still limited and doing tasks such as this form remain difficult
& seem complicated for him.  As his wife, I still assist him with these types of things." (9..1359).

Hartford Disability Claim Appeal Unit
October 26, 2004                                                          Page 28 of 67

Reporting his "mood better since ENT surgery" and off Ativan, Dr. Koumaras gave one example on September 25, 2002: from Dr. And Mrs. Kimberly's continued concern regarding his memory loss, difficulty recalling immediate, gave examples of football game he had watched: "couldn't recall" it (9..1209).  At that time, Social security Administration found Dr. Kimberly disabled from performing any gainful occupation under their stringent rules.

On October 2, 2002, Dr. Eaton saw Dr. Kimberly and noted he was "not doing well —problems with sleep apnea, now secondary to surgery.  He had continued problems with his short term memory, noting Dr. Kimberly had come to the wrong office; that he forgets to put gas in the car (9..1156).  Teary-eyed, he reported the same to Dr. Koumaras that he "forgets" and that his "wife's worried"; that he doesn't finish projects.  (9..1210).

Dr. Kimberly was scheduled for his second surgery for sleep apnea on October 9, 2002: Somnus tongue base.   Dr. Eaton updated UnumProvident, by forwarding a copy of the Vincent testing report, explaining

> "it should be noted that he has diagnosed Dr. Kimberly with an Amnestic Disorder NOS, DSM-IV 294.8 as well as a Cognitive Disorder NOS 294.9. My diagnosis has basically been through psychiatric evaluation. . . . The patient's current status is somewhat improved. He is feeling a tad better with having had prior surgeries on his sleep apnea and noting perhaps an 80% improvement of his oxygen saturation. However, his problems with short-term memory are quite significant. For example, he came to the wrong office the last time he came here, and he forgets to put gas in the car as further examples of his deterioration.
>
> . .. The patient is presently experiencing memory problems both of a short-term and long-term nature. He has cognitive difficulties, depression, fatigue, a sense of hopelessness and anxiety. Comprehension is a major problem for him. He has had these symptoms over the past 2 years.
>
> . . . In terms of his vocational status, he and I are uncertain as to when he can return to work. Given his present cognitive and memory problems, I do not think that it is going to be a feasible opportunity in the near future. Many of his deficits are noted in the report of Dr. Vincent. Most importantly, he cannot sustain attention for any length of time. He has memory problems and a loss of interest in things. He cannot carry out and remember instructions, has difficulty supervising others, becomes short-tempered and irritable, and he has difficulty

Hartford Disability Claim Appeal Unit
October 26, 2004

               <u>especially doing complex intellectual tasks that are the bulk of what
he does as an ophthalmologist.</u>

(9..1349-1350). On <u>October 25 2002</u>, Dr. Kimberly had a post-op follow up with Dr. Tesar s/p
tongue base somnus surgery. Dr. Tesar noted "improved since DOS (Date of surgery). (9..762).
The permanency of his short term memory problems, which Dr. Vincent noted as being of organic
cause (brain damage) had become more apparent as time progressed.

      On <u>October 30, 2002</u>, Dr. Eaton's designations of Axis 1 remained MDD (296.3), Axis III
was "Sleep apnea" Axis IV "severe" and Axis V GAF score "48". (9..326-327). Dr. Eaton answered
other questions on Hartford's "psychiatric APS" form: He stated that Dr. Kimberly's mood was:
"depressed"; that he was "cognition attention-impaired, moderate"; "concentration-impaired,
moderate"; "memory immediate recall, recent, remote". In answer to the question whether there
any psychological factors that might effect this patients performance/occupational functioning, he
checked (✓) "yes": ongoing depression. He specified that there are "no" accommodations/
modifications to the work setting to allow Dr. Kimberly to return to work as an ophthalmologist.
In answer to the query re a "detailed return to work plan" Dr. Eaton responded, "<u>unable to return
to work with current memory problems.</u>" (9..327).

      On <u>October 30, 2002</u>, approximately one week after Dr. Kimberly's second surgery for OSA,
Dr/ Eaton reported "ongoing memory problems i.e. went to meeting of medical nature — can't
remember much. Paying bills twice. Insurance forms filled out times 2. Not using Ativan and seems
to be sleeping/dreaming better." (9..1155). Dr. Koumaras noted the same difficulties on November
6: Dr. Kimberly's "current/Signs Symptoms" are "<u>Memory short term - I forget</u>. Lack motivation.
Discouraged." His "Progress/Current Level of Functioning" noted, "<u>Got lost few times on trip.</u>
"couldn't remember" what happened at mtg. Short att span. No anxiety, sleep fairly well." Dr.
Koumaras noted a sleep test scheduled in December (9..1208).

      On <u>November 14, 2002</u>, Mrs. Kimberly reported: "Same as last report - major problems
continue to be short term memory difficulties, concentration problems, panic attacks. Agitation &
Stress anxiety are high. Second surgery for sleep apnea was on 10/9. Waiting for retesting.... "I still
continue to help Kent with reports & paperwork as well as directions and instructions for short
distance driving." (9..1345). On <u>November 18, 2002</u>, Dr. Kimberly reported to Dr. Sacks that "the
surgery has helped me more than anything" although he still suffered (apparently permanent) short
term memory loss. ( 9..763).

      In <u>late November 2002</u>, Mrs. Kimberly, in a telephone conference with Hartford's Kohler
and then in a follow up letter to her, tried to explain that Dr. Kimberly's problem is not a "mental
illness" but was caused by sleep apnea and "the lack of oxygen while sleeping is the root cause of
all his illness." (9..67-70; 9..236). Shortly thereafter, on <u>November 27, 2002</u>, Dr. Kimberly
discussed with Dr. Eaton his inability to return to work and his inquiry whether he had brain damage
from chronic sleep apnea, continuing to have trouble with multiple task chores. (9..1154). The same

Hartford Disability Claim Appeal Unit
October 26, 2004

week, Dr. Koumaras noted his "short term memory 'really bad'", and that, regarding his apnea, he "was suffocating". (9..1154). Dr. Kimberly was to have another sleep test <u>December 2, 2002.</u> (We do not have a copy of any test, and the Kimberlys have no record of Dr. Kimberly having undergone a test on that date. The only thing they were scheduled to do according to Mrs. Kimberly's calendar was to pick up the testing equipment on that date.

  In the meantime, the Kimberlys completed a Claimant questionnaire for Hartford. (9..318-321). On it, the three major current condition(s) which result in inability to perform the occupation of ophthalmologist was listed as

    **"(1) obstructive sleep apnea-had 2 surgeries and awaiting sleep study; poor sleeps effects all aspects of life.**
    **(2) impaired memory and attention; unable to remember and/or complete tasks.**
    **(3) see attached (page 320) "<u>assumed depression–now known to be secondary to sleep apnea. Improved dramatically after surgery</u>. <u>Kent feels that this is not currently contributing to his disability."</u>**

    . . .

    <u>**When originally placed on disability the diagnosis was severe depression. It took many months and much testing to determine that the primary underlying condition was [actually] severe sleep apnea.**</u> ECT treatments (see attachment, page 320) <u>were not effective for his now known to be secondary depression from suffocation due to sleep apnea.</u> <u>**His depression is remarkably improved after treatment for apnea**</u>. However <u>his memory, recall and ability to complete tasks is markedly impaired due to perhaps multiple medications, oxygen deprivation and/or 16 ECT treatments.</u>

(9..318-321). Hartford asked numerous other questions about Dr. Kimberly's ability to perform tasks and engage in activities, to which detailed answers were giving explaining and giving examples of his various significant cognitive memory-related limitations.

  On <u>December 17, 2002,</u> Dr. Kimberly was referred by Dr. Sacks back to neurologist Dr. Fisher to assess his short term memory problems. Her notes of that visit reflect he was off Ativan, his use of CPAP, his OSA surgery x2; his <u>Sleep study not as good, 2nd one</u>. Desats not as bad. Dreaming now (hadn't before); and his continued "<u>memory problem</u>" which was "Not improving?" and thought possibly caused by OSA, the medications he was taking, or [while] out during ETC. She referenced the SSA neuropsychological testing which reported low-average **General memory; borderline immediate memory; and inability to <u>multi-task</u>;** drives Okay, but went to wrong Dr's building. This was "discussed at length with patient & wife" (although her notes do not reflect what

specifically she discussed) and she concluded he was "unable to RTW at this time" and "**Unknown
if cognition will improve in future.**" (9..761).

Dr. Kimberly again saw Dr. Eaton on January 3, 2003, at which time Dr. Kimberly reported
that the "sleep test was not as good as the last time" and that he may need more surgery. (9..1153).
Dr. Eaton opined:

> **Seems like frontal lobe** (short term mem task completion) **most
> involved in sleep apnea. Continues to give examples of problems
> with short term memory,** i.e listening to tape thinking it was first
> time when it was second.

(9..1153). Interestingly, this is the same area of damage Dr. Vincent had predicted. (9..756).

On January 16, 2003, the Kimberlys reported on their Claimant's questionnaire, that

> "Anxiety, panic attacks, memory & concentration problems still
> continue. ENT, Pulmonary, Neurology & Family Practice evaluations
> still pending. "Still finds it difficult to concentrate and complete
> tasks. Filling out paperwork such as this is hard for him.
> Concentration & attention span are limited. Driving short distances
> with directions is still all he is capable of."

(9..1336). On January 13, 2003, Dr. Kavy met with Dr. Kimberly for over 1.4 hours in follow up
for OSA assessment. (9..832). Dr. Kavy reviews the history of Dr. Kimberly being on CPAP but
couldn't tolerate it; on CPAP 8 with a normal follow up sleep study, and "when able to tolerate the
mask", was normal, but that "most nights it ended up on the floor" and does not use his CPAP
regularly as "the mask is uncomfortable." Also, after **ENT surgery x2 (UPPP & Tongue surgery
x2), his follow up sleep study was abnormal**, and he is **"still fatigued** and not working. His
memory is poor**. His **depression is improved**. . . . He is unable to loose wt." The plan was to try
BIPAP. And if another follow up sleep study remains 'abnormal', to proceed with advanced jaw
surgery. (9..832). Dr. Kavy also filled out a Hartford APS form, noting the "Primary diagnosis" as
"**sleep apnea (ICD-9 code: 780.5), w/ Sx of fatigue and memory loss limiting activities.**" (9..832).
Dr. Kavy also indicated on January 17, 2003, that while Dr. Kimberly had no "physical" limitations,
his "memory loss" was "permanent" and it was "unknown" when he could return to his occupation.
(9..315-316). Dr. Kimberly's "depression and anxiety" had much improved in early 2003 (9..756),
but he was "not sleeping well," and had a "short attention span" was "Tired" and "wiped out"
(9..1205).

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 32 of 67

Dr. Kimberly obtained a new 'BiPAP' machine (actually an auto-titrating unit) approximately the first of February 2003.[9] On February 4, 2003, Dr. Eaton noted that Dr. Kimberly was trying to test himself by reading ophthalmology, but that he was "having trouble remembering what he reads the day before." (9..1152). He was scheduled for a follow up sleep study toward the end of March 2003, and was to have neuropsychological testing in about May 2003. Dr. Sacks noted on March 4 that continued to remain off Ativan; that he "feels better when on sleep apnea machine," that he doesn't really feel depressed and that his "memory is the problem". (9..754).

On March 19, 2003, Dr. Kimberly underwent a sleep test off of the BIPAP machine, which showed "mild desaturation" in that 7% of study less than < 90 and he had an RDI: 8.5, c/w mild OSA. (9..833-853). On April 4, 2003, he reported less depression, that he had continued to use his new sleep machine and was sleeping better, but that he still "Can't do multi tasks or steps", "I can't remember", distracted. (9.1202). On April 15, 2003, he reported to Dr. Eaton that he had purchased an "auto titrating sleep machine." Dr. Eaton stated that he "appears to be improving with his sleep apnea." Wife c/o his poor attention and won't let him drive. Has hard time following instructions, has a lot of projects half finished." (9..1151).

