# EXHIBIT C

# EXHIBIT C



THE
HARTFORD

January 26, 2005

Miller, Monson, Peshel, Polacek & Hoshaw
The Koll Center
501 West Broadway, Suite 700
San Di8ego, CA 92101-3563
Attention: Atty. Susan Horner

Re:   Claimant:        Kent Kimberly, M.D.
      Policy Number:   GLT036915
      Policyholder:    Sharp Rees-Stealy Medical Group, Inc.

Dear Ms. Horner:

We are writing in regard to your appeal of the termination of Dr. Kimberly's claim for Long Term Disability (LTD) benefits under the above captioned group policy.

Under the group policy Dr. Kimberly is entitled to an independent review of the claim facts and the determination made regarding his eligibility for benefits. As such, his file was referred to our Appeal Unit to conduct such a review. The review has been conducted separately from the individuals who made the original decision to terminate benefits and without deference to said determination.

Our determination remains that the documentation previously contained in Dr. Kimberly's LTD claim file, in adjunct with the additional information received from your office on appeal, taken as a whole, supports the prior adverse benefit decision. Therefore, we must uphold the decision to terminate LTD benefits.

Please refer to Jeanne Kohler's letter dated April 29, 2004, that lists the policy provisions that apply to this claim and the evidence in the claim file used to make the initial adverse benefit determination. Our decision to uphold the termination of this claim is based upon that evidence, your letter of appeal, and the following additional information:

1. 7/9/04 – Dr. Clark Clipson – Neuropsychological evaluation report
2. 9/28/04, 12/28/04, 1/5/05 – Dr. Clark Clipson - letters
3. 1/21/05 – University Disability Consortium – medical record reviews
4. 8/7/04 – Dr. James Grisolia – neurologic comprehensive evaluation
5. various internet articles on obstructive sleep apnea, hypoxemia
6. 10/26/04 – Atty. Susan Horner – appeal letter

Mailing Address: P.O. Box 2999
Hartford, CT 06104-2999

7. 4/6/93 to 10/2/04 – medical documentation
8. 12/10/04, 12/22/04, 1/6/05 – Atty. Susan Horner - letters

Records show that Dr. Kimberly left his position as an Ophthalmologist on May 31, 2001. He was approved for LTD benefits under the Mental/Nervous provision of the policy through September 6, 2003. Prior to the exhaustion of his benefit under the Mental/Nervous provision of the policy, Dr. Kimberly advised us that he was, in fact, disabled due to Obstructive Sleep Apnea because he and his spouse believed that this was actually the primary disabling condition. We agreed to extend his disability benefits and investigate his claim further.

Information was obtained, including neuropsychiatric evaluation reports from testing that had been performed in 2002 and 2003, including the raw data from the 2003 testing. Dr. Kimberly's file was then referred to the University Disability Consortium (UDC) for a medical record review, and it was determined that his OSA was under reasonable control and his depression was mild in nature. Other physical conditions of hyperlipidemia, hypogonadism, and sella syndrome were not considered to be disabling him from returning to work either. The physician from UDC spoke with Dr. Kimberly's neurologist and primary care physician before formulating the report. Based on this report, and a review of Dr. Kimberly's LTD claim file, it was determined that his physical condition was not preventing him from performing his own occupation and because his benefits had been exhausted under the Mental/Nervous provision of the policy, he no longer satisfied the policy definition of disability and his claim remained terminated.

On appeal, your office submitted additional information for consideration, including a neuropsychological report from Dr. Clark Clipson and a neurology report from Dr. Grisolia. Dr. Clipson noted that in his opinion, Dr. Kimberly suffers from dementia secondary to chronic oxygen deprivation as the result of his OSA, the opinion of which is shared by Drs. Eaton and Koumaris, and also Dr. Grisolia.

Based on the new medical documentation previously unavailable for review, it was determined that independent medical record reviews were warranted at the appeal level to clarify Dr. Kimberly's conditions and level of functionality. Therefore, medical information obtained during the course of the original claim investigation process, as well as that submitted for review by your office on appeal was forwarded to the University Disability Consortium (UDC). UDC was directed to arrange independent medical record reviews of Dr. Kimberly's case. UDC arranged for Dr. V. Leyenson to review the available medical information contained in Dr. Kimberly's file with an eye toward his concerns regarding the impact of his OSA on his cognitive abilities. Dr. Leyenson is Board Certified in Sleep and Pulmonary Medicine. Dr. Jackie Olander completed the Neuropsychological medical record review of Dr. Kimberly's file. She is Board Certified in Neuropsychiatry.

As noted above, the purpose of requesting these reviews was to obtain clarification of Dr. Kimberly's functional and psychiatric capabilities. Beginning with September 1, 2003, and ongoing to the completion of the medical record review, UDC was asked to have the

reviewing physicians identify any restrictions and limitations that are appropriate given his medical conditions. In the event that any restrictions were identified, UDC was asked to have the reviewing physicians assess how long these would be expected to last. They were also advised to contact the physicians if it was deemed necessary.

Dr. V. Leyenson reviewed the file with a focus on matters pertinent to the effect of OSA on behavioral deficits and cognitive abnormalities. In the report submitted by Dr. Leyenson, in part, he noted that Dr. Kimberly had undergone three sleep studies, and that the third study indicated that with the use of a biPAP machine, his symptoms were significantly improved. He spoke with Dr. Kimberly's psychiatrist, Dr. Eaton, who advised him that Dr. Kimberly's depression was completely cleared and he was no longer on anti-depressants. He also noted that Dr. Kimberly had more behavioral abnormalities than major depression at this point.