On May 9, 2003, Dr. Kimberly underwent a battery of neuropsychological tests with Dr. Schrock, psychologist in San Diego. Among other, it included the Millon Clinical Multiaxial Inventory-III. The instructions related to the utility of this test state:

> ""MCMI-III are normed on patients who were in the early phases of assessment or psychotherapy for emotional discomfort or social difficulties. Respondents who do not fit this normative population or who have inappropriately taken the MCMI-III for nonclinical purposes may have distorted reports. The MCMI-III report cannot be

---

[9]Dr. was initially given a plain CPAP machine which he used for about 9 months until surgery in late June 2002 at which time the surgeon (Dr. Tesar) told him he could stop. Early in 2003 when Dr. Kavy (pulmonary specialist) began to consider jaw and tongue surgery, Dr. Kimberly asked about BiPAP and he set me up with a machine that Dr. Kimberly was only able to attempt for ONE NIGHT. He increased the pressure form 10 to 16 which is a huge step up and the mask literally blew off Dr. Kimberly's face. The machine was very noisy and it was abandoned abruptly. The next day, Dr. Kimberly called ResMed (a company based in Poway) and the clinical nurse there invited him up to try an **auto-titrating unit**. His understanding of this unit is that it functions as a BiPAP unit where pressure increases on inspiration while decreasing on expiration ("BI"). What makes this unit a big advance is that it titrates (adjusts) the pressure delivered based on a feedback loop that continuously monitors during each breath the oxygen saturation, hypopneas and apneas. It is capable of collecting data concerning compliance and efficacy of treatment. He never successfully used a standard BiPAP unit, and his physicians just use that term loosely. When Dr. Kimberly provided several doctors with information about the auto-titrating unit, they told him they had not previously known about its existence or advantages. Therefore, technically, the new "BiPAP" machine to which they refer is actually an auto-titrating machine.

**page 32 of 67**

considered definitive. It should be evaluated in conjunction with
*additional clinical data.*

Obviously Dr. Kimberly was not in the "early phases of assessment or psychotherapy." Pursuant to the test itself, the findings could not be considered definitive; the report may be distorted, and it absolutely required evaluation in conjunction with the clinical data —which is extensive and consistently confirms constant complaints of significant cognitive problems, further validated by third parties who are able to witness Dr Kimberly and provide input about his problems.

Interestingly, Dr. Schrock did not prepare her report of the testing and interview for two months, which delay allows the examiner to perhaps forget some of the details Dr. Kimberly discussed in their interview. It appears this may have happened, inasmuch as the "Patient's Assessment of Own Functioning Inventory" part of the report states, "the patient did not report any symptoms as occurring almost always." (9..264). As can be seen by the constant and consistent reporting by Dr. Kimberly and his wife abut his memory problems after January 2002, this is incorrect. There is no indication that Dr. Schrock received a *complete* copy of his medical records, although she does discuss several. However, her report does state that "Sustained concentration, . . . was in the average range in terms of time . . . and in the mildly impaired range in terms of accuracy (9..268). As Dr. Kimberly underwent more extensive testing with a high respected psychologist in San Diego, Dr. Clark Clipson, Ph.D., who utilized updated norms and evaluated the past testing and what it means, it is unnecessary to restate Dr. Schrock's testing here, and later from Dr. Clipson's report as well.

On May 20, 2003, Dr. Chung recorded Dr. Kimberly's reports that he was "feeling much better" now that he had a new CPAP machine, —that his mood is much better (9..275) although he still had memory difficulties. (9..1150) (also reporting to UnumProvident: "Kent continues about the same. His memory & concentration problems still exist. Short term memory, short attention span, panic attacks, agitation & anxiety are still present.... Still using new sleep apnea machine. Continues w/medical appts. Neuropsychological testing done 5/9/03. Results pending. He continues the same day to day activities. He tries to work on continuing education material, but retaining this information is difficult for him. . . . As reported before, concentration & completing tasks are difficult. Paperwork such as this are difficult. Driving remains to be hard, directions & concentration are difficult for him. He needs assistance with some tasks because of difficulty with attention span". (9..1333). His problems included inability to multitask or organize (9..1200) (unchanged in June 2003, 9..1329).

Dr. Eaton completed an APS on June 17, 2003 (9..1332) (which was excluded from the claims file materials Hartford sent to us). Dr. Eaton identified the "Primary Diagnosis" as Cognitive Disorder, NOS. 294.9; MDD.D 296.3, listed the last and next visits as 6/17/03 and 7/18/03 per the monthly frequency. He identified his objective findings as "Ongoing memory problems" and Dr. Kimberly's reports symptoms as "Forgetful, losing things." Dr. Eaton stated there was a "Secondary Conditions Impairing Work Capacity" —that of "sleep apnea." He stated that Dr. Kimberly had

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 34 of 67

NOT been released to work in his own or any occupation and that Dr. Kimberly was definitely "unable to work as [a] Physician." As a result of the new sleep machine and the surgery for sleep apnea, his depression was minimized and no longer problematic in terms of his disability, but his memory problems remained. (9..1148). In mid July 2003, Dr. Eaton completed another APS form (also not in Hartford's claim materials), reiterating, that the "Primary Dx" is Cognitive disorder, NOS 294.9; MDD.D.296.3; that "objective findings since last report" are "Ongoing memory problems"; that Dr. Kimberly's "Symptoms since last report" are forgetfulness and "trouble w/word finding"; that "Secondary Conditions Impairing [his] work capacity" exist: "Sleep Apnea"; that he has not been released to work in his own or any occupation and "is unable to work as Physician. (9..1328). In mid-August, 2003 (8/18/03) visit with Dr. Eaton, Dr. Kimberly reported "ongoing memory problem on a daily basis." (9..1147). In an 8/19/03 APS form for UnumProvident, Dr. Eaton reported his continuing "Primary Dx" of Cognitive Disorder NOS 294.9; MDD.D 296.3; his ongoing monthly visits; his "Objective Findings..." of "Memory problems" and symptoms of "repeat[ing] himself, losing things." The secondary condition impairing work capacity is again from "sleep apnea" , reiterated Dr. Kimberly had NOT been released to work in occupation and was both medically restricted and limited from "perform[ing] as physician." (9..1327). that same month, he completed a form provided by UnumProvident to determine how he was doing. In it he explained, "My wife is very sick. I have to fill this form out by myself. I have trouble with my short term memory. I have trouble completing anything. My attention span is short. .. I feel my memory is getting worse. I forget what I am saying in mid sentence. I forget where I am going. I forget why I have gone to the store. My kids think I am stupid.. . . My wife does not let me drive much. She supervises all financial stuff. She will not let me use power equipment or sharp knives. I do not know how I will function without her." (9..1326).

Dr. Koumaras, at the direction of Dr. Eaton after the two had discussed the Schrock results ((9..1147), wrote Dr. Kimberly reviewing Dr. Schrock's results. Dr. Koumaras wrote, among other, that, "As you know, the feedback focused primarily on the Wechsler Adult Intelligence Scale-III." He explained that Dr. Kimberly's IQ had improved since the Vincent testing. He also explained,

> The Information subtest measures the ability to integrate past and present memories. On the *Performance subtests* you obtained scaled scores of 9 on the Picture Completion and Digit Symbol Coding Subtests, which places you at the 37th percentile. The Picture Completion subtest measures visual concentration and the discovery of inconsistencies. In this test, you must concentrate on internalized and externalized patterns and identify how an external pattern differs from an internalized pattern. The *Digit Symbol subtest* measures speed and visual motor coordination. Your Index scares were also reviewed. The Index scores reflect processes underlying the IQ scores. The Verbal Comprehension Score was at the 68th percentile, the Perceptual Organization score was at the 77th percentile, and the

Hartford Disability Claim Appeal Unit
October 26, 2004

Working Memory score was at the 84th percentile. However, the processing speed was at the 47th percentile.

Your performance on the Wisconsin Card Sorting test was impaired because of a high number of perseverations. In terms of the Digit Vigilance Test, your score fell within the mildly impaired range in terms of accuracy. Your Verbal memory was mildly impaired at immediate recall. On the Buschke Verbal Selective Reminding test, your ability to learn an unorganized list of words was mildly to moderately impaired in terms of long-term storage of information and retrieval of information.

As I noted to you, there are many positive aspects in your functioning. However, **I wanted to examine issues with you and to provide you with feedback on factors that may influence your providing direct patient care. Based on the above information, I strongly believe your ability to provide direct patient care as an ophthalmologist would be significantly compromised**. Although this feedback is difficult, I hope it will be useful to you in planning your future.

(9.1322-1323). On September 9, 2003, Dr. Chung again referenced the "new CPAP machine[10]. Sleeping better. More energy during the day" —again implicating sleep apnea, not "depression," as the source of daytime fatigue. (9..714). The next week, he reported to Dr. Koumaras that he continues to have " 'Trouble getting it done' - - Tasks. Memory problems. 'I forget", doesn't complete tasks." (9..1197) Dr. Eaton's September 15, 2003 APS form reiterated his APS forms described above for July and August 2003. (9..1321), and Dr. Kimberly's "Claimant Statement" for that month reiterated what had been consistently reported to UnumProvident. Later in October, 2003, Dr. and Mrs. Kimberly explained in the Claimant's Statement Unumprovident provided that his "Concentration & attention continue to be difficult for him. Completing tasks & working on things with multiple steps are very hard. He still searches for words sometimes & easily forgets what he was going to do or say if distracted. . . Kent still needs assistance w/tasks involving multiple steps & paperwork such as this. His attention span is short & he has difficulty w/ multiple tasks." (9..1319).

Dr. Eaton's November 7, 2003 APS form which UnumProvident requested reiterated the continuing status of Dr. Kimberly, as reported in the last 4 APS forms, described above. (9..1318). Dr. Kimberly's 11/25/03 Claimant's Statement (for UnumProvident) explained, yet again, "Difficulties continue to be concentration & attention. Completing tasks & working on things with

---

[10]referring to the auto-titrating machine.

multiple steps are very hard. He still searches for words & easily forgets what he was going to say if distracted even slightly...Kent continues to need guidance with tasks involving multiple steps. His attention span & paperwork such as this is difficult." (9..1316).

The following day, he reported in his session with Dr. Koumaras that he had "Past depression", "I didn't understand ..." " repeats self," "I didn't remember" was under "Stress", "Not depressed", had "Short-term memory" problems: "I forget to remember" (9..1195).

And the following month, 12/11/03, he reported to UnumProvident, "Staying on task continues to be a problem for him. He has difficulty remembering how to complete things if there are multiple steps. He also still searches for words or thoughts if distracted. His memory & attention span are not what they use to be.... Kent works on tasks around the house & he gets physical exercise several times per week. He continues to use the sleep apnea machine nightly. Bookkeeping & paperwork such as this continue to be difficult for Kent. He needs help w/tasks involving multiple steps. He becomes distracted & his attention span is short." (9..1315).

On January 6, 2004, Dr. Kimberly had a follow up examination with Dr. Sacks (family physician), reporting "Still having problem with memory". Forgets things, and that "Psychologist, Dr. Koumar, feels that he should probably not go back to seeing patients." (9..709). On January 8 2004, Dr. Eaton discussed with him the fact that in December he had been ill and stopped the CPAP and had become worse, noting "It [CPAP] makes a difference." Memory remains a problem ie "I forget that I am supposed to do something."(9..1144).