Although Dr. Leyenson reviewed all records, including the neuropsychiatric evaluations, he deferred the explanation of the reviews of these reports to his co-reviewer who is a neuropsychologist, and focused on the polysomnogram data and what impact untreated OSA could have on a person. He noted again, however, that although Dr. Kimberly's first polysomnogram showed extremely severe OSA, a second study showed significantly diminished events and drastically improved oxygen saturations and breathing. And, the third study noted that his biPAP machine was being well tolerated and giving him significant improvement in sleep and daytime symptoms. Dr. Leyenson did indicate that without treatment, things such as behavior and memory deficits and social problems can occur, but with treatment, symptoms mitigate or are eliminated altogether, and it is "highly unusual that patients with obstructive sleep apnea would develop organic brain syndrome". This is because it would require "persistent hypoxemia of severe degree to cause brain damage and loss of brain cells". Dr. Leyenson concluded stating it was his opinion that OSA is not a cause of organic brain disorder, and although it might contribute to that condition during certain periods when not treated adequately, it would not cause permanent damage associated with organic brain disorder. Dr. Kimberly was adequately treated and there is a "lack of data suggesting adequate follow up such as nocturnal pulse oximetry or follow up sleep study". However, his physician stated that he was comfortable with the biPAP, which strongly suggests that it was effective, and if so, there is no data to counter that it would leave any permanent functional restrictions or limitations, and therefore, Dr. Kimberly has no restrictions or limitations as regards his OSA.

The file was also reviewed by Dr. Olander, Board Certified in Neuropsychology, who requested the raw data from Dr. Clark Clipson, the psychologist who performed neuropsychologic evaluations on Dr. Kimberly on June 18, 2004 and July 4, 2004.

The report submitted by Dr. Olander concluded in part that Dr. Kimberly has a chronic history of depression for which he has received multiple treatments including psychotropic medications, therapy and electric shock therapy. His various mental health providers have related his condition to perceptions of support, situational factors associated with his job and family, feelings of rejection, narcissistic injuries, and

problems with job and personality conflicts. He obsesses over minor things, has difficulties with anxiety, and relies on his "wife's reality". He was diagnosed with Obstructive Sleep Apnea (OSA) in November 2001, and in July 2001 a neurological consultant noted that he had a mild problem with memory and concentration, but on a November 2001 examination it was noted that his memory appeared intact.

Dr. Kimberly's complaints of frequent memory difficulties did not emerge until after his ECT treatment began. Dr. Olander noted that some testing done in August 2002, for the purposes of disability, was difficult to interpret because no validity measures were administered and no other instruments were administered to assess alternative sources that could account for test findings other than self-report data. In addition, because of Dr. Kimberly's significant depression, it could affect the interpretation.

Dr. Kimberly had neuropsychological testing with Dr. Schrock in May 2003, at which time she found that "overall clinical findings revealed few actual deficits and appeared close to premorbid estimates, and did not provide evidence to suggest the presence of a cognitive disorder".

Dr. Clipson performed a neuropsychological test thirteen months later. Dr. Olander noted that she had some concerns regarding the testing because of several issues, which in turn lead to questions regarding the subsequent diagnoses Dr. Clipson made. Dr. Olander noted that while Dr. Kimberly's profile on the MMPI-2 was within valid limits, it might underestimate his present problem situation because he is "responding in an effort to look good", and therefore, his denial of psychiatric problems may be questionable.

Her second concern is that Dr. Clipson used data that was over a year old, and in a forensic case it is important to use current data. She was unclear as to why he used the old data instead of administering new tests. In addition, he scored the data with demographically adjusted norms, obtained a Full Scale IQ of 98, and interpreted as indicative of a significant difference. She stated, however, it is important to note that the use of demographically adjusted norms suggests that his performance is being compared to a group of similar individuals such as highly educated white males of similar age and then when his scores are in the average range it suggests his scores are comparable to this norming group. Dr. Clipson's statement that Dr. Kimberly's performance on the WAIS-III test suggested mild to severely impaired to average ranges was not consistent with the data. He also used incorrect standards of practice to interpret the IQ tests. She noted that "a rating of cognitive impairment should be based upon finding consistent deficits on similar measures, otherwise, test interpretation is more suggestive of pseudo-neurological factors such as depression. However, this was not the case. She indicated that Dr. Kimberly had one deficit out of three measures, but performed above average in the two harder tests.

She questioned Dr. Clipson's statement that there was no evidence found to suggest that Dr. Kimberly relies on somatization defenses, because on personality measure, his score showed that he has a tendency to develop physical symptoms.

Based on these concerns, Dr. Olander concluded that "insufficient data was found to support Dr. Clipson's diagnoses. And, she concluded, since Dr. Grisolia appeared to base his conclusions of cognitive impairment based upon the neuropsychological test results, his findings are also questionable".

Therefore, based on information received from your office on appeal, reviews received from the University Disability Consortium, and documentation previously contained in Dr. Kimberly's LTD claim file, our determination remains that the documentation on file, taken as a whole, supports the prior decision. Therefore, we must uphold the prior decision to terminate benefits.

This determination as described in the above analysis represents our final decision on this claim. The Hartford reserves all rights and defenses available to us in making our determination as well as the right to fully investigate any additional claims brought by Dr. Kimberly, or his legal representative, in conjunction with this Policy.

Dr. Kimberly is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to this claim. He may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA").

Dr. Kimberly may also have this matter reviewed by the California Department of Insurance by writing directly to them at the following address:

> California Department of Insurance Consumer Service Division
> 300 South Spring Street, 11th Floor
> Los Angeles, CA 90013
> Telephone - (213) 897-8921 or (800) 927-HELP

Please be advised that we are closing Dr. Kimberly's claim file at this time, and no further action will be taken with respect to this claim.

Sincerely,

*Judith Rose*

Judith Rose
Appeal Specialist
Benefit Management Services
Hartford Life and Accident Insurance Company