Dr. Eaton's APS form of the same time, to UnumProvident, reiterates again that the "Primary Dx" is "Cognitive Disorder NOS 294.9, MDD.D 296.3"; "Objective Findings" are "Ongoing memory problems"; "Secondary Conditions Impairing Work Capacity" is "sleep apnea" and that "patient is unable to work as a physician." (9..1313). Dr. Eaton completed a prescription form "To whom it may concern" stating

> "Dr. Kent Kimberly has a cognitive brain disorder. He is unable to
> practice medicine at this time & it appears that this is a permanent
> disability." (9..1314)

On March 4, 2004, Hartford paid Milton Jay, to review the "neuropsychiatric records" and focus on the psychologic issues. See NEURO PSYCH RECORD REVIEW by Milton Jay (0..58-70) ("I have focused my review on neuropsychological matters."). This limited record review followed a similar record review performed by an in house "behavioral health nurse." (9..139-141). It is our understanding that Dr. Jay performs many "record reviews" for Hartford. He did not see or interview Dr. Kimberly. Hartford did not provide Dr. Eaton, or Dr. Sacks, or Dr. Kavy or Tesar or even the Kimberlys with continued updated forms to complete to get a better handle on his symptoms and limitations and medical restrictions. In fact, it appears that the only records Hartford placed in the claim file for 2003 were essentially those from the psychologist/psychiatrist, not from physicians

following and treating Dr. Kimberly's problematic sleep apnea. Dr. Jay purports to have had an unrecorded telephone conversation with Dr. Eaton, related to which Hartford has advised us there are no notes. Dr. Jay did purport to encapsulate at least the subject and some points of the discussion to Dr. Eaton, requesting Dr. Eaton's signature. Even the signed copy, which contains Dr. Eaton's important correction, is not in the claims file. Dr. Jay stated to Dr. Eaton, "you noted that you have not seen recent evidence of significant ongoing difficulties w/sleep apnea" and Dr. Eaton corrected that to read, "except his ongoing memory problems." (9..1303-1306, correction at 9..1304). Hartford issued its benefits termination on <u>April 29, 2004</u>, asserting Dr. Kimberly's disability was "due to Mental Illness" for which there is a 24-month benefits limitation. Hartford stated, "Mental Illness means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders of any kind including those caused by chemical imbalance. Mental Illness does not include dementia, organic brain syndromes, delirium, amnesia syndromes or organic delusional or hallucinogenic syndromes." Hartford justified its decision because it was "Dr. Jay's opinion that the depression and sleep apnea conditions are under good control with only mild residual symptoms. These conditions did not appear to be significantly impairing." (0..49). Hartford also contended there were "huge improvements in cognition seen between Dr. Vincent's 2002 testing and Dr. Schrock's 2003 neuropsychological evaluation [that] strongly suggested that the cognitive complaints very predominantly resulted from the depression and/or sleep apnea conditions"; "that [Dr. Kimberly's *depressive symptoms* are currently"mild" and have been mild for some time" and concluded, "<u>The sleep apnea appears to be under reasonable control and there is no clear valid basis of restrictions and limitations which would preclude your for working as an Ophthalmologist</u>" reiterating, "With the assistance of an independent medical review of records by Dr. Jay, it is our conclusion that your physical condition of sleep apnea was under reasonable control as to not preclude you from performing the duties of an ophthalmologist." (0..49).

Engaging in a little light sarcasm, given this man's profound medical history, we ask,

> Perhaps Hartford would like to sign all of their employees and Dr. Jay up for complimentary eye assessment and eye surgery to be performed by Dr. Kimberly at their earliest convenience?
>
> *With luck*, he may be able to remember the eye anatomy and perhaps retain a general under standing of what some of the surgical tools do.
>
> We suppose it is *possible* that *if* there are no multiple tasks involved, no

Hartford Disability Claim Appeal Unit
October 26, 2004

complexities, no organization or decision making required, and he does not have to take or issue any directions or multiple communications to other O.R. personnel that he will not become overwhelmed by the procedure, or become distracted and 'forget' what he is saying, or forget what he is doing, and will not forget to complete his task or get lost in the middle of it. If so, perhaps his wife could stand by to direct him back into the O.R.

All sarcasm aside (as we, Dr. Kimberly, his wife, his physicians, UnumProvident, Social Security, and apparently everyone but this insurance company (Hartford) that has to pay the claim believe he is disabled, probably permanently so, from performing the occupation of ophthalmology due to his memory problems and cognitive deficits), there is no hospital or clinic which would *allow* this physician to perform eye surgery *or to have* hospital or clinic privileges with his medical history.

On May 4, 2004, Dr. Kimberly had a follow up with Dr. Sacks, who also reported, "Generally feeling Okay". Mood much better. D/c'd Zoloft. No further depression. Still c/o memory problems. (9..706). On May 11, 2004, Dr. Eaton noted, that Dr. Kimberly "Notice[s] things more. Ongoing problems; memory is worse "I need someone to repeat what someone says to me." Also concerned about sleep getting worse ie machine is showing it takes more pressure to keep airway open." (9..1142).

On June 18, 2004 and July 2, 2004, as described in a report dated July 9, 2004, Dr. Clipson, Ph.D., psychologist, conducted comprehensive neuropsychological testing of Dr. Kimberly due to the limitations in prior testing both by Jay Vincent and by Dr. Schrock. (9..1234-1252). Specifically, the comprehensive testing conducted by Dr. Clipson included the following

Clinical Interview with Dr. Kimberly and his wife, Carolyn
Mental Status Examination
Test of Memory Malingering (**TOMM**)
Validity Indicator Profile (**VIP**)
Wechsler Adult Intelligence Scale, 3rd Edition (**WAIS-III**) admin.by Barbara Schrock, PhD 5/9/03
Wechsler Test of Adult Reading (**WTAR**)
Halstead-Reitan Neuropsychological Test Battery (**HRB**)
Digit Vigilance Test (**DVT**)
Complex Ideational Material from the Boston Diagnostic Aphasia Examination (**CIM**)
Boston Naming Test (**BNT**)
Controlled Oral Word Association Test (**COWAT**)

Hartford Disability Claim Appeal Unit
October 26, 2004                                                        Page 39 of 67

             Category Fluency – Animals
             Auditory Consonant Trigrams (**ACT**)
             Story Memory Test (**SMT**)
             Word Lists I & II from the Wechsler Memory Scale, 3rd Edition (**WMS-III**)
             Figure Memory Learning (**FML**)
             Rey Complex Figure Test, Copy and Recognition Trial (**RCFT**)
             Grooved Pegboard (**GP**)
             Beck Depression Inventory, 2nd Edition (**BDI-II**)
             Minnesota Multiphasic Personality Inventory, 2nd Edition (**MMPI-2**)

             Ms. Kimberly completed the following behavioral rating scales regarding her husband:
             — Neuropsychological Impairment Scale (**NIS**),
             — Observer Form Adaptive Behavior Assessment Scale (**ABAS**)

Dr. Clipson describes his interview with Dr. Kimberly:

             During interview with Dr. and Ms. Kimberly, in addition to his
             problems with memory functioning, he reports having problems with
             distractability ("I forget what I'm saying, I start tasks and don't finish
             them").  He becomes easily overwhelmed and will perseverate ("I
             make the same mistakes over and over").  He describes having
             difficulty processing auditory information and says, "I'm like a bull in
             a china shop, I have to do things slowly."

             A thorough review of neuropsychological functioning was conducted
             with Dr. Kimberly during interview:

             *Sensory-perceptual.* Dr. Kimberly requires the use of corrective lenses
             for distance perception.  He notes that he recently has begun to desire
             spicier foods, but otherwise is unaware of any changes in his sense of
             taste or smell.  He denies having any pain and denies having any other
             sensory-perceptual difficulties.

             *Cognition-thinking.*  The patient reports being easily distracted and to
             have difficulty remaining on task.  He is perseverative and has
             difficulty multi-tasking, or doing more than one thing at a time.  He
             denies any problems with seizures, dizziness, or common sense.

             *Memory.*  Dr. Kimberly reports having numerous problems with his
             memory, particularly with learning new information and recent
             memory ("I can't remember what I read").  He has particular difficulty

Hartford Disability Claim Appeal Unit
October 26, 2004

recalling people's names and often forgets what he was doing. He
denies having any difficulties with remote memory.

*Communication.* The patient reports that he sometimes has difficulty
following conversations with others. He also reports having
word-finding problems and that he reads slower than he used to. He
denies having any problems with spelling or writing.

*Motor Functioning.* Dr. Kimberly denies having any motor difficulties.

*Social.* The patient admits that he is sometimes less tactful than usual,
but otherwise enjoys close relationships with his family members.

*Psychological.* Dr. Kimberly reports having a history of obsessive
tendencies that he experienced as positive in helping him perform his
duties as an eye surgeon. He denies having any other psychiatric
symptoms at the present time.

Currently, the patient spends his time "puttering around the house,
doing yard work projects or working on the car. I'll spend time on the
internet. I'm really involved with my church and my kids." He also
goes to the gym three days a week. He notes that in addition to being
unable to work, he reads much less than he used to.

Dr. Clipson discussed the findings of test results. (9.1234-1252). Among other, he explains
at pages 11-13 of his report:

In May 2003, Dr. Kimberly was given an individually administered
test of **intellectual functioning**, the WAIS-III. Using standard norms,
he scores in the high average range of intellectual ability with a Full
Scale IQ of 115. However, using demographically adjusted norms, his
Full Scale IQ is 98. This significant difference (over a standard
deviation) is indicative of a loss of overall intellectual functioning.
This score places him at approximately the 45th percentile in relation
to others of his age, ethnicity and level of education in the
standardization sample. There is a 90% chance that his true IQ lies
between 94 and 100. The 6-point difference between his Verbal IQ
score of 96 (39th percentile) and his Performance IQ score of 102
(55th percentile) is neither significant nor unusual.

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 41 of 67

The patient demonstrates a significant difference between his low
average score of 85 (16th percentile) on measures of crystallized
intelligence and his average to high average score of 109 (73rd
percentile) on a measure of fluid intelligence. Crystallized intelligence
is related to the depth and breadth of a person's fund of knowledge,
while fluid intelligence refers to mental operations that a person may
use when faced with a novel or unusual task that cannot be performed
automatically.    These mental operations may include concept
formation, problem solving, drawing inferences, comprehending
implications, and using inductive and deductive reasoning.   His
performance on the various WAIS-III subtests ranges from mildly to
severely impaired to average.

A procedure for assessing the patient's **premorbid level of intellectual
functioning** is performed during this evaluation. The WTAR predicts
premorbid intelligence using both demographic information and a
person's ability to read irregularly spelled words.  This instrument is
co-normed on the WAIS-III and WMS-III and can be used to predict
a person's premorbid functioning across several domains of intellectual
and memory functioning.  The WTAR demonstrates a moderate to
high correlation with the WAIS-III and WMS-III Index scores, for
example correlating .80 with the Full Scale IQ.  The discrepancy
between Dr. Kimberly's predicted and actual Full Scale IQ score (using
standard norms) is not significant.  His predicted Full Scale IQ score
lies in the superior range which is consistent with his academic and
occupational background. However, the 13-point difference between
his predicted Verbal Comprehension score of 120 and his actual score
of 107 is both significant and unusual as only 5 to 9% of the
standardization sample show a discrepancy of this magnitude.  In
addition, the 11-point difference between his predicted Processing
Speed score of 110 and his actual score of 99 is also both significant
and unusual as only 10 to 24% of the standardization sample
demonstrate a discrepancy this large.  These discrepancies would of
course be much more significant if demographically corrected norms
were used.

The use of the extended HRB allows for **global measures of cognitive
functioning**.   The Impairment Index is based upon seven of the
original tests in this battery.  Ratings of .5 and higher are considered
as evidence of cerebral dysfunction, with scores ranging from .5 to .7
being indicative of mild to moderate impairment and scores of .8 and
higher suggestive of severe impairment.  Dr. Kimberly achieves an

Impairment Index score of .3, contraindicating evidence of brain damage. However, the use of the extended HRB provides a Global Deficit Scale (GDS) score based on the administration of 21 neuropsychological tests. The patient achieves a T score of 39 on the GDS, placing him at the 14th percentile. This level of performance indicates mild cognitive impairment overall.

On measures of **sensory-perceptual functioning**, Dr. Kimberly demonstrates mild to moderate impairment overall in his abilities in this area (3rd percentile). He demonstrates no errors of suppression on measures of double simultaneous stimulation in either the tactile, auditory or visual modalities. However, he demonstrates one error with his right hand and two with his left on a measure of finger agnosia. On a measure of finger graphesthesia, he demonstrates three errors with both hands. On a measure of stereognosis (tactile recognition), he demonstrates mild impairment with his left hand (14th percentile) while scoring in the average range with his right (39th percentile). His visual fields appear intact.

Dr. Kimberly is administered several measures of **attention**. On a measure of visual attention, scanning, and speed of information processing in which he is asked to connect, in order, numbers that are presented randomly on a page, he scores within the average range (37th percentile). On another measure of visual attention in which he is asked to cancel out all the "6"s he can find on two pages as quickly as possible, he demonstrates good accuracy, scoring in the average range (45th percentile). He is also administered measures of auditory attention. He demonstrates mild to moderate impairment on a measure of verbal discrimination (6th percentile), but scores in the average range when asked if a series of two non-verbal, auditory stimuli are identical or different (27th percentile)

The patient is administered several measures of **language functioning**. On the Aphasia Screening Test from the HRB, Dr. Kimberly scores in the average range (63rd percentile). His only error is that of mild dysarthria (he has difficulty pronouncing the words Methodist Episcopal). He scores in the low average range (18th percentile) on the Verbal Comprehension Index from the WAIS-III. On a measure of receptive language ability involving auditory comprehension, he demonstrates mild impairment (13th percentile). He is also administered two measures of expressive language ability. On a measure of confrontation naming that involves mentally

Hartford Disability Claim Appeal Unit
October 26, 2004

retrieving the names of a variety of objects presented visually as line drawings, the patient scores in the above average range (90th percentile). He scores in the low average range on a measure of category fluency in which he is asked to name as many animals as possible within one minute (23rd percentile).

. . .

**Short-term memory** is the ability to hold information in immediate awareness and then use it within a few seconds. It is a limited capacity system, as most adults Dr. Kimberly's age can retain seven or eight "chunks" of information in this memory system at one time. On the most simple measure of this ability, Dr. Kimberly is able to correctly recall six numbers in the correct sequence after a single presentation, which is low average. On another measure of this ability involving the recall of as many words as possible after hearing a list of 12 words once, he also scores in the low average range (16th percentile). On a measure of immediate auditory memory that involves repeating a story he has just heard, he demonstrates moderate impairment (1st percentile). On a measure of immediate memory involving a visual task in which he is asked to reproduce four abstract figures following a single presentation, he demonstrates mild impairment (13th percentile).

. . .

In contrast to other types of memory, **long-term memory** is the ability to store and fluently retrieve new or previously acquired information. When asked to recall a brief story he had learned following a four-hour delay, Dr. Kimberly demonstrates moderate impairment (1st percentile). He was able to recall only 55% of the material he had encoded earlier, a performance that demonstrates moderate to severe deficits in forgetting (below the 1st percentile). . . . . His learning abilities are also impaired, as he demonstrates moderate to severe impairment (below the 1st percentile) on measures of verbal learning while scoring in the low average range (16th percentile) on measures of visual learning.

. . .

On measures of motor functioning, Dr. Kimberly generally demonstrates low average to average abilities. On a measure of motor speed, he scores within the average range with his dominant, left hand (68th percentile), while scoring in the low average range with his right (16th percentile). He does worse than expected with his right hand.

Hartford Disability Claim Appeal Unit
October 26, 2004                                                        Page 44 of 67

On a measure of grip strength, he scores in the low average range with
his left, dominant hand (23rd percentile), while scoring in the average
range with his right (47th percentile). <u>On this measure, his dominant
hand performance is worse than expected.</u>  On a measure of manual
dexterity, he scores in the average range with his dominant left hand
(27th percentile) while scoring in the low average range with his right
(19th percentile).  <u>While he does demonstrate the expected right-left
discrepancy on this task, he makes an excessive number of drops with
both hands.  Dropping pegs of any number is a very unusual behavior,
and he drops two pegs with his left hand and three with his right.</u>  On
a measure of kinesthetic-motor coordination (where visual input is
removed), he scores in the average range when using only his left,
dominant hand (70th percentile), low average performance when using
only his right hand (19th percentile), and average abilities when using
both hands (25th percentile).  He demonstrates average abilities while
learning this task that involves placing blocks in spaces on a board
while blindfolded (37th percentile), <u>yet does not demonstrate the
expected improvement when using his non-dominant hand.</u>

    With respect to PERSONALITY FUNCTIONING, Dr. Clipson explained at page 15 of his
report:

The BDI-II is a self-report measure of the <u>symptoms of depression.</u>
Dr. Kimberly's score of 7 on this instrument places <u>him in the
"minimal" range of severity</u> (the minimal range runs from 0 to 13).
<u>This is consistent with his self-report and recent history suggesting that
he is no longer suffering from significant depressive symptoms</u>

As a result of the comprehensive examination, Dr. Clipson diagnosed Dr. Kimberly as follows:

DIAGNOSTIC IMPRESSION
Axis I:        Dementia due to hypoxemia (294.1)
               Major Depressive Disorder, recurrent, in partial remission (296.35)
Axis II:       No diagnosis
Axis III:      Chronic hypoxemia secondary to obstructive sleep apnea
               Hypertension
               Hypogonadism
               Elevated triglycerides
Axis IV:       Unemployment
Axis V:        Current GAF - 65 (Symptoms of mild severity that interfere with
               social and adaptive functioning)

Hartford Disability Claim Appeal Unit
October 26, 2004

(9..1234-1252 at page 16 of his report.).  Dr. Clipson provided his summary and recommendations
as follows:

> Dr. Kimberly is a 49 year-old physician with a history of depression,
> obstructive sleep apnea and hypogonadism who has undergone
> treatment with numerous psychotropic medications along with 16 ECT
> treatments.  It is clear from his history, symptoms, and the current test
> data that the patient has endured depressive episodes in the past,
> beginning in early adulthood, and that he has a depressive disorder that
> is indeed a separate entity from his other cognitive and medical
> problems.  <u>Indeed, this fact has complicated his diagnosis and
> treatment for both depression and sleep apnea</u>.  For example, it would
> appear that while he initially responded positively to treatment with
> Zoloft, it was only later as the effects of chronic sleep apnea became
> evident that the medication became ineffective.  By that point, <u>all other
> treatments for depression seemed to be fruitless, as those treatments
> could not adequately address either the effects of OSA or his lowered
> testosterone levels</u>.  <u>By the same token, the diagnosis of OSA may
> have been overlooked for some time because disrupted sleep and
> fatigue are common symptoms of depression, and OSA can in and of
> itself cause symptoms of depression</u>.
>
> <u>In any event, the primary question at the focus of this evaluation is
> whether Dr. Kimberly has indeed suffered some degree of brain
> damage</u>.  **The evidence for this is significant and substantial**.  What
> complicates the diagnosis is that the patient was so high functioning
> to begin with, so that even some of his average test scores represent
> areas of decreased cognitive ability.  **Nonetheless, there are several
> compelling reasons that support a conclusion that the patient
> currently demonstrates mild cerebral dysfunction**.
>
> <u>The first issue is that of determining if there is a possible, identifiable
> cause for brain damage</u>.  Several factors in his medical background can
> be ruled out.  For example, neither hypogonadism nor empty sella
> syndrome has been associated with cognitive deficits to my
> knowledge.  Although he has taken a variety of psychotropic
> medications, I also think it unlikely that having used these medications
> could result in permanent brain damage.
>
> That leaves <u>three primary factors to consider: ECT, OSA, and
> depression</u>.  <u>ECT is known to cause memory problems that can
> sometimes take several months to resolve, although patients often</u>

Hartford Disability Claim Appeal Unit
October 26, 2004

report more memory problems following ECT than are indicated through research. Memory problems are known to be more pronounced in those who receive bilateral ECT treatments, as did Dr. Kimberly. The bottom line is that there is much controversy in the field regarding the effects of ECT on memory functioning after a period of a few months. It may be that ECT effects different patients in different ways, so that while some may have no long-term effects in terms of memory functioning, others do.[11]

---

[11] We note that ECT was performed under anesthesia, and Dr. Kimberly was on the CNS depressant, Ativan. OSA patients have increased risk of morbidity and mortality during anesthesia and "sedation may result in potentially complete airway obstruction. If this happens while the patient is unobserved (e.g., on the wards or during transport), the patient could become hypoxic and have a respiratory...arrest"..."Patients with sleep apnea syndrome should be extubated only when they are fully awake... sedation and narcotics should be avoided in the postoperative period, since these patients tend to be extremely sensitive to even small doses." http://www.rashaduniversity.com/mrashad/sleepapsyn.html.

The American Sleep Apnea Association in "Sleep Apnea and Same-Day surgery" states, "It is well known that sleep apnea* can be a complicating factor in the administration of general anesthesia. . . . Although there have been no clinical trials on anesthesia in sleep apnea patients, clinical experience confirms that anesthesia can be problematic in these patients. The cause of potential problems is seen in an anatomic and physiologic understanding of sleep apnea: the syndrome of obstructive sleep apnea is characterized by repetitive episodes of upper airway obstruction during sleep. ("Apnea" literally means "without breath" and is clinically defined as a cessation of breath that lasts at least ten seconds.) Sleep apnea may be accompanied by sleep disruption and arterial oxygen desaturation. General anesthesia suppresses upper airway muscle activity, and it may impair breathing by allowing the airway to close. Anesthesia thus may increase the number of and duration of sleep apnea episodes and may decrease arterial oxygen saturation. Further, anesthesia inhibits arousals which would occur during sleep. Attention to sleep apnea should continue into the post-operative period because the lingering sedative and respiratory depressant effects of the anesthetic can pose difficulty, as can some analgesics. Given the nature of the disorder, it may be fitting to monitor sleep apnea patients for several hours after the last dose of anesthesia and opioids or other sedatives, longer than non-sleep apnea patients require and possibly through one full natural sleep period. Hence there is concern that same-day surgery (also known as out-patient or ambulatory surgery) may not be appropriate for some sleep apnea surgery patients. . . . The use of preoperative sedatives must be considered carefully as sedative medication, like anesthesia, suppresses upper airway muscle activity.. . .For certain patients, it may be judicious to admit them to an intermediate care or intensive care area postoperatively to facilitate close monitoring and airway support measures. . . . It should be remembered that the overwhelming majority of sleep apnea cases have not been identified. . . ..http://www.sleepapnea.org/sameday.html

Licteig and Grigg, in "Risks of OSA and Anesthesia" state, It is well known that anesthetic, opiate, and sedative agents are central nervous system (CNS) depressants that increase the tendency for upper airway collapse (Figure 1). Additionally, CNS depressants alter the normal ventilatory response to hypercapnia and hypoxemia." citing Cullen DJ. Obstructive sleep apnea and postoperative analgesia—a potentially dangerous combination. J Clin Anesth. 2001;13:83-85. http://www.sleepapnea.org/osa_anesthesia.html

Hartford Disability Claim Appeal Unit
October 26, 2004

**OSA is also associated with a variety of neuropsychological deficits.** Indeed, in the November 2002 issue of the Journal of Respiratory and Critical Care Medicine, it was found that the volume of gray matter in the brains of patients with OSA was reduced by up to 18 percent compared with control subjects. The amount of gray matter reduction was found to increase as the syndrome became more severe. **Areas of the brain particularly affected included the left frontal cortex and the cerebellum.** The researchers opined that OSA may be a symptom of this loss of gray matter, which can also effect memory functioning. In addition, chronic hypoxemia is also associated with a variety of neuropsychological impairments, particularly short-term memory, visual-spatial functioning, planning and organization, and manual dexterity. Research focusing exclusively on middle-aged OSA patients has demonstrated that when these patients show declines on neuropsychological measures, these tend to be displayed in the areas of intellectual efficiency, attention and concentration, memory, perceptual-motor organization, executive functioning, and simple motor skills. While deficits in attention and memory functioning may be related directly to sleep disruption, declines on general intellectual measures, executive abilities and psychomotor performance is related more to the severity of the hypoxemia. While treatment with supplemental oxygen therapy can improve neuropsychological functioning to some degree, other deficits may persist, particularly those in the areas of planning and manual dexterity.

Finally, chronic depression can cause a disruption in the consolidation of memory through a reduction in the size and efficiency of the hippocampus, that structure of the brain concerned with consolidating short-term memories into long-term storage.

---

We note that on November 21, 2001 (ECT #6) due to excessive "agitation" after the procedure, Dr. Kimberly was given extra Ativan, and after the procedure on November 9, was given Vicodin and another medication for "agitation." He received IV sedation, which would inhibit breathing, as well as Ativan by mouth, which also suppresses breathing. He also received supplemental IV sedation in the recovery room because of agitation, and was sent home sometimes still groggy from the sedation, where I took an unmonitored nap for 3-4 hours without the CPAP machine which was not adequately treating his OSA. All shot treatments, except the first, were done on an outpatient basis after which he was sent home. This raises the possibility that Dr. Kimberly suffered some increases in his already moderate OSA due to anesthesia and/or CNS depressant medications. What is certain, is that his profound cognitive problems became noticeably apparent toward the end of the ECT treatments.

**page 47 of 67**

After considering all these factors, it becomes clear that any or all of them could have contributed, in varying degrees, to the neuropsychological deficits evident during the current evaluation. It should be noted that no research is available to help us understand the possible interactive effects of these conditions. Generally speaking, however, when there are multiple causes for brain damage, there is a cumulative effect.

The results of the current evaluation support the impression that Dr. Kimberly has suffered mild brain damage. There are several factors that support this conclusion. These include a loss of intellectual functioning indicated both by the significant difference between predicted and actual scores on the Verbal Comprehension and Processing Speed Indices from the WAIS-III as well as the difference in IQ scores obtained when contrasting the use of standard norms with demographically corrected norms. In other words, his performance on measures of verbal comprehension and speed of mental processing represent losses in ability in these areas. The comparison of his performance using demographically corrected norms as opposed to standard norms exposes the "hidden" loss of ability. Compared to the "average" person, Dr. Kimberly seems fine; compared with his peers (or his premorbid level of functioning), however, his cognitive deficits become evident. Other factors indicative of brain damage include his Global Deficit Score which indicates the presence of mild brain damage, as well as his impaired performance on several of the neuropsychological instruments. **It is also noteworthy that his deficits appear in the pattern associated with brain damage associated with chronic hypoxemia**.

At the present time, Dr. Kimberly demonstrates average abilities in the areas of visual attention and visual processing, language functioning, and working memory. Although he also demonstrates average abilities in the areas of processing speed and executive functioning, it is very likely that these represent areas of significant decline from his premorbid level of functioning. He demonstrates mild deficits in the areas of immediate visual memory and in auditory processing. This includes difficulties with auditory comprehension and uneven auditory attention. He demonstrates moderate impairment in the area of immediate auditory memory, and severe impairment in the area of long-term verbal-auditory memory. He appears especially prone to forgetting verbal information, indicating a deficit in his ability to convert this information into long-term storage.

**Given these findings, Dr. Kimberly is unable to return to his previous employment as an ophthalmologist. Of particular concern would be his tendency to forget important information, his problems with manual dexterity and fine motor speed, and his reduced cognitive efficiency and planning abilities. In addition, his deficits in cognitive flexibility and problem solving would cause him problems in situations that demand flexibility of thought and logical analysis, such as when he has to make rapid diagnoses and treatment decisions.**

While we have quoted various lengthy portions of his report, due to the extensive analysis, that should not be construed as meaning his entire report should not be read as part of your review of his appeal of Hartford's decision.

Dr. Clipson also refers us to Rourke SB, Adams KM, **"The Neuropsychological Correlates of Acute and Chronic Hypoxemia"** Neuropsychological Assessment of Neuropsychiatric Disorders (1996) (Grant & Adams), a copy of which he provided with his report (9..1253-1276). It discusses the mechanics of respiration and oxygenation. This authority explains that

"even subtle deviations in the oxygen supply to the brain can result in significant and enduring neurobehavioral sequelae" (9..1253). "If the anoxia continues for more than a few minutes, an anoxic/ischemic encephalopathy will likely ensue, frequently involving both neuropsychological impairments and neuroradiological abnormalities. Equally salient neurobehavioral effects ay also occur however when the brain is supplied with a *physiologically inadequate amount of oxygen (i..e, hypoxemia)* over an extended period of time. (9..1253)

This authority also addresses neurobehavioral sequelae of chronic exposure to hypoxemia such as in COPD or sleep-disordered breathing and sleep apnea syndrome. Page 9..1262 (388 of the article). They explain

"Sleep-disordered breathing (SDB), which occurs predominantly during light ...and REM sleep ... is characterized by the presence of apneas (complete cessation in breathing), hypopnease (partial cessation of respiration), and oxygen desaturations occurring subsequent to hypopneic events .... The sleep apnea syndrome (SAS) is diagnosed when apneas last at least 10 seconds and occur more than 30 times over a period of 7 hours of sleep ... An apnea index... of 5 or higher, or a respiratory disturbance index (i.e. RDI: number of apneas

plus the number of hypopnea per hours of sleep) of 10 or higher, have also been used to diagnose SAS. . .

. . .

Excluding the numerous study citations, the authors explain:

> There are a substantial number of clinical features associated with SDB and SAS. ...The included loud snoring ..., major cardiovascular risk factors... including hypertension... and cardiac arrhythmias ...; leg kicks ..; confusion, enuresis and impotence at nighttime..., and excessive daytime sleepiness ...; morning headache...; a significantly higher frequency of auto accidents ..., particularly with severe apnea...; affective disturbances such as irritability, anxiety and depression...; cognitive complaints of concentration and memory problems, which show high correlations with mood; insomnia and hypersomnia...; and neuropsychological impairments....

> When middle-aged patients with SAS show deficits on formal neuropsychological tests, these tend to occur in the areas of intellectual efficiency..., attention and concentration...; memory..., perceptual-motor organization and efficiency..., executive functioning..., and on tests of simple motor skills.... (9..1263)

At 9..1264, they summarize studies that demonstrate "that deficits in attention and memory were more related to sleep disruption, whereas declines in general intellectual measures, executive-type tasks, and psychomotor performance were related to the severity of hypoxemia." They also explain (at 9..1268) that "when neuropsychological deficits persist following CPAP, they tend to occur on tasks requiring planning and manual dexterity. . . . Finally, it is important to note that the discontinuation of CPAP for one night can result in the reversal of treatment gains.... (9..1268). Finally, they explain that:

> The accumulation of evidence from studies of individuals . . . with sleep disordered breathing, sleep apnea syndrome . . . suggests that both acute and chronic exposures to hypoxemia can significantly impair neurobehavioral functioning. Although some neuropsychological deficits improve with supplemental oxygen therapy in persons with cardiopulmonary disorders or with nasal [CPAP] in persons with sleep disorders, other deficits persist. These residual neuropsychological deficits that remain after treatment may indicate that permanent cerebral damage has been sustained, and in deed there is some postmortem evidence that suggests this is the case. (9..1268)

Hartford Disability Claim Appeal Unit
October 26, 2004                                                    Page 51 of 67

> . . . Persons with hypoxemia do exhibit some relative strengths.
> Specifically, verbal skills tend to be spared, and aspects of memory,
> especially retention, tend to be preserved.  As a result, clinicians can
> expect that these individuals will generally be able to express
> themselves and communicate with others, and be able to remember
> simple instructions concerning their treatment regimen. (9..1269)

Dr. Clipson has also provided the updated revised Global Deficit Score, which we forward
with his report (Further Refinement and Validation of the Global Deficit Score (GDS) (2004) from
Heaton, R.K., Miller, S. W., Taylor, M. J., and Grant I. (2004) Revised Comprehensive Norms for
an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for
African American and Caucasian Adults. Lutz, FL: Psychological Assessment Resources, Inc.)
(9..1277-1279).

On August 7, 2004, Dr. Kimberly underwent a comprehensive neurologic reevaluation by
James Grisolia, M.D. (9.1280-1282).  Dr. Grisolia conducted a history and physical and medical
review of Dr. Kimberly, and advised Dr. Kimberly of the impact of Dr. Clipson's neuropsychological
testing.

> . . . The patient continues with cognitive difficulties and underwent
> testing with Dr. Clipson, which was detailed in his report of 07/09/04.
> Dr. Clipson found a number of difficulties including isolated deficits
> of sensory perceptual functioning, several measures of attention and
> at least some fluency tests as well. Short term memory was below
> average, probably below expected for this gentleman's premorbid IQ
> except for a very clear abnormality of the medial auditory memory,
> which was at the first percentile and long term memory representing
> a story after a four hour delay was also at the first percentile. Despite
> these scattered abnormalities, the patient did show an overall
> impairment of function as measured by the extended global deficit
> scale of the Halstead-Reitan.
>
> In addition to the above history, it is worth noting that the patient
> received a course of 16 ECT treatments during 2001. The patient's
> wife noted substantial reduction in memory after that.
> . . .

## IMPRESSION

The patient clearly has some cognitive impairments on
neuropsychological testing by Dr. Clipson, a competent local
practitioner, whose work is known to me. Consulting literature, it is

very clear that untreated patients with obstructive sleep apnea, will
have predominantly frontal lobe problems due to somnolence, but that
even after adequate treatment, some scattered cognitive defects persist,
and this is reported in a number of reports in the literature. While other
factors may also account for his difficulties, it appears most likely to
me that the residual hypoxemic effects of the sleep apnea are the most
likely contributor to his remaining cognitive difficulties. The patient's
depression is adequately treated, and this was tested for by Dr. Clipson
with Beck and depression inventory and other measures. Malingering
was adequately tested followed by MMPI and other independent
measures of malingering also came out as giving reliable information.
Under these circumstances, I think it is clear that the patient will be
unable to function as a physician as defects and certain forms of
memory and sensory perceptual functioning would make it impossible
to function reasonably or adequately as an ophthalmologist. I also
noticed some difficulties with motor coordination and clumsiness,
which would of course be impossible to tolerate in an ophthalmic
surgeon.

For this reason, I believe, the patient is impaired on a permanent basis
from the practice of ophthalmology. The most likely etiology appears
to be residual cognitive defects with obstructive sleep apnea. I should
mention that the patient's neuropsychological testing and clinical
examination findings in this office do not support a diagnosis of
Alzheimer's disease nor the predecessor condition, minimal cognitive
impairments. There is no clinical or MRI evidence for stroke. My
understanding of the residual deficits reported by people following
ECT do not correlate with this patient's residual symptomatology and
neuropsychology findings.

Dr. Grisolia attached to his report some reprints of a few medical articles, including "Learning,
memory, and executive control in individuals with obstructive sleep apnea syndrome" from the
Journal of Clinical & Experimental Neuropsychology. 24(1):93-100, 2002 Feb(9.1283-1285), which
discusses in abstract form

"A range of neuropsychological deficits have been identified in
individuals with obstructive sleep apnea syndrome (OSAS) and have
been related to disruptions in function of the frontal cortex of the
brain. We hypothesized that impairments in the use of strategic,
frontally-mediated processes that facilitate learning and memory
would be associated with deficits in the .long-term episodic memory

of *verbal material (i.e., word lists)*. We evaluated 28 adults with OSAS and 24 controls (ranging from 28 to 60 years of age) using the **California Verbal Learning Test**. General executive abilities were assessed using the **Wisconsin Card Sorting Test**, **Letter fluency**, and **Category fluency**. Individuals with OSAS exhibited poorer recall across learning trials, less efficient use of semantic clustering, and poorer use of semantic cues. Retention of previously encoded information and recognition, however, were intact. With the exception of letter fluency, deficits were not observed in general executive control. Results are discussed within the context of disruptions in the interactions between long-term memory and executive abilities that are subserved by frontal and distal brain regions."

Another abstract, "Obstructive sleep apnea and the prefrontal cortex: towards linking nocturnal upper airway obstruction to daytime cognitive and behavioral deficits" from the Journal of Sleep Research. 11(1):1-16, 2002 Mar., states:

> "Obstructive sleep apnea (OSA) is accompanied by significant daytime cognitive and behavioral deficits that extend beyond the effects of sleepiness. This article outlines a causal model by which to understand these psychological effects among OSA patients. The model proposes that sleep disruption and blood gas abnormalities prevent sleep-related restorative processes, and further induce chemical and structural central nervous system cellular injury. This, in turn, leads to dysfunction of **prefrontal regions of the brain cortex (PFC)**, manifested behaviorally in what neuropsychologists have termed 'executive dysfunction'. Executive dysfunction is proposed to markedly affect the functional application of cognitive abilities, resulting in maladaptive daytime behaviors."

Dr. Kimberly could not understand the specialized testing and what had improved, what had not, what would not, and whether there were any differences in prior testing or the implications from the tests, and thus asked Dr. Clipson to put it all in context for him and explain at a professional level what it all meant. Dr. Clipson provided a nine-page report on September 28, 2004, which we provide as part of Dr. Kimberly's appeal (9.1286-1294). Among other things, he states,

**On June 18 and July 2, 2004, I conducted a neuropsychological evaluation of Dr. Kimberly.** As part of that evaluation, I conducted an extensive record review as well. As noted in my report dated July 7, 2004, I concluded that Dr. Kimberly does suffer from a physical

condition, namely that of dementia due to hypoxemia, which itself is secondary to obstructive sleep apnea. I agree with Ms. Kohler's conclusion that Dr. Kimberly's depressive disorder has improved significantly, and that his other medical conditions (hyperlipidemia, empty sella syndrome and hypogonadism) do not prevent him from working as an ophthalmologist. I do, however, believe that his dementia does prevent him from being able to work in this capacity.

I believe that the essence of the problem in understanding the physical basis for Dr. Kimberly's dementia lies in the confusion regarding his psychiatric and medical history. That is, he was initially (correctly) diagnosed with depression in 1993. The basis for this diagnosis is rather clear, as it was consistent with his reported symptoms at the time, and fit with both his individual and family psychiatric history. He was treated successfully with an antidepressant medication (Zoloft) until 1998. At that time, he became unresponsive to the medication and numerous other medications were tried. After his condition worsened and no psychotropic medications had helped, he underwent bilateral electroconvulsive treatments (ECT) in November and December 2001. These treatments were not helpful and were discontinued after sixteen sessions. Just before starting ECT, he was diagnosed with obstructive sleep apnea (OSA) in August 2001. In early 2002, he continued to complain of fatigue and memory problems, and in June and September of 2002, underwent surgery for OSA. After one false start with a sleep apnea machine that was not beneficial, in February 2003 he began using a sleep apnea machine that allowed him to obtain an adequate night's sleep. Also in April 2002, he began treatment for lowered testosterone levels. After these interventions (the surgeries for OSA, finding the right sleep apnea machine, and treatment for lowered testosterone), his "depressive" symptoms improved. **However, he was left with a loss of cognitive ability related to chronic hypoxemia from the OSA.**

After reviewing Dr. Kimberly's psychiatric and medical history, I believe that what happened is that after his 1993 depressive disorder was stabilized on medication, sometime around 1998 he began to develop OSA. However, because of the similarities in the symptoms between the two disorders, the OSA was overlooked until 2001 when Ms. Kimberly brought her concerns to Dr. Fisher, who then ordered the initial pulmonary and sleep studies that ultimately confirmed the diagnosis. For a variety of unknown reasons, there was a lack of coordination between those evaluating and treating his physical

condition (OSA and low testosterone) and those treating his mental disorder (depression). Dr. Kimberly's overall condition did not begin to improve until he was successfully treated for OSA and his testosterone levels returned to normal. At that time, his depression really did improve, **as did the "depressive-like" symptoms that were in reality related more to OSA: low energy, fatigue, inattention, etc. Unfortunately, during this time from 1998 until 2003, Dr. Kimberly apparently suffered frequent hypoxic episodes that caused brain damage**.

The April 29, 2004 letter from Ms. Kohler contains some information from record review that will be discussed briefly. Ms. Kohler indicates that in an Employee Statement d. 08/08/01, Dr. Kimberly reported having problems that he related primarily to symptoms of depression and anxiety. A letter from Dr. Kimberly's psychiatrist, Dr. Gary Eaton dated 08/02/01 confirmed a diagnosis of Major Depressive Disorder, recurrent, while also noting an EEG from 07/23/01 that was normal. It should be noted that at this point, Dr. Kimberly had not yet been diagnosed with OSA, so it is understandable why Dr. Eaton provided the diagnosis he did, and why Dr. Kimberly would have reported his symptoms in the manner he did. In his next physician's statement from 02/19/02, Dr. Eaton added the diagnosis of sleep apnea, indicating his awareness of this physical condition by that point. A physician's statement dated 01/17/03 from Steven Kavy, M.D., pulmonologist, confirmed a primary diagnosis of Sleep Apnea. While Dr. Kavy indicated that Dr. Kimberly was "physically" able to work as an ophthalmologist (meaning he could sit, stand, walk and drive for up to eight hours), he also noted "memory loss" as a limitation.

Dr. Clipson noted that "much of the remainder of Hartford's decision seems to have been based on Dr. Jay's report" and therefore addressed the data and the assertions in that report to help Dr. Kimberly sort out problems and inadequacies with the former opinions. Dr. Clipson explains, starting at page 3 of his report:

Dr. Jay first reviews a psychological evaluation performed by **Dr. Kenneth Vincent** in August 2002. I agree with Dr. Jay that Dr. Vincent's evaluation does not constitute a neuropsychological evaluation, nor is it extensive enough to determine whether an individual is disabled. Nonetheless, Dr. Vincent concludes that Dr. Kimberly suffers from Major Depressive Disorder, Amnestic Disorder

NOS, and Cognitive Disorder NOS.  Of note, although Dr. Vincent opines that the "most likely cause" of Dr. Kimberly's memory problems is depression exacerbated by ECT and sleep apnea, he also concludes "there are some underlying organic processes, as yet undiscovered that are affecting the claimant's visual-motor ability and his ability to discriminate important visual cues."

Dr. Jay then references a neuropsychological evaluation of Dr. Kimberly performed by **Dr. Schrock in May 2003.** By this point in his history, Dr. Kimberly's depressive symptoms would have been improving, and he would have been gaining benefit from both his sleep apnea machine and the testosterone treatment.  Like Dr. Jay, I have also been able to review both Dr. Schrock's report and her raw test data.

Dr. Schrock notes that on the *Victoria Symptom Validity Test* (VSVT), Dr. Kimberly "produced a valid performance in terms of items correct. However, the patient's performance in terms of his reaction time fell in the range that suggests that factors other than cognitive impairment may be influencing a client's performance on this neuropsychological test battery."  Dr. Jay concludes that "these abnormal performances" on the VSVT "raised some challenges to the validity of the neuropsychological findings" reported by Dr. Schrock.  He adds, "Since some of the findings in memory and executive cognition that she reported were at lower levels than would normally be expected for this man, this question of the validity of the findings was significant."

**According to the VSVT Interpretive Guide:**
. . . poor performance may reflect poor effort, deliberate feigning, exaggeration of real cognitive deficits, factors independent of conscious dissimulation and external rewards, or any combination of the above. Therefore, it is of the utmost importance to recognize that VSVT scores are, at best, capable of indicating that factors other than cognitive impairment may be influencing a client's performance. Even in cases where financial or other incentives exist and where performance on the VSVT is in the questionable range, the client may be legitimately impaired, acting without conscious intent, or a combination of both.

Hartford Disability Claim Appeal Unit
October 26, 2004

As such, it is difficult to say with certainty why someone performed poorly on the VSVT, or to conclude that someone who performed poorly does not have brain damage.

Later in his report, Dr. Jay takes the result of Dr. Kimberly's performance on the VSVT and concludes that his lower scores are the result of "subnormal effort" suggesting "some basis of doubt as to whether such weaker findings represented valid cognitive weaknesses or instances of subnormal effort." **It is concerning to me that while Dr. Schrock is more conservative in her interpretation of the VSVT, Dr. Jay appears willing to conclude that the slowed reaction time demonstrated on this instrument reflects "subnormal effort" on the part of Dr. Kimberly.** It would seem to me that other hypotheses are just as likely to explain the slowed reaction times seen on this instrument (i.e., the obsessive personality traits also noted in Dr. Schrock's report). **Dr. Jay seems to have disregarded his own observation that "use of a second test of cognitive symptom validity would have been very useful in this case" and over-interpreted the data.** This is particularly concerning since Dr. Jay takes these slower reaction times on one measure and ultimately rejects any findings of cognitive impairment because of them.

Dr. Jay then contrasts the results of the August 2002 evaluation by Dr. Vincent with the results from Dr. Schrock's evaluation. In reality, the only test results that he really compares is that of the Wechsler Adult Intelligence Scale, 3rd Edition, which was given during both evaluations

Dr. Clipson then summarized the two tests, listing the data from each (and which tests reported no data). We find much of his report significant, and detailed in its reasoning, and therefore copy it for you, with some emphasis of our own added. After Dr. Clipson's comparison of the data from the two tests, he states,

"**It is quickly very apparent that Dr. Vincent provided only limited test results** - the three IQ scores and five subtest scores - making comparisons between the two assessments rather difficult. Nonetheless, Dr. Jay opines that the "huge improvements in cognition seen between Dr. Vincent's 2002 testing and Dr. Schrock's 2003 neuropsychological evaluation strongly suggested that the cognitive complaints very predominantly resulted from the depression and/or

Hartford Disability Claim Appeal Unit
October 26, 2004

sleep apnea conditions." It would seem to me that indeed Dr. Kimberly's performance did improve significantly because in August 2002, he was still severely depressed as well as being fatigued from OSA.

**The question then becomes, once Dr. Kimberly's depressive disorder improved and he was stabilized on his sleep apnea machine, is there evidence of any remaining cognitive impairments? By the time he was evaluated by Dr. Schrock in May 2003, Dr. Kimberly's depression had improved as had his physical condition relative to the sleep apnea.** In Dr. Schrock's evaluation, Dr. Kimberly demonstrated deficits on measures of verbal fluency, visual attention, verbal memory, and perseverative tendencies. While she concludes that his "memory performances do not produce any particular organic profile," and that "factors other than cognitive status may be involved on these test scores," she does not provide any conclusive statements regarding whether Dr. Kimberly has sustained brain damage. However, she does write: "It is believed that the present test scores may represent a mild underestimate of the patient's current neuropsychological status." This statement suggests that Dr. Schrock no doubt perceived Dr. Kimberly as having a greater degree of neuropsychological impairment than he demonstrated in his test performance. Nonetheless, Dr. Jay concludes that "the poor verbal memory and Wisconsin Card Sorting Test findings and slight slowing in processing speed could not be validated as legitimate due to some abnormal findings on cognitive symptoms validity testing that suggested subnormal effort. Thus a cognitive disorder was uncertain."

Dr. Jay indicates that Dr. Kimberly has "psychological coping complications" related to his "capacity for return to occupation." He bases this assertion on Dr. Schrock's interpretation of the MCMI-III data as well as his conversation with Dr. Eaton, Dr. Kimberly's psychiatrist. There are several problems here. First of all, Dr. Schrock did not perform an "interpretation" of the MCMI-III data, she merely summarized the actuarial report from National Computer Systems (NCS). That is, rather than consider the test data in relation to this particular patient's history and symptoms, and develop hypotheses that are consistent with this history, she simply recites what the computer says. The actuarial reports that are produced by NCS are not meant to be used in this manner. In addition, the report itself states:

Hartford Disability Claim Appeal Unit
October 26, 2004

> MCMI-III reports are normed on patients who were in
> the early phases of assessment or psychotherapy for
> emotional    discomfort    or    social    difficulties.
> Respondents who do not fit this normative population
> or who have inappropriately taken the MCMI-III for
> nonclinical purposes may have distorted reports.  The
> MCMI-III report should not be considered definitive.
> **It should be evaluated in conjunction with
> additional clinical data.**

. . . [Dr. Kimberly] could not be considered as "in the early phases of
assessment or psychotherapy."  Secondly, if he has brain damage, this
would affect the interpretation of his test performance, as it is typical
for those with brain damage to elevate on the compulsive scale as he
did.  Finally, one of the two characteristic defensive code-types on the
MCMI-III is that of an elevation on the compulsive scale.  That is,
rather than telling us anything about Dr. Kimberly's personality style,
his MCMI-III profile could simply reflect his defensive approach to
the test.  None of these factors were taken into consideration either by
Dr. Jay or Dr. Schrock.

Dr. Jay indicates that he also based his opinion on his conversation
with Dr. Eaton.  Dr. Jay quotes Dr. Eaton as saying, "You had the
opinion that this man could not return to work as an ophthalmologist
due to cognitive difficulties, and you thought the prognosis for any
improvement in his cognitive difficulties was uncertain."  However,
because of his agreement with Dr. Jay's characterization of Dr.
Kimberly as "highly perfectionistic and quite fearful of and intolerant
of even minor weaknesses in his cognitive ability," Dr. Jay 'opines'
that Dr. Kimberly "could not tolerate the idea of his returning to his
occupation unless he felt 100% restored."  It seems to me that Dr. Jay
overlooks Dr. Eaton's assertions about Dr. Kimberly's cognitive
difficulties, and dismisses Dr. Kimberly as having *personality traits*
that interfere with his ability to return to work

Dr. Clipson indicates that he spoke with Dr. Eaton, and that "Dr. Eaton asserts that despite
Dr. Kimberly's recovery from depression, he continues to demonstrate evidence of brain damage,
most likely as a result of chronic hypoxemia, which causes him to be unable to work as an
ophthalmologist."  (he also points out that Dr. Eaton stated he had signed a statement to that effect.)

Hartford Disability Claim Appeal Unit
October 26, 2004

We again copy other discussions contained in his report for you:

> Based on his review of the evidence available to him, **Dr. Jay does not conclude that Dr. Kimberly has no brain damage**, only that "a legitimate cognitive disorder was uncertain." He bases most of this conclusion on his interpretation of Dr. Kimberly's performance on the VSVT, which he interprets as representing "subnormal effort." As noted above, this interpretation itself is open to question, as Dr. Jay goes beyond the specificity of the interpretation offered by Dr. Schrock in her evaluation of Dr. Kimberly. However, Dr. Jay then states:
>
> > Only rigorous neuropsychological re-evaluation showing the same weaknesses, in the context of definitive cognitive symptom validity testing showing normal findings, would validate the cognitive difficulties, in my opinion[12].
>
> **This is precisely what occurred during my neuropsychological evaluation of Dr. Kimberly in July 2004.** He was administered two measures of symptom validity testing related to neuropsychological functioning, both of which demonstrated valid and compliant responding. That is, there was no evidence either of malingering or of emotional problems interfering with his cognitive abilities. In addition, the validity indicators on the Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-2) suggested a mild tendency to deny unfavorable personality traits or psychiatric symptoms, suggesting that his claims of good adjustment may be somewhat exaggerated.
>
> **Using the newest norms (2004) for neuropsychological assessment developed by Heaton, Miller, Taylor and Grant, along with demographically-adjusted norms for the WAIS-III and the WMS-III,** Dr. Kimberly demonstrates clear and convincing evidence of brain damage. The evidence includes the following:
>
> > 1)    **A Global Deficit Scale (GDS) T-score of 39 (14th percentile),** indicating mild overall cognitive impairment. This score is based upon the administration of 21 neuropsychological tests. The GDS has a specificity of 87.66%, or a false positive error rate of 12.34%, meaning that only approximately 12% of the standardization

---

[12] Noticeably, before Hartford terminated benefits, Hartford conducted no additional testing.

Hartford Disability Claim Appeal Unit
October 26, 2004

sample who do not have brain damage score as though they do using this scale. In other words, there is an 88% chance that the GDS score is accurate.

      2)     **A significant discrepancy between his Full Scale IQ score of 115 using standard norms and a Full Scale IQ score of 98** using norms corrected for age, ethnicity and level of education. This discrepancy suggests that while Dr. Kimberly may appear to possess high average intelligence in relation to the general population, <u>he is only of average cognitive ability</u> in relation to his peers. Given his history of academic and occupational success (GPA of 4.0 in high school, GPA of 3.9 in college, completion of medical school, residency and occupational stability for several years), this demographically corrected IQ score is indicative of a significant loss of intellectual ability.

      3)     **Significant discrepancies between his actual and predicted performance on measures of Verbal Comprehension and Processing Speed on the WAIS-III**, based on his performance on a measure of premorbid intellectual functioning, the Wechsler Test of Adult Reading (WTAR). This measure relies on both demographic data as well as the ability to read irregularly spelled words, an ability that is resistant to most forms of <u>brain damage</u>.

      4)     **Dr. Kimberly demonstrates evidence of impaired performance on measures of sensory-perceptual functioning, auditory comprehension, short-term memory, long-term memory, and motor functioning**. This is <u>consistent with the kinds of deficits one would expect from chronic hypoxemia</u>.

<u>**Dr. Kimberly suffers from dementia secondary to chronic oxygen deprivation as the result of OSA**. This is not just the opinion of the undersigned, it is shared by his treating psychiatrist Dr. Eaton and his psychologist, Dr. Koumaris as well. In addition, when evaluated by a neurologist, Dr. Grisolia in August of this year, the same conclusion is reached</u>. Indeed, Dr. Grisolia says:

      Consulting the literature, it is very clear that untreated patients with obstructive sleep apnea will have predominantly frontal lobe problems due to somnolence, but that even after adequate treatment, some scattered cognitive deficits persist. . . While

other factors may also account for his difficulties, it appears most likely to me that the residual hypoxemic effects of sleep apnea are the most likely contributor to his remaining cognitive difficulties.

It is the final opinion of the undersigned that <u>Dr. Kimberly does suffer from a permanent and chronic physical disability, that of dementia, or brain damage.  This physical disability renders him unable to practice as an ophthalmologist because of his deficits in memory, sensory-perceptual and motor functioning.</u>

Please direct your review to the full content of the comprehensive reports at the appeal numbered pages identified, above. (9.1234-1252, 9.1253-1279, 9.1280-1282, 9.1283-1285, 9.1286-1294).

We believe that Hartford's error will become abundantly clear after your careful, unbiased and objective review of all of Dr. Kimberly's medical and clinical information.

## DOCUMENTS RELATED TO DR. KIMBERLY's CLAIM

After benefits were terminated, we requested all information in Hartford's or its agents or employees' possession "related to" Dr. Kimberly or his disability claim pursuant to the Department of Labor Regulations.  We first received 733 documents which were supposedly Hartford's entire claim file.  It appeared numerous documents had not been sent, and we again requested all information, following which we received another 701 pages of documents.  We first thought the same set might have been sent because of the similarity of total pages, but after closely reviewing the two sets, it appears they were a different set of documents.  There were some duplicate records, but many that were not in the first set.  We sent an itemized letter dated July 14, 2004 reiterating our requests, but separately numbered the paragraphs to make it easier for you to cross-reference anything to which Hartford was specifically responding.

Hartford, through Ms. Kohler,  kindly responded by letter of August 30, 2004.  As to that letter, than you for the confirmation that (referring to the paragraph number from our July 14 letter), Hartford had/has:

(our Q)
#3\[13]:        no case management plan and/or claim management plan;

---

[13] "3.  We have not received a copy of the "Case Management Plan" and/or "Claim Management Plan."  Please forward them and place a copy to the file"

Hartford Disability Claim Appeal Unit
October 26, 2004

Page 63 of 67

#5\[14]:        no handwritten notes;

#7\[15]:        no notes, summary, outlines etc. by Cohen;

#8\[16]:        no record of Alvarado/Eaton phone conversation made;

#9\[17]:        no records from Stacey Papa, LCSW or Martha Kohler, LCSW;

#10\[18]:       no handwritten notes

---

[14] "5: there are several . . . finalized typed reports or letters that purport to summarize portions of certain alleged telephone conversations, including with Dr. Kimberly's treating specialists. Yet you have not included any of the hand written notes related to those telephone conversations so that we can insure that all of the pertinent information that was discussed was not selectively omitted or recharacterized in the process of creating the letters or reports. We are aware from work with other Hartford claims that the handwritten notes exist."

[15] "7. the records included a report dated October 10, 2001 authored by **Lori Cohen, Ph.D.** "Behavior Health" (BH) consultant, but curiously does not include any notes, summary, outline, chronology or other information authored by Ms. Cohen. It is obvious that she participated in the behavioral health aspects of the claim investigation, analysis, and/or decision-making related to Dr. Kimberly's claim for long term disability. We must request that you ensure each of her notes and information, including anything transmitted *electronically* by e-mail or inter-office network communications be included in the claim's file, and that a copy be forwarded to us."

[16] "8. the records also reflect that on . . . September 28, 2001, Ms. Cohen had a telephone conference with Dr. Eaton, yet her notes of that phone conversation are not included. This prevents Dr. Eaton or our client from verifying or addressing any concerns about the nature, extent and characterization by Ms. Cohen about the conversation and information discussed. Please provide those telephone notes."

[17] "9. we notice that a **"Stacey Papa, LCSW"** and **"Martha M. [Marty] Koehler, LCSW, CMFT"** "Behavioral Health Case Manager" (BHCM) were also involved in communications related to Dr. Kimberly's disability claim. However, their behavioral health department reports and notes and files are not included in the claim file. It appears that Ms. Papa and Koehler of the Behavioral Health department are not employed in Hartford's benefits claim department, which appear to have a separate files and notes, since their notes and reports and input are not contained in "Claim File"."

[18] "10) . . . report dated March 4, 2004 by "University Disability Consortium" ("UDC"), of Newton Highlands, Massachusetts, . . . not affiliated with the University, authored by your peer reviewer, UDC's Milton Jay, Ed.D., addressed to . . . behavioral health nurse Alvarado . . . is located together with several other letters directed to examining and treating neurologist Bena Fisher, M.D. and . . . psychiatrist Gary Eaton, M.D., in which records reviewer Jay purports to characterize certain telephone conversations he had with Drs. Fisher and Eaton. . . . none of reviewer Jay's hand-written telephone notes, or the outline of questions or notes with which he conducted his telephone interviews related to the two treating specialists were included in the claim's file. Not only are *we* unable to verify Jay's report accuracy as to *all* of the phone conversation, and who said what, but neither is the *claims reviewer* able to review that information. Please obtain those and add them to the claim materials, as they reflect the nature and character of the questions, the reasoning, the information and the process used in the claims investigation and review process. It is unquestionable that they relate to Dr. Kimberly's claim."

**page 63 of 67**

Hartford Disability Claim Appeal Unit
October 26, 2004

| | |
|---|---|
| #11\[19]: | that Hartford is unable to determine what material Dr. Jay had access to for his review |
| #12\[20]: | that the 'substantial recent summary' is only 3 pages in length (9990139-141) |
| #13\[21]: | no record of Alvarado, RN's background and training except she has her R.N.; |
| #14\[22]: | the raw data is from Hartford and not Dr. Jay |
| #17\[23]: | (was not addressed) |
| #18\[24] | that the received records were missing pp. 4 and 5 |

---

[19] "11. Nor do the claim materials that you sent reflect exactly *which records were and which were not* forwarded to reviewer Jay to read, including whether copies of all of the OSA (Obstructive Sleep Apnea) records were provided to him, the 16-course bilateral ECT treatment records, etc., all hand written notes, and all typed reports from his treating providers. Please send a copy of the materials that reflect which records were and were not reviewed by Milton Jay"

[20] "12. Reviewer Jay makes specific reference to what he called "a substantial recent summary of the medical records" provided by the behavioral health nurse, Linda Alvarado, R.N. *Yet again,* curiously, MS. Alvarado's report of "substantial recent summary of medical records" is not included in the claim materials you sent. While it appears that one version of, or aspects from it, appear in the re-printed "Summary Detail Report", her actual report that was sent to reviewer Jay, as well as the recommendations of the "method to use for clarification" mentioned in the file is not described and documented in the file. Please immediately forward these and return a copy to your claim file."

[21] "13. Nor is there any indication in the claim file that we can find related to the background and training of behavioral health nurse Alvarado. While the portions of the "Summary Detail Report" which you provided refer to her opinions, there is nothing to indicate her experience in the medical specialties implicated in Dr. Kimberly's claim, preventing Dr. Kimberly through our office from reasonably addressing any concerns. Please also provide us with all other notes and information transmitted to, from or in Nurse Alvarado's possession, or that she has ever prepared or used in her approach to this claim. Please add a copy of those documents to the claim-related documents"

[22] "14. . . . Jay also refers to his review of copies of the *neuropsychological raw data* that he states accompanied Dr. Schrock's neuropsychological evaluation of May 9, 2003. Yet again, Hartford has excluded those copies from the claim materials. Please return a copy to your claims file, and provide us a copy of the raw data that Milton Jay reviewed, and specifically his copy that he wrote any hand-written notes, and return a copy of that version to your claim-related documentation in the claim file.

[23] "7. Reviewer Jay argued "no cognitive symptoms validity testing was [allegedly] conducted". Jay does not state what test he is referring to, or what part of the neuropsychological examination conducted by Dr. Vincent was inconsistent or inaccurate with the consistent reports of memory loss reported, or why such validity testing was allegedly required such as inconsistent reporting of memory loss and cognitive impairments in medical records (which we have not noted anyway). Since he alleges such testing should have been done, please provide us with the "Cognitive Symptom Validity Testing" protocol to which Milton Jay refers, and reliable information that discusses the sensitivity, specificity, predictive accuracy and validity of the alleged "Cognitive Symptom Validity Testing" that allegedly forms the basis of his statement"

[24] 18. Jay states that p.5 of Dr. Vincent's 6-page narrative report was missing from the records available to him (although all of the pages of his report are missing from the "claim file" sent to us). Please indicate whether he ever asked the claims department or the nurse to provide him with the missing page (which discusses the Wechsler Memory Scale III and initial 4 points of Summary and Conclusion points), and whether that page was ever provided to Jay. . . .

**page 64 of 67**

Hartford Disability Claim Appeal Unit
October 26, 2004

| #20\[25]: | (noting, no mention of extension) |
| #21\[26]: | (not addressed in full) |
| #22\[27]: | not done |
| #24\[28]: | not addressed - and no record from Dr. Jay concerning his alleged attempt to contact Dr. Koumaras |
| #25\[29]: | (not done) |

---

[25] "20. Dr. Jay also refers to an extension he obtained from behavioral health consulting nurse Alvarado for doing his "record review". We have not seen Ms. Alvarado's notes related to either reviewer Jay's request or the reason for the delay, or Ms. Alvarado's granting of the extension, when that occurred, or how long an extension it was, or why it was Ms. Alvarado who granted the extension instead of the claim representative. Please provide us all of those notes

[26] 21. ... provide a copy of Milton Jay's [CV] in effect in early March 2004. ...advise 1) whether he is board certified by the American Board of Clinical Neuropsychology (ABCN) and/or the American Board of Professional Neuropsychology (ABPN), 2) whether he has a doctoral degree in psychology from an accredited university training program and an internship or its equivalence in a clinically relevant area of professional psychology, for instance, as required by the National Academy of Neuropsychology (NAN); and specifically, whether he has either a Ph.D. or Psy.D.? There is no indication in the claim file that relates to the background and experience of this reviewer on which Hartford has relied. Please provide all of the file materials that document the date of Hartford's inquiry into the background and training of this peer reviewer with UDC before using him and relying on his comments. If you have prior experience with him, please advise us how many times Hartford has used him for its peer reviews, and also of the times Hartford has used him, how many times he has actually interviewed the claimant and performed actual testing and clinical analysis of the patient. More particularly, we are interested in how many times he has treated patients in the last five years who have significant OSA and concurrently underwent multiple (16) bilateral ECT treatments.

[27]22. Please obtain, add to your claim's file, and provide us with a copy of Milton Jay's complete set of papers related to Dr. Kimberly or his claim.

[28] "24. we understand that the Dr. Kimberly's long-treating psychologist, Robert Kourmaras, Ph.D., was contacted by reviewer Jay when Dr. Koumaras was on a short vacation, (although he does not state that was in late February 2004, 2 months prior to the denial letter, and on his return on or before March 18, 2004, Dr. Koumaras returned the call but was told a decision had been made without his input. Please advise why these communications are not documented in the records. They occurred at least five weeks prior to issuing the decision denying benefits. Please place a copy of the note related to the receipt of Dr. Koumaras' call and the content of the conversation in the claim file.

[29] 25. We also note several records are contained in the claim file that are questionnaire forms addressed to Paul Revere, attached to which is a copy of a signed (by Dr. Kimberly) authorization for the release of information to the Hartford. The questionnaire form, dated November 16, 2001 (enclosing records release authorization), specifically asks Paul Revere to forward to Hartford copies of "any pertinent detailed medical records (hospital or physician),... any Independent Medical Examinations, Activity Checks, or In-person Interviews regarding [Dr. Kimberly]". While you included the completed questionnaire form, you did not include any of the documents that Paul Revere sent. Perhaps you keep other disability insurer's claim's file materials related to a claimant's LTD claim in a separate file folder, or a separate section of a multi-leafed claim file. Irrespective of how the other insurer's records related to a claim are filed, it is information that you have obtained related to a claim during your investigation of that claim, which should have been included in the records which you forwarded to us. It has been our rather substantial experience that one insurance company requests records of another, there is inter-insurer cooperation related to the investigation of the claim. Please provide us with <u>all</u> records you received from Paul Revere.

Hartford Disability Claim Appeal Unit
October 26, 2004

#26\[30\]:     (not provided or explained)
#27\[31\]     (not done)

Also, when we sent our letter of July 14, 2004 enumerating the various things we believed may be missing and our August 27, 2004 follow up to that letter (which indicated we may require an etension of the date by which to submit an appeal due to the delay), and then received the second set of approximately 700 pages on September 1, 2004, we initially thought the second set must be nearly the same as the first set of approximately 700 pages since the representation about the first set is that it was the complete claims file. However, there were *many many* new and different records in the second set that were not in the first set, which we did not even realize for several weeks, making it very difficult to then go back through the two sets to determine what in fact was new and what was duplicated. This could easily have been described by Hartford in a cover letter. Unfortunately, our delayed receipt of these documents in addition to not even advising us they in fact were a different set of documents will make finalizing Dr. Kimberly's appeal by the 180-days after receipt of the benefits termination letter very difficult. We reserve a short extension if it becomes necessary by which to mail the appeal due to our delay in getting the records we requested from Hartford.

We are concerned about medical documentation that Sharp Rees Stealy indicates was sent to Hartford in mid 2003, but which was not included in the claim file (either version of it). These include SRS physician, Drs. Sack's, Tesar's and Chung's records in and after mid 2002, Dr. Fisher's last record in late 2002. We are also concerned with the complete lack of any information and investigation by Hartford into features and symptoms of Sleep Apnea Syndrome —specifically OSA —as it impacted and residuals continue to impact Dr. Kimberly.

Respectfully, Dr. Kimberly is and has not been disabled by "mental illness" but by a physical illness manifested by a number of symptoms that include depression, and developed dementia, with real evidence of brain damage, cause by chronic hypoxemia. He has and continues to be disabled by symptoms which appear to have at all times been caused by a disease process associated with aging and risk factors of hypertension, weight gain and physical anatomy in the head/neck, —specifically, Obstructive Sleep Apnea, and *related to which apparently profound and extended or chronic episodes or periods of hypoxemia have caused permanent brain damage and resulting cognitive deficits.*

As this information became available to Hartford, his disability claim and the provisions of the policy under which it was paid, should have been corrected from 'mental illness' to a physical illness manifesting a number of symptoms, which initially included low energy, loss of interest, feeling overwhelmed, some psychomotor retardation, irritability, mood swings & fatigue/tiredness/ somnolence, trouble getting out of bed in the morning, concentration difficulties, anxiety and

---

[30] 26. provide...the exact version of Norms and any Global Deficit Scales used by ...Jay for his... report.

[31] 27. provide...any... information to which Milton Jay referred as reference materials regarding bilateral ECT, OSA, chronic or acute oxygen deprivation, etc., in the preparation of his report

Hartford Disability Claim Appeal Unit
October 26, 2004

depression. He had 44 pound weight gain initially, neck girth exceeding 17 inches, and has had and continues to have hypertension, either systolic and/or diastolic. His presentation was classic for OSA from the beginning of his disability, despite the fact that it was not initially diagnosed or recognized as the culprit.    Because of the delayed diagnosis and delayed effective treatment of OSA, this unfortunate man has suffered permanent damage which will never allow him to practice as a physician again.

We trust that once you review the information we have presented with your past file as a whole, that you will overturn the termination of his disability benefits which was clearly in error. Dr. Kimberly is entitled to continued payment of benefits, retroactive to the date payment ceased, plus simple interest thereon at 10% pursuant to the California Insurance Code, which should be forwarded to our office, payable to Miller, Monson, Peshel, Polacek & Hoshaw and Kent Kimberly.

Very Truly Yours,

MILLER, MONSON, PESHEL, POLACEK & HOSHAW

Susan L. Horner

SLH:
cc:  Kent E. Kimberly, M.D., ophthalmologist

W:\LIT\LITH-L\KIMBERLY MD\Letters\Kimberly_APPEAL 10_26_04.wpd

From Carolyn Kimberly

Kent was a highly intelligent person, as shown by his academic achievements, always focused, easily able to remember things, very precise and task oriented.

When he began to feel not well in 1998 he was fatigued, seemed to be in a fog and constantly complained of being tired and dragged down. He was becoming progressively overwhelmed by a life he had handled easily and excellently.

This came to a peak when he was driving home from work in July of 2001 and fell asleep/dozed off and sideswiped the wall on the freeway.

After this as he saw many doctors and tried many psychiatric medications, but nothing seemed to change his overall feelings and physical difficulties of poor energy and health. He had a hard time concentrating and completing things.

He was eventually tested for sleep apnea after I brought to the attention of his doctors that he seemed to be "holding" his breath while he slept. However, he was not a snorer, as are most patients with sleep apnea. He did not fit the doctor's usual profile for this disease. Initially after the test showed that he had a significant problem with sleep apnea he got a basic CPAP machine and when he could tolerate it, he began to feel somewhat better. The machine was not easy for him to use. It was uncomfortable forcing unhumidified air down his nose into his lungs and many nights he removed it during his sleep and it ended up on the floor.

After continuing to feel fatigued and constantly tired, it was recommended that he have ECT treatments. During the course of 16 treatments he never felt any better and in fact some things began to become worse. After 16 treatments and the fact that he was becoming quite confused and disoriented, the alarmed doctors abruptly stopped treatments.

During the course of his treatments and ever since then I have noticed changes in Kent. He will do things, or not do things, that were never a part of his previous behavior.

Concentration and memory seem to be his biggest difficulties. He never before would forget what he was going to say during a conversation. In fact, he would usually help me to remember what I was going to say. Now he often has to stop and not only remember what he was going to say but he has to search for the words and sometimes simply cannot remember at all. Our family has adjusted by being very conscious of the fact that he has these difficulties and we make an effort to listen more carefully and never interrupt his thoughts so he can try hard to finish what he was thinking. I have found that he will also say the wrong word for something.

Comprehension is also difficult for him. When he is watching something on television or having a conversation with someone he will often turn to me to ask me what was said. If he is relating an incident to someone he will look to me to help him remember what he was saying and sometimes want me to finish because he cannot find the words to complete his thought.

There have been instances when we have had entire conversations about something and then at a later date or time he will not remember any part of that conversation. One time we were sorting and cleaning out the garage and I told him he needed to get a particular large empty box from upstairs and bring it down to the trash. We were just standing there face to face and I was telling him where it was and why it was there and that he needed to get it and bring it down to the trash. It was not just a passing comment. He acknowledged that he understood. When we came in the house just a few minutes later and I asked him whether he had gotten the box and he asked "what box". I responded by telling him the

box we had talked about a few minutes before and he looked at me with a blank face and had no recollection of the conversation. We also had a lengthy discussion about flooring in our home, including looking at brochures, etc., and sometime later when I brought it up again he had no recollection of the discussion even after I showed him the brochures he had seen previously.

He will sometimes try to cook or prepare a meal or snack for himself. In the past when he would do this he always put everything away and completed this task like any other adult. Now I have to be aware of what he is doing. He leaves the stove burner on, he will leave food and containers out on the counters and remembering where things are in the kitchen are hard for him. I have watched him open every drawer looking for the silverware.

If he goes out on errands he must now take a detailed list of where to go and what to get. He has gone out to do a couple of things and would return only completing one of them. One time he went out to go to the post office and get gas in his car. He went to the post office and returned totally forgetting that he was going to get gas. He went to make copies of documents and left the originals in the machine. He now takes a small amount to copy at one time and makes several trips in order to get what he needs.

He is easily distracted and will do things over, forgetting that he has already done them. One time he went out the the mailbox to get the mail. He brought it in, began sorting it and became distracted by something else. He left the mail spread out on the table never coming back to finish. A little while later he went out to the mailbox to get the mail again. He sets the sprinklers to run and forgets to turn them off. After doing this several times now he writes notes or sets timers to remind himself.

Kent never before had difficulty reading instructions and assembling things. He would complete these tasks by himself and quickly. How if we have something to put together with detailed written instructions, we work on them together. I will read them to him and we will reread, discuss and work together. He becomes confused by this type of thing. His concentration and the ability to follow step by step directions are hard for him.

It has become hard for him to learn new things. Previously I was the one that always turned on and off the thermostat for the heaters/air conditioners in the house. Now that Kent is home more he wanted to know how to use them. I have shown him several times and he cannot remember how to set the controls. Each time he is perplexed by them.

He always had a good memory of what he had seen at the movies or on television. He never wanted to see a movie again or watch an episode of a television program over. Now when we are watching something that we have seen and one of us mentions that he has seen that recently, he often has no memory of seeing it. Even after we try to spark his memory to help, he will still not remember.

Completing things are also hard for him. He spends lots of time trying to do yard work and completing chores in the yard of our home. These tasks now take him a lot longer to do and he often leaves things unfinished, forgetting to go back to them later.

Kent also always handled all the financial duties for our family. Now we do these together, or he at least brings things to me to check after finding that he was making mistakes. He also previously took care of his own medications but now after becoming confused about this several times, I handle it for him. He is afraid of taking the wrong medications or making a mistake about doses. He has taken his morning medicines twice in one day. I now place out his medications just before he arises and I tell him to take them plus I watch while he actually takes them.

CAROLYN KIMBERLY